# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Case No. 12-24400-FAM

UNITED STATES OF AMERICA,
STATE OF FLORIDA, *et al.*

     Plaintiffs,

v.

MIAMI- DADE COUNTY,

     Defendant.

_____

BISCAYNE BAY WATERKEEPER, INC.,
*et al.*

     Plaintiffs-Intervenors; and

_____

MIAMI-DADE SEWER AND WATER
EMPLOYEES, LOCAL 121 OF THE
AMERICAN FEDERATION OF STATE,
COUNTY, AND MUNICIPAL EMPLOYEES,
AFL-CIO and EMILION AZOY,

     Plaintiffs-Intervenors.

_____/

## BISCAYNE BAY WATERKEEPER AND JUDI KOSLEN'S RESPONSE IN OPPOSITION TO MOTION TO ENTER CONSENT DECREE

Paul J. Schwiep, Fla. Bar No. 823244
Coffey Burlington, P.L.
2699 South Bayshore Drive, Penthouse
Miami, Florida 33133
Phone: 305-858-2900
pschwiep@coffeyburlington.com

Julie Dick, Esq., Fla. Bar No. 86455
Abraham Law Group
151 Crandon Blvd., #100
Key Biscayne, FL 33149
Phone: 786-224-4555
jdick@abrahamlawgroup.com

James M. Porter, P.A, Fla. Bar No. 443239
9350 S. Dixie Highway, 10th Floor
Miami, Florida 33156
Phone: 786-425-2299
Jim@JamesMPorterPA.com

Plaintiffs/Intervenors Biscayne Bay Waterkeeper, Inc. and Judi Koslen (collectively, "BBWK") submit this Response in Opposition to the Plaintiffs' Motion to Enter Consent Decree, ECF 86. The Motion should be denied because the proposed Consent Decree is not fair, reasonable or in the public interest.[1]

## Introduction

The United States, the State of Florida, and the Florida Department of Environmental Protection ("FDEP, collectively, "Plaintiffs") move for the entry of a consent decree (the "Decree") that will guide the reconstruction of Miami-Dade County's (the "County") three wastewater treatment plants ("WWTPs") and the operation of the County's wastewater sewage system for the next 15 years at a cost of $1.6 *billion* dollars. *See* ECF 25-9 (identifying the cost of new capital projects alone at $1,550,634,370). Before entry, this Court must evaluate all relevant facts to determine whether the proposed Decree is fair, reasonable and in the public interest. *See* ECF 87, at 7 (citing *Metro. Housing Dev. Corp. v. Arlington Heights*, 616 F.2d 1006 (7th Cir. 1980)). If the Court finds for any reason that the proposed Decree falls short of these requirements, it should be rejected. *US v. Cannons Eng'g Corp.*, 899 F. 2d 79 (1st Cir. 1990).[2]

As a preliminary matter, the proposed Decree must be viewed in the context of the County's sewage system's sordid history of Clean Water Act ("CWA" or the "Act") violations.[3]

---

[1] The issues for the Court's consideration are factual and disputed. Both Plaintiffs and BBWK have filed evidentiary materials including affidavits that create genuine factual issues for the Court's resolution. Accordingly, an evidentiary hearing with witnesses subject to cross-examination is appropriate. *See, e.g., US v. City of Akron*, Case No. 09-272, 2013 WL 999909, at *1 (N.D. Ohio Mar. 13, 2013) (court conducted six-hour fairness hearing taking testimony appropriate to the issues). BBWK requests that the Court convene at its earliest convenience a status conference to resolve the precise nature of the hearing on Plaintiffs' motion.

[2] *See, e.g., S*ierra Club v. Hamilton Cnty. Bd. of Cnty. Comm'rs, 504 F.3d 634 (6th Cir. 2007) (court rejected proposed consent decree and directed the parties to either prepare for trial or revise the decree).

[3] As described in *City of No. Miami v. Train*, 377 F. Supp. 1264 (S.D. Fla. 1974), and in a May 11, 1992, Grand Jury Report, *In Circuit Court of the 11ᵗʰ Judicial Circuit of Florida in and for the County of Dade, Fall Term, A.D. 1991*, *Final Report of Grand Jury* (Greenbaum, J.)(ex. 1

1

This is not the first time the US and the County have come before this Court requesting judicial approval of a consent decree and promising compliance with the Act.  In 1993, the US brought suit against the County alleging that the sewage system was being operated in violation of the CWA. *See* Case No. 93-CV-1109-FAM, ex. 2 hereto.  The US alleged that (1) ongoing discharges of raw sewage from broken pipes and pump stations to surface waters (Sanitary Sewer Overflows or "SSOs") represented "an imminent and substantial endangerment to the health and welfare of persons"; and (2) a force main running under Biscayne Bay to the Central District Plant on Virginia Key was at risk of catastrophic failure and thus also represented an "imminent and substantial endangerment." *Id.* ¶¶ 50, 56. The US and the County resolved that litigation through two consent decrees.[4]  The First Partial Decree addressed the Biscayne Bay force main while the Second and Final Partial Decree addressed the SSOs, requiring that the County implement substantial improvements to its wastewater infrastructure. *See* Decl. of Mark J. Klingenstein, P.E., ECF 87-5, ¶¶ 37-40 (hereinafter, "Klingenstein Decl. ¶ __").  Collectively, those Decrees were intended to fully bring the County into compliance with the CWA and each required the US Environmental Protection Agency ("EPA") to oversee compliance.

The US now claims that the County did "one heck of a job" implementing the two decrees "meeting all required deadlines and/or extensions thereto." *See* Declaration of Brad Ammons, ECF 87-1 ¶ 7 (hereinafter, "Ammons Decl. ¶ __").[5]  But the inescapable truth is this: Eighteen years after those two Consent Decrees were approved by this Court the County remains

---

hereto), the County's sewage system has historically been plagued with Sanitary Sewer Overflows (illegal discharges of raw sewage) of various causes, triggering periods of capital expenditures followed by inadequate maintenance creating "boom and bust" cycles of violations.

[4]   The First Partial Consent Decree was dated 1/13/94 and was entered by this Court on January 18, 1994, (Civ-93-1109-Moreno, ECF 36). The Second And Final Partial Consent Decree was dated 4/17/95, and entered by this Court on September 12, 1995 (*Id.* ECF 118)(Ex. 3 & 4).

[5]  Although the County may have technically met deadlines, some deadlines were extended to the point that 18 years after entry, the County has yet to implement all the requirements of the 1995 Decree. Deposition of Doug Yoder at 64 (hereafter cited as "Yoder dep. at __")(Ex 5 hereto).

in persistent and continuous violation of the CWA.  Just in the past five years alone SSOs resulted in the illegal discharge of 50 million gallons of raw sewage into local surface waters, including Biscayne Bay. ECF 87, at 1 n.1.  Hundreds, if not thousands, of additional violations occurred over that same time. *See* Ammons Decl. ¶¶ 28-40 (identifying hundreds of violations); *see also* ECF 76 (wherein thousands of violations are identified).  In addition, yet again a force-main under Biscayne Bay to the Central Plant on Virginia Key is in "imminent danger" of catastrophic failure. *See* Mem. Fr. Carlos A. Gimenez, Mayor, Miami-Dade Cnty., to the Bd. of Cnty. Comm'rs. (July 17, 2012) (ex. 6 hereto).

As a consequence of the County's ongoing violations, the US finds itself in the awkward position of publicly congratulating the County for its performance under the prior decrees (and thereby defending EPA oversight) while at the same time pursuing a new CWA enforcement action against the County. The US explains that the County was able to meet "all required deadlines and/or extensions thereto" under the 1994 and 1995 Consent Decrees while simultaneously routinely violating the CWA because those earlier decrees were "mostly focused on eliminating capacity needs," *see* Ammons Decl. ¶ 23, whereas the recent SSOs are due to the deteriorated condition of the force mains, *id*. ¶ 29, and deferred maintenance, *see* Klingenstein Decl. ¶ 45. But from a CWA perspective cause hardly matters:  repeated CWA violations occurred under EPA supervision and while the County was under consent decrees.

It is telling that the US again alleges, just as it did in 1993, that (1) repeated SSOs represent an "imminent and substantial endangerment"; and, (2) a force main running under Biscayne Bay to the Central District Plant on Virginia Key represents an "imminent and substantial endangerment." *See* ECF 1 ¶¶ 89, 94.

The SSOs and other violations identified in Plaintiffs' complaint occurred because the County, after funding the capital improvements required by the two existing Decrees failed to

adequately fund operation and maintenance of the sewage collection and transmission system.

11/30/12 Decl. of Dr. Michael Kavanaugh (hereinafter "Kavanaugh 11/30/12 Decl. ¶ __," ex. 7 hereto); 12/3/13 Affidavit of Emilio Azoy (hereinafter, "Azoy Aff. __," ex. 8 hereto).  The failure to adequately fund operation and maintenance of the system occurred in violation of paragraph 8 of both prior decrees which required that that the County "take all steps necessary to minimize further unpermitted discharges of untreated wastewater containing raw sewage to local surface waters." *See* Cnty. Resp. to Waterkeeper/Koslen Request for Admission # 129, ECF 77-1 (admitting the County failed to take all steps necessary to minimize future SSOs as required under the 1995 Decree)(hereinafter cited as "County RFA Resp. # ___"); US Amended Response to Waterkeeper/Koslen Request For Admission # 71, ECF 77-4 (same) (hereinafter cited as "US Am. RFA Resp. # __").  Instead, the County continually looted Water and Sewer Department ("WASD") revenues, transferring over $200 million dollars from the WASD to the County's general revenue fund. *See* County RFA Resp. # 177-178 (admitting that between 1995 and the present date the County transferred over $200 million from WASD accounts to the County's General Revenue Fund).  As a consequence, these funds were not available to WASD for operation and maintenance activities. *Id.*  This lack of funding caused or contributed to violations of the CWA.[6]  The County was able to divert WASD revenues for other purposes because the 1994 and 1995 Decrees did not prohibit the County from redirecting O&M funds, did not require that the County adequately fund maintenance of the system, and because EPA failed to enforce the prior decrees' "all steps necessary" requirement.

---

[6] *See* Yoder dep. at 59-60, 65-66 (acknowledging that the loss of $200 million was a cause of the County's failure to take all steps necessary to minimize future SSOs as required under the 1995 Decree and contributed to the current violations; *see also* County RFA Resp. # 96 (acknowledging operation and maintenance violations identified by EPA were caused in part by a lack of funding); Klingenstein Decl. ¶ 107 (stating County's deferred maintenance "caused and contributed to ongoing SSOs and plant discharge permit violations.").

At the same time the County was repurposing WASD revenues, the County Commission declined to raise sewer rates, keeping them instead among the lowest in the Country. *See* May 18, 2013, Miami Herald Editorial, Miami-Dade Water Fee Must Increase for Health's Sake ("Miami-Dade residents have long enjoyed some of the lowest water bills in the country, a result of political reluctance to raise rates…. But this self-serving expediency has now backfired, with the deterioration of the system for lack of proper funding.") (ex. 9 hereto.)

BBWK brought these issues to the attention of the US during the proposed Decree's public comment process and suggested that the Decree be modified to account for the lessons learned from the prior Decrees. The US received more than 1,800 pages of comments from 75 individuals or entities during the comment process, 74 of whom commented in opposition to the proposed Decree, including the Mayors of Key Biscayne, South Miami, and Pinecrest. *See* ECF 87-6, US Notice of Filing Exhibits, ECF 88. Notwithstanding the many suggestions offered to improve the proposed Decree, the US stubbornly refused to change even a single word.

In light of the County's demonstrated violations of the CWA while acting under EPA oversight and pursuant to two judicial Decrees, and applying lessons learned from the County's history of CWA violations, BBWK suggests that the proposed Decree is not fair, reasonable, or in the public interest for the following reasons:

1.      Failure to Account for Climate Impacts.  The US has advised that it is "imperative" that the County take steps to protect the new capital projects from climate impacts, including sea level rise, storm surge, and flooding. *See* ECF 87-6, at 7.  But the US has declined to expressly require the County do so.  Instead, the US has elected to rely on the County's aspirational assurances that climate impacts will be addressed during the "design and engineering" phase. (Ammons Decl. ¶ 73; Klingesnstein Decl. ¶¶ 94, 98.)  According to WASD Deputy Director Doug Yoder, however, because the proposed Decree does not expressly require

the County to implement such measures, decisions whether, when, and how to protect the three coastal treatment plants from climate impacts is within the County's unbridled discretion and there is "no guarantee" the County will do anything whatsoever to account for such impacts. *See* Yoder dep. at 78-80. Based on past experience, there is a substantial public risk that items not specifically required to be performed may go undone. The proposed Decree should require the County to evaluate now known and expected impacts of climate change including sea level rise, storm surge, and flooding and account for such impacts as part of the Decree's implementation.

2.      <u>Lack of Concrete Compliance Deadlines</u>.  Although EPA has known of the County's O&M violations for years the proposed Decree does not contain a fixed date by which those violations must be corrected. Instead, the Decree allows the County 17 months after approval just to propose a schedule for fixing the O&M violations. The County and EPA have been pushing paper back and forth for 18 years already while requirements in the 1995 Decree remain unfulfilled. To ensure this does not happen again, the proposed Decree should contain fixed, firm dates for correction of all O&M related CWA violations.

3.      <u>Failure to Accelerate Force Main Repairs</u>.  According to the US, the deteriorated condition of the 54" force main from Fisher Island to the Central Plant represents an "imminent and substantial endangerment" and the County acknowledges that a rupture could have catastrophic consequences.  Under the proposed Decree, replacement of the force main is "scheduled for completion in April 2017" but, according to the County and US, the work "may be completed up to a year earlier" (Ammons Decl. ¶ 18) and "it's reasonable to expect that that work will be done by the end of 2015." (Yoder dep. at 70).  If the work to repair what the US views as an imminent and substantial endangerment and what the County describes as potentially catastrophic can be completed within calendar year 2015, it should be.

4.     <u>Protecting Financial Resources</u>.  The proposed Decree does not prohibit the County from redirecting revenues necessary to operate the system consistent with the CWA to other purposes. *See* Yoder dep. at 60.  Based on recent history, it should.  Likewise, WASD's Deputy Director testified that the County Commission must raise rates to comply with the proposed Decree, but the Decree contains no requirement to do so. *Id.* at 122-23. The Decree should require the County to raise and preserve the funds necessary to implement its directives.

5.     <u>Inadequate Deterrent Penalties</u>.  In the 1995 Decree, the US assessed the County a $7 million penalty for the violations identified in the 1993 Complaint ($5 million of the penalty was offset by the County's agreement to fund in a like amount certain water conservation and reuse measures as Supplemental Environmental Projects ("SEP")). That penalty was not, however, a sufficient to deter the County from continuing to violate the CWA over the ensuing 18-years. The proposed Decree contains a total payment amount of less than $3 million, of which $2 million is part of the County's agreement to implement a SEP.  Although Mr. Ammons stated that he followed the EPA 1995 Interim CWA Settlement Penalty Policy, the US declined to identify the total number and nature of the County's CWA violations, the maximum penalty to which the County could be subject, the economic benefit to the County from its CWA violations, or precisely how Mr. Ammons arrived at the proposed penalty amount. *See* Ammons Decl. ¶¶ 45-47. As established below, the proposed penalty is unjustified and facially inadequate.

6.     <u>Continued Reliance on Ocean Outfall</u>.  Finally, the proposed Decree is premised on the County's continued utilization of ocean outfalls notwithstanding that (1) the County's permit for such discharges has lapsed; and (2) State law will soon bar continued reliance on ocean outfalls. The Decree's failure to provide for an alternate to ocean outfalls renders it contrary to the public interest and unreasonable as it is doomed out of the gate.

## I.    <u>STANDARD OF REVIEW</u>

Courts hold that the entry of a consent decree is not merely a matter of accepting an agreement among litigants, it is a "judicial act." *League of United Latin Am. Citizens v. Clements,* 999 F.2d 831, 845 (5th Cir. 1993) (citing *US v. Swift & Co.,* 286 U.S. 106, 115 (1932)). Thus, "when [a court] has rendered a consent judgment it has made an adjudication." *Kaspar Wire Works v. Leco Eng'g & Machine, Inc.*, 575 F.2d 530, 538–39 (5th Cir.1978).   A consent decree reflects a Court's judgment and the Court must exercise "equitable discretion before accepting litigants' invitation to perform the judicial act." *Clements,* 999 F.2d at 846.

Because that a consent decree is a judicial act courts have explained:

[A] consent decree does not merely validate a compromise but, by virtue of its injunctive provisions, reaches into the future and has continuing effect, its terms require more ***careful scrutiny***. Even when it affects only the parties, the court should, therefore, ***examine it carefully*** to ascertain not only that it is a fair settlement but also that it does not put the court's sanction on and power behind a decree that violates Constitution, statute, or jurisprudence. ... ***If the decree also affects third parties, the court must be satisfied that the effect on them is neither unreasonable nor proscribed***.

*Clement,* 999 F.2d at 845 (quoting *US v. City of Miami,* 664 F.2d 435, 441 (5th Cir. 1981)).

Thus, this Court must evaluate whether the proposed decree is "fair, adequate, and reasonable, as well as consistent with the public interest." *US v. Fayette Urban Cnty. Gov't,*, 591 F.3d 484, 489 (6th Cir. 2010).  Courts reject consent decrees that do not meet the test after evaluating relevant facts and circumstances. *Sierra Club v. Hamilton County Bd. of County Comm'rs*, 504 F.3d 634 (6th Cir. 2007); *see also United States v. City of Akron*, 794 F. Supp. 2d 782 (N.D. Ohio 2011) (rejecting decree); *US v. City of Akron*, Case No. 09-272, 2013 WL 999909, at *1 (N.D. Ohio Mar. 13, 2013) (refusing to approve decree and appointing an expert to assist the court because "the Court cannot adequately review the Decree absent an expert").

## II.   ARGUMENT

**A.   The Proposed Consent Decree Is Not Fair, Reasonable Or In the Public Interest Because It Does Not Expressly Require That The County Protect The Required Capital Projects From Anticipated Climate Impacts.**

The proposed Consent Decree includes $1.6 billion of new infrastructure with the bulk of the capital projects (over $1 billion) intended to rebuild and rehabilitate the County's three coastal wastewater treatment plants.[7]  Notwithstanding the County's pronounced vulnerability to climate impacts, however, prior to selecting the new capital projects the County failed to account for whether, when, or how, those capital projects might be affected by climate impacts.[8] Yoder dep. at 90-92.  In fact, it was only after identification of the capital projects – and in response to the objections of BBWK – that the County bothered to consult anyone regarding how climate impacts might affect the WWTPs' ability to maintain compliance with the CWA ("operational reliability").[9] County RFA Resp. # 143-145.

Failing to protect the WWTPs from climate impacts leaves the plants at substantial risk of significant damage such that their operational reliability cannot be assured. *See* Declaration of Dr. Harold R. Wanless and Dr. Brian J. Soden, ¶¶17-26 (ex. 10 hereto)(hereinafter cited as Wanless Decl. ¶___"); Decl. of Dr. Leonard Berry and Mr. Ricardo A. Alvarez, ¶¶ 19-37 (ex. 11 hereto)(hereinafter cited as Alvarez Decl. #1 ¶ ___"); *see also* Yoder dep. at 77-78 (wherein Yoder agrees that "some mitigation or hardening work is necessary to improve the operational

---

[7] *See* ECF 25-9 (identifying the costs of the proposed Decree capital projects for the WWTPs); Klingenstein Decl. ¶ 65 (identifying infrastructure deficiencies at each of the plants).

[8] The Organization for Economic Cooperation and Development, an international non-governmental organization, identified Miami as among the top ten population centers in the world at risk from climate impacts (storm surge, flooding, and sea level rise) and, in terms of the value of property and infrastructure at risk, Miami ranks number one. R. J. Nicholls et al., *Ranking Port Cities with High Exposure and Vulnerability to Climate Extremes: Exposure Estimates* 3, 7, 28 (OECD Env't. Working Papers, Paper No. 1), *available at*: www.aia.org/aiaucmp/groups/aia/documents/pdf/aias076737.pdf.

[9] "Operational reliability" refers to the ability to achieve and maintain compliance with the CWA over the useful life of the plants and equipment.

reliability of the plants."); 3/5/13 Ltr. fr. Carlos A. Gimenez, Mayor, Miami-Dade Cnty., to Hon. Frank Caplan, Mayor, Village of Key Biscayne (ex. 12 hereto) (discussing the need to consider climate issues to improve operational reliability of the WWTPs).[10]

Once engaged, the County's consultant agreed with BBWK's experts, identifying $1.7 billion of plant infrastructure at risk of loss due to climate impacts including over $239 million of the new, proposed capital projects at risk of complete loss due to storm surge. Jayson J. Page & Beth Waters, Hazen & Sawyer, *Sea Level Rise Impacts at Miami-Dade Water and Sewer Wastewater Treatment Facilities* (2013) (hereinafter, "Hazen & Sawyer") (ex. 12 hereto).

Hazen & Sawyer identified a number of adaptive measures to protect the plants from anticipated climate impacts, including surrounding the plants with surge walls, *id.*, and also recommended that the County implement a $20 million plan to "harden" the plants against climate impacts. County RFA Resp. # 148, 149.  But, rejecting the consultant's advice, the parties did not include any of the Hazen & Sawyer mitigation measures in the proposed Decree or the capital project list attached to the Decree. *See* 6/21/13 Alvarez Decl. #2 ex. 14 hereto.

During the public comment process BBWK urged the US to revise the proposed Decree to require the County to address in the Decree climate impacts to protect the WWTPs.  Even though the US agreed that "climate change presents risks to the infrastructure of Miami-Dade's sewage system," (US Response to Comments at 7) and stated that "it is imperative that jurisdictions, like [the County], that are faced with such potentially harmful consequences, take

---

[10] The need to protect wastewater infrastructure from climate impacts was illustrated by Hurricane Sandy in 2012. Data from the hardest hit areas shows that 11 billion gallons of untreated and partially treated sewage flowed into rivers, bays, canals, and in some cases, city streets, largely as a result of storm-surge and flooding that swamped the region's major sewage treatment facilities. *See* http://www.climatecentral.org/pdfs/Sewage.pdf

steps to prepare for and mitigate them as an important part of their wastewater infrastructure planning and decision making," *id*. at 8, the US declined to revise the Decree.

In the US Response to Comments, the US points to two unrelated provisions in the proposed Consent Decree that it claims will "ensure" that the sewer system will be built in a manner that complies with the CWA and is resilient to climate impacts. *Id*. at 8. First, the US points to general language requiring the County "take all necessary measures" to achieve CWA compliance. *Id*. Given the County's failure to comply with the "all steps necessary" provisions in the 1994 and 1995 Decrees, and EPA's failure to enforce those requirements, it would not be reasonable or in the public interest to rely on similar nonspecific assurances in the Decree to ensure that the County will take action beyond what is expressly required. Otherwise, the US points to paragraph 17 of the proposed Consent Decree which requires that the County use "sound engineering practices" in the performance of the work required by the Consent Decree. *Id*. But not one of the various EPA documents referenced in paragraph 17 regarding engineering practices addresses climate impacts. In fact, the County describes paragraph 17 as "an open-ended provision" and denies it has an obligation under the CWA to address climate impacts. (Cnty Mot. to Dismiss Count II Am. Compl., at 14, ECF 74.)[11]

The US refused to revise the proposed Decree to specifically require the County protect the plants because it "*believes*" that the County will voluntarily spend the money and do the work necessary to protect the plants, even if not expressly required to do so by the Decree. *See* Ammons Decl. ¶¶ 74-75 (wherein Mr. Ammons states that there is nothing in the proposed Decree that would prohibit the County from protecting the plants from climate impacts and based

---

[11] In the US Response to Comments at 7, the US also argues it would be inappropriate to include a requirement in the proposed Consent Decree requiring protection of the plant because the proposed Decree is "focused" on curing the County's "current and significant violations." This same "focus" is what allowed the County to operate for 18 years under two consent decrees, with EPA oversight, and still manage to "significant[ly] violat[e]" the CWA.

on what he's been told he "believe[s] Miami-Dade will take climate change impacts into account when designing and/or implementing the remedial measures mandated by this proposed Consent Decree"), Klingenstein Decl. ¶ 98 (wherein Mr. Klingenstein also indicates his willingness to rely on the County's nonbinding, verbal assurances that it will voluntarily protect the plants).[12]

Notwithstanding Messrs. Ammons and Klingenstein's "predictions" of future County behavior, the deposition testimony of WASD Deputy Director Dr. Doug Yoder illustrates why their blind faith in the County's willingness to voluntarily act to protect the plants is unwarranted and why the proposed Decree should be revised to require the County protect the plants from climate impacts.[13]  Dr. Yoder testified that he helped negotiate the proposed Decree and is "very familiar" with its terms. Yoder dep. at 60.  According to Dr. Yoder, the proposed Decree ***does***

---

[12] Messrs. Ammons and Klingenstein apparently have no formal background or professional experience in matters of climate science, infrastructure vulnerability assessments, or the design and engineering of climate impact mitigation measures or infrastructure hardening techniques. Mr. Ammons is an EPA enforcement officer (Ammons Decl. ¶ 6) and Mr. Klingenstein admits to lack expertise in climate science (Klingenstein Decl. ¶ 79). Notwithstanding their lack of expertise, these individuals freely opine on issues of climate impacts, sea level rise, and the vulnerability of the plant infrastructure. Mr. Ammons, for example, claims to have studied sea level rise estimates, concluded that under the worst case scenario the plants themselves will not be submerged and that therefore the plants will remain capable of treating sewage even if there is a sea level rise of three feet. *See* Ammons Decl.  ¶¶ 54, 58 and 79; *see also* Klingenstein Decl. ¶¶ 58-61, 96. Perhaps because they are not experts, the "analysis" and opinions offered by Messrs. Ammons and Klingenstein focused on sea level rise and overlooks other climate impacts – such as the storm surge that the County's consultant identified as overtopping portions of each of the plants. *See* Hazen & Sawyer, slides 25-27; *see also* Alvarez Decl. # 2 ¶¶ 8(c), (d), 10, 15 (discussing the importance of considering wave action and storm surge together with sea level rise in analyzing plant vulnerability). Further, even though he admits a lack of expertise in the field, Mr. Klingenstein provides his critique of BBKW's climate science and vulnerability assessment experts'opinions, Klingenstein Decl. ¶¶ 89-82, and throws in a few opinions of his own on the subjects. *Id*. ¶¶ 98-100.
  The affidavits of Messrs. Ammons and Klingenstein were not produced until after discovery was closed and, because the US would not voluntarily make them available for deposition, their qualifications and opinions have not been probed through discovery. *See* BBWK Omnibus Motion, ECF 106 (seeking to compel the US to produce Messrs. Ammons and Klingenstein for deposition).  Their opinions should be weighed accordingly.
[13] Dr. Yoder was deposed several days after Messrs. Ammons and Klingenstein signed their affidavits swearing to their faith in the County's willingness to voluntarily implement protective measures not required in the proposed Decree and as a consequence they did not have the benefit of this testimony prior to predicting the County will voluntarily act to protect the plants.

*not* require the County to protect the plants from climate impacts. *Id.* at 78. According to Dr. Yoder, the decisions of (1) whether to protect the plants, (2) how to protect the plants, (3) how much to spend to protect the plants, and (4) what risks to consider are wholly discretionary with the County. *Id*. at 78-82. Additionally, no funds have been set aside for protecting the plants. *Id.* According to Dr. Yoder, there is no guarantee the County will actually do so. *Id.*

In its Response to Comments the US also frets that compelling the County to implement climate protections at the wastewater treatment plants will create "unnecessary delay" and that it is important to correct the violations "now." U.S. Response to Comments, at 11, 14.  First, the Unites States' argument is based on a mischaracterization of BBWK's public comments. BBKW has advocated for moving forward with the capital projects while evaluating climate impacts:

> Aware of the urgent need for some of the capital improvement projects identified in the draft consent decree to go forward immediately, [BBWK] recommends the decree be bifurcated, thereby allowing certain projects to proceed rapidly (e.g., those projects necessary to abate conditions representing an imminent and substantial endangerment as identified by U.S. EPA), while the parties undertake the sound science and engineering studies necessary to make informed decisions regarding the sea level rise and storm impact-related issues.

ECF 88, Public Comments Submitted by Biscayne Bay Waterkeeper, at 21.[14]  Simply put, adding an express requirement to the proposed Decree that requires that the County actually do the work it has represented to EPA it will do should not cause delay.

If the US means what it says – that climate impact protections are "imperative" (meaning "vital, crucial, essential and urgent") – then its failure to expressly require that the County take such action is not fair, reasonable or in the public interest. Likewise, according to BBWK's experts, leaving the plants, including $1.6 billion in new capital investments, vulnerable to

---

[14] If the US is seriously concerned about correcting the violations "*now*," BWWK respectfully suggests a deadline be set for the correction of the operation and maintenance violations, as discussed in Section II.B below, and the date for completion of the replacement of the under-Bay pipe be shortened from 2017 to 2015 consistent with the deposition testimony of WASD Deputy Director Dr. Doug Yoder, discussed in Section II.C below.

climate impacts is not in the public interest and places at risk the County's ability to maintain compliance with the CWA over the useful life of the plants. Wanless Decl. ¶¶ 17-26, Alvarez Decl.#1 ¶¶ 19-37, Alvarez Decl.#2 ¶ 18.  The issue of whether a consent decree ensures compliance with the CWA is so important that it is considered in connection with each of the three prongs of the consent decree evaluation. *See U.S. v. Lexington-Fayette Urban Cnty. Gov't*, 591 F.3d 484, 489 (6th Cir. 2010) (noting that one of the most important considerations when evaluating the reasonableness prong is whether the decree will bring the polluter into compliance with the CWA); *US v. Metro. St. Louis Sewer Dist.*, 4:07-CV-1120 CEJ, 2012 WL 1466033 (E.D. Mo. Apr. 27, 2012) (finding the decree to be substantively fair in part because it remedies the ongoing violations of the CWA); *U.S. v. DeKalb Cnty., Ga.*, 1:10 cv 4039 WSD, 2011 WL 6402203, at *10 (N.D. Ga. Dec. 20, 2011) (finding decree which is technically adequate to bring the violator into CWA compliance satisfied the reasonableness and public interest prongs).

Selecting capital projects prior to considering climate impacts also violates both federal and local policy and therefore approving the proposed Consent Decree is not in the public interest. Indeed, EPA's *Clean Water and Drinking Water Infrastructure Sustainability Policy*, www.water.epa.gov/infrastructure/sustain/upload/Sustainability-Policy.pdf counsels that planning processes for wastewater treatment plants take climate impacts into account **before** an infrastructure process is chosen.  Likewise, the County's failure to consider climate impacts prior to selection of the capital projects is inconsistent with the recommendations of its own Southeast Florida Regional Climate Change Compact, which recommends analysis of climate impacts **before** making wastewater infrastructure decisions.[15] The US brushes off BBWK's arguments

---

[15] The recommendations of the Southeast Florida Regional Climate Change Compact, available at available at http://southeastfloridaclimatecompact.org, were approved and adopted by the County Commission on April 2, 2013.  Miami-Dade Cnty., Fla., Resolution Accepting the Southeast Florida Regional Climate Action Plan Which Includes Actionable Recommendations for Regionally Coordinated Climate Change Mitigation, Adaptation Strategies, and Efforts in

stating "the fact that national policy encourages collaborative action to adapt to climate change does not compel the Court to find that this particular enforcement decree is contrary to policy and the public interest simply because it lacks express mandatory climate change requirements." But while a policy doesn't "compel" the Court to act, public interest and common sense does.

In the words of the US, it is "imperative" that the County take action to protect the plants from climate impacts including sea level rise, storm surge and flooding. It must be clear, now, after nearly 20-years of County continuous violation of the earlier decrees, that the only way to ensure this occurs is for the Court to reject the proposed Decree and expressly require that the County protect the capital investments and the plants from climate impacts.

**B.     The Decree Does Not Specifically And Promptly End The Current Operation And Maintenance Violations At The Central District Waste Water Treatment Plant As Identified In EPA's June 12, 2012 Inspection Report And Notice Of Violations.**

In its admission responses, the County admitted that it "has not corrected all operation and maintenance violations identified by EPA at Plant #1 of the Central Plant in the June 12, 2012, Notice of Violation." County RFA Resp. # 93.  EPA has admitted the same.[16]  Thus, there is no dispute that the County remains in violation of the CWA at the Central Plant.[17]

While paragraph 19(h) of the proposed Decree does provide for County submission of an O&M plan to EPA within 17-months of the Court's approval of the proposed Decree, thereafter, there is no deadline for EPA to respond to the submission.  The County and EPA can continue to

---

Building Community Resilience R-240-13 (Apr. 2, 2013), available at www.miamidade.gov/govaction/matter.asp?matter=122459&file=true&yearFolder=Y2012.
[16] US RFA Resp. #43: "[T]he US admits that there is evidence that [the County] has not corrected all operation and maintenance violations at Plant 1 of the CD WWTP that were identified by EPA in the June 12, 2012 Notice of Violation." And, in County RFA Resp. # 96, the County admitted that "[s]ome of the operation and maintenance violations identified by EPA in the June 12, 2012, Notice of Violation were the result of a lack of funding."
[17] BBWK submits that the continuous O&M NPDES violations (from 2007 to the present date) at the Central Plant were not factored into EPA's calculation of the maximum civil penalty or the Settlement Penalty that the EPA is proposing to this Court.

discuss without a deadline to end the O&M violations.[18]  After more than five-years of

continuous O&M violations at the Central Plant, the proposed Decree sets no specific date by

which the O&M violations at the Central Plant must cease.

This is unacceptable. It is not diligent prosecution and, it is certainly not fair, reasonable

or in the public interest, especially because many of these O&M violations implicate Union

worker safety and health issues, as well, and can be fixed immediately.[19] *See* Azoy Aff. ¶¶ 8-12.

While EPA claims that it doesn't know if chronic O&M violations of the County's

NPDES permit have been ongoing at the Central Plant since at least 2008,[20] FDEP admits that

chronic Operation and Maintenance violations of the State clean water law have been occurring

for since 2007.[21]  Yet, in the EPA Inspection and Notice of Violations Report of 2009, it states:

"(2) MDWASD must increase the frequency in its Maintenance Program for the final settling

tanks to ensure that no short-circuiting of the weirs occurs and trash/debris/solids is not leaving

treatment or fouling equipment. ***This problem has been a repeated finding since 2007.***"  Given

that EPA admits in its June 2009 Inspection Report that lack of cleaning by WASD "has been a

---

[18] It is worth noting that in Count III of the Complaint, BBWK alleges that the EPA has stalled on re-permitting the NPDES permit for the ocean discharge at the County's Central District Plant for almost 10-years in violation of the APA and the intent of the federal CWA.

[19] *Friends of Milwaukee's Rivers v. Milwaukee Metro. Sewage Dist*., 382 F.3d 743, 760 (7th Cir. 2004).  In *Friends*, the settlement under review did not propose the elimination of SSOs, nor did it even propose a percent reduction in the total volume of SSOs. Rather, it merely limited the remedial measures to ensure an eventual reduction in the number of overflows. *Id.* at 763-64.  In rejecting the proposed consent decree, the court emphasized that "[c]ompliance means an end to violations, not merely a reduction in the number or size of them."  *Id.; see also Atl. States Legal Found., Inc. v. Eastman Kodak Co*., 933 F.2d 124, 127-28 (2d Cir.1991) (considering whether the alleged diligent prosecution achieves a permanent solution or whether violations will continue notwithstanding the settlement); *New York Coastal Fishermen's Ass'n v. New York City Dep't of Sanitation*, 772 F. Supp. 162, 168 (S.D.N.Y. 1991) (same).

[20] *Compare* US Am. RFA Resp. ## 49, 50, and 51 (wherein EPA states it does not know whether the County has been in continuous violation of the CWA since 6/09, 6/08, and 4/07, respectively) *with* County RFA Resp. # 93 (wherein County admits continuous violations).

[21] FDEP admits that "there is evidence that the County has been in violation of Chapter 403, Florida Statutes, each and every day between April 2007 (the date of the EPA/FDEP inspection of the North and Central Plants described in the EPA April 23, 2008 letter) and the present date." (FDEP RFA Resp. #76) (ECF 77-4)

repeated finding since 2007," it is not credible that EPA responds to BBWK's Request for Admission that it "doesn't know" if the County has been in continuous violation of the NPDES O&M requirements" since 2007. And, given that EPA cannot assure the Court of a firm date by which the County will cease these chronic violations, the proposed decree fails to meet the test of fairness, reasonableness or public interest.

The facts are undisputable – prior to BBWK filing its 60-day Notice of Intent to Sue on October 8, 2012, EPA had failed to bring an enforcement action to stop the repeated and chronic O&M violations at the Central Plant, which it knew were recurring year-after-year since at least 2007.[22] Even at this late date, not all O&M violations continue at the Central Plant and, EPA proposes no fixed date in the Decree when they will end. All EPA can say is that: "Miami-Dade either resolved or proposed to resolve the violations identified the violations identified in the report." (ECF 87-6, at 16.)  EPA says that the O&M problems have been or "will be" addressed through the proposed decree. But, EPA discloses to the Court no specific date by which the chronic violations will be stopped and, the proposed decree provides none, either.

Simply "throwing dollars" at a problem does not mean that the County will fix known O&M violations.  For example, EPA's June 12, 2012, Inspection and Notice of Violations noted that O&M Violations specifically resulted from the County's redirection of dollars to other projects including the Port Miami widening project. *Id.* at 2.  Thus, some CWA violations were specifically caused by the failure of the County Commission to approve necessary O&M expenditures at the Central Plant. Notwithstanding the financial plan requirement in the proposed Decree, this type of politically-caused violation cannot be reasonably anticipated to end without more rigorous third party financial oversight, including as appropriate the use of a Special

---

[22] The County admits, as does EPA, that some of the chronic O&M violations at the Central Plant were due to the County's removal of over $200 million in WASD funds for use in the County General Fund for non-sewer related purposes. *See* Michael Kavanaugh #1 Affidavit (ECF 7-1) and Kavanaugh #2 Affidavit (ECF 5-13).

Master, as BBWK has proposed. *See* Kavanaugh 11/30/12 Decl., ECF 5-13.  Furthermore, many

of the O&M violations at the Central Plant are unrelated to capital expenditures and are the result

of improper housekeeping and cleaning.[23] These same flawed housekeeping and cleaning

violations have been reoccurring at the Central Plant since 2007 and may exist today.[24]

C.  **The Proposed Decree's Financial Plan Does Not Prevent the County from Looting the WASD's O&M Funds, Nor Does the Proposed Decree Guarantee that Adequate Capital and O&M Funds will be Forthcoming in Future Years.**[25]

BBWK's expert Dr. Michael Kavanaugh, an economist who has worked extensively in

public finance and on proposed CWA consent decrees, including for the County on the

1994/1995 decrees, has provided testimony that the County had diverted over $200 million from

the WASD O&M Fund and used it for purposes that were unrelated to WASD matters.

---

[23] The June 12, 2012 EPA Report states (at 4):
> Previous EPA inspections have noted similar trash, sheens, floatables, sanitary products, pin floc, color and algae in the final settling tanks/ secondary clarifiers. Miami-Dade WASD should implement a regularly-scheduled cleaning of the effluent troughs between tanks, as well as removal of any floatables/trash. In addition, [WASD] should explain why the settling tanks are experiencing such large amounts of pin floc that is being discharged (e.g. sludge age and/or blanket depths; not enough sludge wasting due to out of service sludge digesters, etc.). All of the trash, floatables, sanitary products, algae and floc have the potential to be discharged through the outfall into the Atlantic Ocean.

[24] The County has also violated CWA Pre-treatment Requirements at the Central Plant from 2007 to 2013 and may still be in violation today.  EPA notes that the County has had only one Pre-Treatment Program violation at the Central Plant in 2013. ECF 87-6, at 17-18. But this is only because the County prohibited private waste haulers from dumping liquid wastes at the Central Plant.  Apparently, the County re-directed private waste haulers to the South Plant. In the EPA's June 12, 2012 Report the EPA found the County failed to adequately sample and analyze effluent from private waste haulers. The County was directed to develop a sampling protocol to monitor individual hauled receipts of non-domestic wastewater. In the US Am. RFA Resp. #40, EPA admits that "the County has not implemented a sampling protocol to monitor individual hauled receipts of non-domestic wastewater at the Central Plant since receipt of EPA's June 12, 2012 Notice of Violation."  EPA notes that "as of January 2013, Miami-Dade no longer accepts hauled waste from non-[WASD] haulers at the [Central Plant]." Evidently, the County moved the private waste haulers from the Central Plant to the South Plant without implementing a required Pre-Treatment Program that meets the applicable standards.

[25] Funding for capital projects identified in appendix D should not be equated with O&M funding. In the EPA's June 12, 2012 Inspection Report and Notices of Violation, EPA provided examples of capital expenditures for equipment that were later not adequately maintained causing failures. *Id.* at 8.  The proposed Consent Decree can fall prone to this same behavior by the County without adequate oversight, as recommended by Dr. Kavanaugh.

Kavanaugh 11/30/12 Decl. ¶ 7; *see also* Azoy Aff. ¶¶ 9, 13. Subsequently, in the County and

EPA's Answers to BBWK's Requests for Admissions, both admitted the truth of Dr.

Kavanaugh's opinion. County RFA Resp. #177; US Am. RFA Resp. # 112.  Dr. Kavanaugh also

opined that the proposed Financial Analysis Program in the proposed Decree (Para. 19(k)) is

inadequate and should not be approved by the Court because it will not prevent the same

financial problem at WASD (as occurred over the past twenty-years) from recurring.[26]  *See* ECF

5-13.  He said an appropriately revised decree:

> 17. …would also create an independent capability to review and comment on the report
> to the Court and to other members of the public. This panel of experts (or a Special
> Master appointed by the Court or both) would review the report and prepare reports to the
> Court and the Public, as provided for in the CD.
>
> 18. A public reporting program, review board and schedule is needed to avoid the
> experience of the previous CD. The reporting required in the previous CD failed to keep
> WASD on a track to a successful completion of the CD. Consequently, instead of success
> (i.e., compliance with the CWA), the previous Consent Decrees resulted in the WASD
> being in widespread violation of the CWA (hundreds of SSOs, violations of effluent
> limits, and O&M violations at wastewater treatment plants, etc.). The previous auditing
> process of WASD's finances was not enough to prevent material diversions of purchasing
> power from WASD's wastewater system to general county uses as I documented in my
> first affidavit in this case. Production of traditional public reports –budgets, audits, plans
> – has proved to be insufficient. What is needed is a third party specifically charged with
> reporting to the Court on the progress of the CD that the Court approves. This third-party
> must be funded for the life of the CD and must have the skills needed to read and
> interpret financial reports…
>
> 21. I conclude with an observation on the financial analysis program's capability to track
> and report transfers. The draft CD includes "tracking and reporting transfers" as one of
> the capabilities of the financial analysis program. The language in the draft CD states: "A
> program that tracks and reports any transfer or use of funds obtained by the County from

---

[26] EPA argues that the proposed Financial Analysis Plan in the proposed decree is somehow a
substitute for guaranteed funding. ECF 87-6, p. 22. It is not. EPA was aware at least since 2007
that the County was not making adequate funds available to the WASD and, yet, EPA stood by
for half a decade while the sewage collection and treatment system fell further and further into
disrepair. EPA also did nothing when the WASD Director, John Renfrow, publicly announced in
the Miami Herald that the system was being "held together with chewing gum."
*See* Rabin, Charles and Morgan, Curtis, "Miami-Dade's leaky pipes: More than 47 million
gallons of waste spilled in past two years," *The Miami Herald*, May 14, 2012,
http://www.miamiherald.com/2012/05/14/2799249/miami-dades-leaky-pipes-more-than.html.

the collection of sewer rates for any purpose not related to the management, operation, or maintenance of the Sewer System or to any capital improvement need of the Sewer System." While important, there is a more important check that the CD must create to deal with operating transfers – operating transfers must be prohibited unless approved by the Court. Unless such operating transfers are prohibited, the WASD's independent auditors will only discover after the fact when there are operating transfers out of the wastewater system to either the water system or to the County's general fund. Unfortunately, the auditors' disclosures cannot prevent the transfers or undo them after they occur. Simply adding a capability to a financial analysis program to detect a transfer after the fact is unlikely to be a deterrent to further transfers. Experience shows that it is not enough to detect transfers after the fact. The CD should prohibit -- as long as the CD is in effect -- any operating transfers from the wastewater system to any other entity, without prior Court approval. In light of past experience with hundreds of millions of dollars of transfers out of the wastewater system operations fund, there must be a financial firewall between the wastewater system and the County and between the wastewater system and the water system or, in my opinion, it is unlikely that the CD and its capital plan will be successfully completed. (Emphasis supplied)

Kavanaugh 1/16/13 Decl. ¶¶ 17-21, ex. 15 hereto.

As is clear from Dr. Kavanaugh's declaration,[27] the proposed Decree's Financial Analysis Program, without more, won't work and, therefore, is not fair, reasonable or in the public's interest. The Financial Analysis Program (a computer program), without more remains open to abuse by the WASD and the County. Over an extended period, EPA oversight was not effective in monitoring or preventing the looting of the WASD operational budget. As admitted by the County, this repurposing of funds was responsible for numerous violations of the federal CWA.[28]

In his deposition, Deputy WASD Director Yoder confirmed that:

---

[27] Dr. Kavanaugh's opinions have not been rebutted by any Rule 26 expert evidence from the County or the EPA and, any hybrid witness' statements as to paragraph 19(k) would fail to meet Rule 26 disclosure requirements, FRE 702 or a *Daubert* inquiry.

[28] *See* County RFA Resp. # 179 (admitting that "lack of funding" has "contributed to violations of the County's NPDES permit at the Central District plant." *See also* US Am. RFA Resp. # 46: "Some of the operation and maintenance violations identified by EPA in the June 12, 2012, Notice of Violation were the result of a lack of funding. Response: The US objects to this RFA to the extent it seeks the US to admit Miami-Dade's acts, as only Miami-Dade may admit or deny this RFA. The US further objects to this RFA as calling for speculation. Notwithstanding these objections, the US admits that there is evidence that indicates that some of the operation and maintenance violations identified by EPA in the June 12, 2012, Notice of Violation were the result of a lack of funding."

- Approximately $200,000,000.00 dollars was removed from WASD's budget by the County Commission over a 15-year period (at 58);

- Of that $200,000,000.00, only $25 million is a loan. Mr. Yoder does not anticipate repayment from the County for the rest of the funds which were removed from WASD's budget (at 58-59);

- The removal of those funds had an impact on WASD's Operations and Maintenance Budget (at 59);

- The removal of the funds was "in part" a reason why the County moved from compliance to non-compliance with the 1994 and 1995 consent decrees (at 59-60);

- The County's "failure to take all steps necessary" as required by the 1994 and 1995 consent decrees is "a resource issue as having the staff and financial resources to do upgrades that are being addressed in his consent decree, in the new consent decree" and the consequences of same are "increased risks of CWA violations," (at 66); and

- There is nothing in the proposed Decree "that would prohibit the County Commission in the future from taking additional funds from the Water and Sewer Department." (at 60)

As admitted by the County in its Responses to BBWK's Requests for Admissions, there is no guaranteed funding for the proposed Consent Decree Capital Projects.

**D.    The Consent Decree Is Unfair, Unreasonable, And Contrary To The Public Interest Because It Includes An Insufficient Civil Penalty That Violates <u>EPA's Settlement Policy And Rewards The County For Breaking the Law</u>.**

The civil penalty in the proposed Decree of $978,100 is contrary to EPA policy and contrary to the public interest because it will not serve to deter future CWA violations. Courts have rejected proposed consent decrees containing terms "less stringent in several respects than the EPA's own policy advises and civil penalties are the minimum the EPA stated it would accept in settlement of the litigation." *US v. Telluride Co.*, 849 F. Supp. 1400, 1406 (D. Colo. 1994).  The same outcome should obtain here where the proposed penalty will not even recover the dollar amount that the County benefitted as a result of its non-compliance with the CWA.[29]

---

[29] The proposed penalty and supplemental environmental project ("SEP") are less than half of the amount of the penalties awarded against the County for CWA violations in 1995.

The EPA's Interim CWA Settlement Penalty Policy (the "Settlement Policy") sets forth the method to calculate "the lowest penalty figure which the Federal Government should accept in a **settlement**" for violations of the CWA.[30]  The stated goals of deterring non-compliance and ensuring that violators do not obtain an economic advantage over competitors, "generally require that penalties recover the economic benefit of noncompliance, plus an appropriate gravity amount" as a deterrent. *Id*. The Settlement Policy first suggests estimation of the maximum statutory civil penalty, and sets forth what can be summarized as a three step process to calculate the lowest acceptable settlement figure in CWA cases. *Id*. at 4. The first step requires calculation of the economic benefit,[31] the second step requires calculation of an additional total gravity component, and the final step allows for reductions based upon litigation considerations, the violator's ability to pay, and appropriate supplemental environmental projects ("SEPs"), if any. *Id*. Following this process will result in a significantly higher penalty than that in the Decree.

The maximum penalty for violations occurring between March 15, 2004, and January 12, 2009, is $32,500 per violation per day, and $37,500 per violation per day for violations occurring on or after January 12, 2009 (the "maximum penalty").[32] The maximum penalty is the key starting point in any judicial assessment as to the appropriateness of a fair civil penalty in CWA cases, absent a consent decree,[33] and should be calculated and considered in this case.  EPA has not provided to the Court or BBWK its assessment of the maximum penalty.  It is not even clear if EPA conducted the calculation.

---

[30] The Settlement Policy is available at
http://www2.epa.gov/sites/production/files/documents/cwapol.pdf.
[31] The standard method to determine the Economic benefit is using the EPA's "BEN" model. "[T]he benefit should be calculated from the first date of noncompliance." Settlement Policy at 5. The BEN model is available online at http://www2.epa.gov/enforcement/penalty-and-financial-models.
[32] 28 U.S.C. § 2461, 31 U.S.C. § 301, and 40 C.F.R. §§ 19.1-19.4.
[33] *See, e.g., Catskill Mts. Chapter of Trout Unlimited, Inc. v. City of New York*, 451 F.3d 77 (2d Cir. N.Y. 2006); *Hawaii's Thousand Friends v. City and Cnty. of Honolulu*, 821 F. Supp. 1368 (D. Haw. 1993).

BBWK has calculated that a maximum civil penalty in this case, which would exceed $150 million based on the admitted CWA violations over the past 5 years alone – without even accounting for the continuous violations of the earlier decrees, which the County admits occurred,[34] or the additional penalties for violating Florida law. Courts have found that "[a] lenient penalty that is far less than the maximum penalty may provide evidence of non-diligent prosecution" sufficient to defeat dismissal of a citizens suit filed after a CWA suit was brought and settled by the state's environmental enforcement agency. *Friends of the Earth v. Laidlaw*, 890 F. Supp. 470, 491 (D. S.C. 1995).[35] The Court should find that the lenient proposed penalty renders this Decree unfair, unreasonable, and contrary to the public interest.

Economic benefit has generally been described by courts as the "benefit to the offender of delaying capital expenditures and maintenance costs on pollution-control equipment." *United States v. Citgo Petroleum Corp.*, 753 F.3d 547 (5th Cir. 2013) (internal citations omitted). Calculation of the economic benefit is an important step required by the Settlement Policy and is also the cornerstone of court-awarded penalties.[36] Courts have considered the failure of a civil penalty in a consent decree to recover the economic benefit as evidence of lack of diligent prosecution sufficient to overcome dismissal of a citizens' suit.[37] While Mr. Ammons claims to

---

[34] County's RFA Resp. #129.

[35] In *Laidlaw*, the Court observed that the maximum penalty under the law could have been as high as $2,270,00.00, but that the parties ultimately agreed to a penalty of only $100,000.00. *Id.* at 491; *see also Atlantic States Legal Found. v. Universal Tool*, 735 F. Supp. 1404, 1416-1417 (N.D. Ind. 1990) (where the court agreed with the plaintiff in finding "the lenient penalty assessment of only $10,000 for the hundreds of reported violations, despite statutory authority for penalties of $25,000 per violation," supported finding of a lack of diligent prosecution).

[36] In *Citgo Petroleum*, the Fifth Circuit vacated a court awarded CWA civil penalty and remanded for determination of economic benefit, stating "the district court's failure to quantify the economic benefit… requires reversal." *Id.* at 10.

[37] *See, e.g., Laidlaw*, 890 F. Supp. 470, (D.S.C. 1995) (where the court determined that "because recoupment of a violator's economic benefit of noncompliance is central to the enforcement of the CWA, the failure of the state enforcement agency to recover, or even to determine, a violator's economic benefit is strong evidence that the agency's prosecution of that violator was not diligent for purposes of…the CWA." *Id.* at 497)

have calculated the economic benefit when deriving the proposed penalty,[38] BBWK submits that it would be impossible for EPA to use the Settlement Policy to derive a minimum settlement penalty of less than $1 million in a case such as this where the economic benefit exceeds $200,435,000.00,[39] the amount diverted from WASD by the County Commission for use on non-sewer related expenses since 1995.[40]  The proposed penalty in the Decree thus fails to recover even .005% of the economic benefit, rewarding the County for its non-compliance.

Moreover, per the second step of the Settlement Policy, "[e]very reasonable effort must be made to calculate and recover a gravity component in addition to the economic benefit component." *Id*. at 6. "Both deterrence and fundamental fairness require that the penalty include an additional amount to ensure that the violator is economically worse off than if [he] had obeyed the law." *Id*. at 6. It is unclear if the EPA calculated a gravity component at all much less how one was calculated as, beyond its failure to recover even .005% of one portion of economic benefit, the proposed penalty seemingly fails to recover any gravity component.[41]

The final step to calculate a minimum acceptable settlement penalty in CWA cases permits reductions due to the violator's ability to pay, litigation considerations, and any qualifying SEP. *Id.* at 4. EPA has not presented any arguments that the County is unable to pay. Additionally, it appears that the County improperly applied the National Municipal Litigation

---

[38] Ammons Decl. ¶ 12.

[39] The $200,435,000 does not include other economic benefits which may have resulted from delayed costs or costs avoided by the County's lengthy non-compliance. For example, the County has admitted to violating Paragraph 8 of the 1995 decree for 20 years.

[40] *See* Kavanaugh 11/30/12 Decl. ¶ 7.  If the dollar amount of the transfers is adjusted using the Consumer Price Index to reflect the purchasing power of the dollar at the time of transfer, that figure becomes $262,109,000.00. *See id.* ¶ 14.

[41] Such considerations are essential to deterring future CWA violations. *See, e.g., Laidlaw* 890 F. Supp. 470, 497 (S.C.D. 1995) ("If a penalty…merely required the polluter to disgorge the benefit it received from noncompliance, then from a purely economic standpoint, a discharger would be indifferent between spending the money necessary to achieve full compliance in a timely manner and ignoring the regulation and simply paying the civil penalty as a cost of doing business"); *See also SPIRG v. Monsanto Co.*, 1999 WL 156691, at *14 (D.N.J. Mar. 24, 1988).

Consideration ("NMLC") to reduce the amount of the proposed penalty. Even if the NMLC were applicable here, its use could not reduce the proposed penalty to less than one million dollars.

There are eight listed litigation considerations in the Settlement Policy. *Id.* at 15-19. Alternatively, the NMLC may apply to reduce a municipal penalty. *Id.* at 19. However, the NMLC "is…discretionary…It should only be used if there is some evidence that the municipality made a good faith effort to comply" with the CWA. *Id.* at 19-23. There has been no showing of a good faith effort at compliance. Rather, BBWK has presented evidence of the County's long history of intentional ***non***-compliance. Accordingly, the NMLC should not apply in this case. Yet, Mr. Ammons stated that he utilized the NMLC "to calculate the economic benefit and the total bottom-line settlement penalty." Ammons Decl. ¶ 46.[42]

For argument's sake, even if the NMLC did apply in this case, based upon the County's estimated population of approximately 2.5 million[43] with 66+ months of violations and use of the "minor actual or potential harm" impact criteria[44] the result is a minimum penalty a range between $6,024,000 and $8,895,000.[45]

Equally troubling, beyond Mr. Ammons' bare-bones affidavit EPA has not provided the Court with information justifying the proposed penalty of $978,100. As a result, the Court lacks information needed to determine whether EPA properly considered the required factors when

---

[42] NMLC is not the method used to calculate Economic benefit, but rather, to calculate an alternative minimum penalty for municipalities. It is therefore unclear that Mr. Ammons ever accurately calculated the Economic benefit.

[43] U.S. Census Bureau, estimated population of Miami-Dade County from 2012, at http://quickfacts.census.gov/qfd/states/12/12086.html.

[44] This is the lowest possible penalty that can be derived by adding tables A and B under the NMLC. Based upon the magnitude of the harmful impacts, a higher impact criteria may be required which would result in a higher penalty range.

[45] *See* Settlement Policy at 22-23.

determining the proposed penalty. EPA has failed to provide support for any reductions to the minimum penalty derived under the Settlement Policy.[46]

Even more unreasonable is the EPA's reduction of the proposed penalty due to the SEP in the Decree. Pursuant to the Settlement Policy, "[i]n order for a violator to receive a settlement penalty reduction in exchange for performing [an SEP, the SEP] must conform with the EPA'S SEP Policy, or be approved in advance by the Assistant Administrator." *Id.* at 25. The SEP Policy requires a "nexus" between the SEP and the violations.[47] Furthermore, "[a] SEP may be allowed in a municipal case…provided the cash penalty is no less than [60%] of the amount provided in section IV.D.7" (the NMLC provision). *Id.* EPA states that it considered the SEP in the Decree to reduce the proposed penalty, however, the SEP consists of paying to hook up 74 private businesses that are currently using septic tanks to the public sewers.[48] There were and are no violations in this case for groundwater pollution by septic tanks.  Lacking a nexus to the case, this SEP should not reduce the proposed penalty unless the Assistant Administrator approved same in advance – an assertion not established by EPA. Further, if the NMLC even applies, the proposed SEP violates the Settlement Policy as it is not paired with a cash penalty of at least 60% of a reduced penalty calculated under the NMLC provision.[49]

In light of the foregoing the Decree should not be rejected because the proposed civil penalty and SEP violate EPA policy and will not deter future violations of the CWA.

---

[46] As further support for the award EPA cites to two other mitigating factors: the $2,000,000.00 penalty awarded by the earlier decree, and the County's supposed "good behavior."  Neither of these arguments have merit nor do they fall under categories of factors to be taken into consideration pursuant to the Settlement Policy.

[47] EPA's SEP Policy can be found at: http://www2.epa.gov/enforcement/policy-guidance-publications#sep; *see also* http://www2.epa.gov/sites/production/files/documents/sepnexus-mem.pdf.

[48] The SEP in the Decree has a purported cost to the County of $2,047,200.00. Summary of Comments, at 31.

[49] This would require a cash penalty of no less than 60% of the minimum penalty range of $6,024,000.00 - $8,895,000.00, the amount previously discussed above.

E.   **The Consent Decree Fails To Require Abatement, As Expeditiously As Possible, Of The Imminent And Substantial Endangerment Caused By The Deteriorated Condition Of The 54" Under-Bay Force Main From Fisher Island To The Central District Wastewater Treatment Plant.**

According to the 1991 Miami-Dade Grand Jury Report, a break of a large under-bay force main is "potentially the most serious environmental catastrophe waiting to happen under Biscayne Bay." (Ex. 1 at 15).  The Grand Jury Report states a failure of one of the under-bay force mains would cause "hundreds of millions of gallons of raw sewage [to] pour into Biscayne Bay" and "Biscayne Bay to experience [its] worst environmental catastrophe[] in modern history." *Id.*  The 1991 Grand Jury emphasized the urgency to repair the degradation of the under-bay lines by calling for the County to "immediately assign its highest priority to the construction of a replacement pipe", stating the "detrimental impact of a spill of this type and the cleanup and mitigation costs are incalculable…. [and] we must address this known environmental hazard now."  *Id.*  at 16.  While the under-bay force main that was at risk at the time of the 1994 and 1995 partial Consent Decrees has been repaired, the force main from Fisher Island and Virginia Key presents the same dire risk today.

This nightmare scenario remains as real and significant of a risk today as it did in 1991. In fact, "the Phase 3 section of the force main…has more defective pipe segments and more exhibited wire breaks across the entire length of pipe than other sections." ECF 87-6, at 19.  The US refers to the "deteriorated condition" of the under-bay force mains as an "imminent and substantial endangerment to the health and welfare of persons."   Compl., ECF 1 ¶ 3.    WASD's Director, John Renfrow has stated that "we are facing a catastrophic event", that "the pipe is about to burst" and "we can't afford any delay."  Miami Today, Ortiz, "Sewage Leak 'Time Bomb' in Biscayne Bay," week of July 26, 2012, http://miamitodaynews.com/news/120726/story2.shtml.  WASD Deputy Director Yoder testified the consequences of a rupture in the force main between Fisher Island and Virginia Key "would

be on the order of 25 million gallons a day of raw sewerage that would discharge initially at the point of rupture and would, under the general plan that [WASD has] had in place, be diverted to the Atlantic Ocean until such time as a repair could be made to the rupture." Yoder dep. at 71:13-18. The area that would be impacted by a rupture of this magnitude includes significant "ecological resources of concern," the Biscayne Bay Aquatic Preserve and Biscayne National Park (http://www.nps.gov/bisc/index.htm). *Id*. at 72:15-22.

The imminent and substantial endangerment condition of the under-bay sewage force main from Fisher Island to Virginia Key violates the proper operation and maintenance of appurtenant structures in the NPDES Permit for the Central Plant, 40 C.F.R. § 122.41(e), and paragraph 8 of the First Partial Consent Decree and Second and Final Partial Consent Decree.

The EPA acknowledges that replacement of the Fisher Island force main with a new, larger and deeper (60" force main) could be completed by April 2016. Ammons Decl. ¶ ¶ 16; *see also* ECF 87-6, at 19. Dr. Yoder testified that the work could be done even sooner and that it is "reasonable to expect that that work will be done by the end of 2015." Yoder dep. at 70:4-7. However, the proposed decree sets a deadline for work of April 8, 2017; a full one-year and 4 months *after* WASD says it would be possible to complete the work. Decree, at 5 of 7.

The relaxed deadline in the Decree has led the County to move slowly in commencing the work to repair the force main. Dr. Yoder testified that "there's no contract in place to replace the portion of the force main between Fisher Island and Virginia Key." Yoder dep., at 69:19-21.

Where a substantial and imminent threat to human health and environment are involved the courts have required projects to be done "as soon as possible to protect against [] potential hazards[.]"*United States v. Seymour Recycling Corp.*, 554 F. Supp. 1334, 1340 (S.D. Ind. 1982); *see also United States v. Ottati & Goss*, 694 F. Supp. 977, 981 (D.N.H. 1988). In respect to the 54" force main between Fisher Island and Virginia Key, although all parties acknowledge it

presents an imminent and substantial endangerment, the proposed consent decree in no way requires that the work be done as soon as practicable. On the contrary, the deadline in the proposed Decree provides more than one year of leeway to the County, beyond the timeframe within which both the County and US believe the work could reasonably be completed. As such, the proposed deadline moves what by any measure should be a high priority to a back burner project that can be completed at a leisurely pace. The deadline in the proposed consent decree does not force or even encourage the County to remedy this significant threat "as soon as possible to protect against potential hazards." The deadline for completion of replacing the 54" force main should be moved to April 8, 2016, if not January 31, 2015. Failing to include a deadline that reflects the urgency to repair and replace the under-bay force main as soon as possible is not fair, reasonable or in the public interest.

**F.     Continued Reliance on Ocean Outfalls Is Unfair and Contrary to Public Interest.**

The County discharges treated effluent from its North and Central waste water treatment plants via ocean outfall. Klingenstein Decl. ¶¶ 15, 21. The Central Plant discharges into federal waters in the Atlantic Ocean pursuant to NPDES permit no. FL0024805, issued under Section 402 of the CWA. As explained in Count III of BBWK Amended Complaint,[50] an NPDES permit is required under Section 402 of CWA for the County to discharge into navigable water of the United States. *See* 33 U.S.C. § 1342. The County's NPDES Permit No. FL0024805 expired in 2004. Am. Comp. ¶ 44. While the County applied for renewal of the permit in 2004, EPA has neither granted nor denied the application, which remains pending nine years later. *Id.* ¶ 78. EPA contends that NPDES Permit FL0024805, although expired since 2004 is administratively effective since the County timely applied for new permit. ECF 74, at 2-3 (citing 40 C.F.R. § 122.6 & 5 U.S.C. § 558(c)).

---

[50] The proposed Decree does not purport to, nor will it, resolve Count III, which remains for the Court's consideration.

Under Section 403 of CWA, 33 U.S.C. § 1343, and regulations promulgated thereunder, including 40 C.F.R. § 125.120 *et seq.* ("Ocean Discharge Criteria") in considering an application for ocean discharges, EPA must consider whether any discharges into a marine environment will cause an "unreasonable degradation of the marine environment."  40 C.F.R. § 125.122(a).  An "unreasonable degradation of the marine environment" occurs if there are "significant adverse changes in ecosystem diversity, productivity and stability of the biological community within the area of discharge." 40 C.F.R. § 125.121(e).  Although EPA has not rendered a decision to issue or deny the County's permit application, BBWK maintains that a permit could not legally be issued under the standards set forth in the applicable regulations, because, among other things, neither EPA nor the County have provided sufficient information to determine whether or not "significant adverse changes in ecosystem diversity, productivity and stability of the biological community" is occurring "within the area of discharge." *Id.*  This explains EPA's failure to act.

But federal agencies ***must*** act on applications "within a reasonable time." 5 U.S.C. § 558 (c).  Courts have found that unreasonable delay can either be established by an explicit agency deadline (in an agency statute) or by "contextual or historical evidence."  *Coal. for Sustainable Res., Inc. v. U.S. Forest Serv.*, 259 F.3d 1244, 1251 (10th Cir. 2001).  Under the APA, a district court is authorized to "compel agency action unlawfully withheld or unreasonably denied." 5 U.S.C. § 706(1); *see also Norton v. So. Utah Wilderness Alliance,* 542 U.S. 55, 63 (2004).   In *Southern Utah Wilderness*, the Supreme Court held that a Court has authority under the APA to mandate agency action "unreasonably delayed" where, as is alleged here, the agency fails to take action "that it is ***required to take***." *Id.* at 64.  Where judicial review of agency inaction is authorized under the APA, review is precluded ***only*** "if another statute expressly or impliedly forbids the relief requested." *Gjondrekaj v. Napolitano*, 801 F. Supp. 2d 1344, 1348 n.3 (M.D. Fla. 2011) (citing *Hamby v. Janer,* 808 F.2d 1433 (11th Cir. 1987)).

In addition to CWA permitting requirements, Florida's Ocean Outfall legislation requires all wastewater utilities in Southeast Florida to reduce nutrient discharges by 2018 and to cease outfalls entirely by 2025, at which time 60% of wastewater flows must be reused. Fla. Stat. § 403.086(9)(a)-(j).  Notwithstanding this, the proposed Decree does not oblige the County to end reliance on ocean outfalls by any particular date or even plan for the end of ocean discharges. The Decree acknowledges that "implementation of the (State of Florida's) Ocean Outfall Legislation may impact the scope and scheduling of certain capital improvement Projects identified in Appendix D." However, while acknowledging that the Ocean Outfall Legislation "may impact" the projects, the Plaintiffs and County nowhere plan for how those impacts will actually be addressed in the Decree. Mr. Klingenstein notes that "changes to the proposed capital projects may be necessary depending on the final plan approved by FDEP." Klingenstein Decl. ¶ 77.  Again, however, no effort is made to address these concerns now.  EPA's "ready, fire then aim" approach is not in the public interest.

Mr. Klingenstein further concedes that the ocean outfall issue which will overtake the proposed Decree and render it obsolete: "I expect that Miami-Dade and the Plaintiffs will negotiate revisions to the consent decree that accommodate [Ocean Outfall Legislation] changes." Id. ¶ 111. The Court should not approve a Decree where EPA acknowledges the Decree is essentially obsolete on issuance due its continued reliance on a discharge methodology that will shortly be prohibited.

**<u>Conclusion</u>**

Accordingly, BBWK requests that the Court deny the motion for entry of consent decree after an evidentiary hearing on the motion at which BBWK is permitted to present testimony and cross-examine the movants' affiants.[51]

Respectfully submitted,

By:   / s/   Paul J. Schwiep
        Paul J. Schwiep, Fla. Bar No. 823244
        COFFEY BURLINGTON, P.L.
        2699 South Bayshore Drive, Penthouse
        Miami, Florida 33133
        Phone: 305-858-2900
        Fax: 305-858-5261
        pschwiep@coffeyburlington.com

---

[51]  As this Court is aware, BBWK has requested discovery from Plaintiffs and the County which has not been provided.  BBWK continues to investigate potential flaws with the proposed Decree and reserves the right to raise additional issues as new information is unearthed.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on January 16, 2014 I electronically filed the foregoing with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record on the Service List below via transmission of Notice of Electronic Filing generated by CM/ECF.

_/s/   Paul J. Schwiep_____

## SERVICE LIST

| | |
|---|---|
| Rachel Kamons, Esq., Trial Attorney<br>Rachael.Kamons@usdoj.gov<br>Environmental Enforcement Section<br>Environment and Natural Resources Division<br>United States Department of Justice<br>601 D Street NW, Suite 6031<br>Washington, DC 20044<br>Telephone: (202) 514-5260<br>Facsimile:  (202) 616-2427<br><br>*Counsel for United States of America* | Jonathan A. Glogau<br>Jon.Glogau@myfloridalegal.com<br>jann.mrazek@myfloridalegal.com<br>teresa.herndon@myfloridalegal.com<br>Florida Department of Legal Affairs<br>The Capitol PL-01<br>Tallahassee, FL 32399-1050<br>Telephone: (850) 414-3300<br>Facsimile:  (850) 414-9650<br><br>*Counsel for State of Florida* |
| Andrew J. Doyle, Esq.<br>andrew.doyle@usdoj.gov<br>United States Department of Justice<br>Environmental & Natural Resources Division<br>Post Office Box 7611<br>Washington, DC 20044<br>Telephone: (202) 514-4427<br>Facsimile:  (202) 514-8865<br><br>*Counsel for United States of America* | Barney Jack Chisolm, Jr., Esq.<br>Jack.Chisolm@dep.state.fl.us<br>Florida Dept. of Environmental Protection<br>3900 Commonwealth Blvd.<br>Mail Station 35<br>Tallahassee, FL 32399-3000<br>Telephone: (850) 245-2242<br>Facsimile:   (850) 245-2301<br><br>*Counsel for State of Florida Department of Environmental Protection* |

| | |
|---|---|
| Kirk Sanders White, Esq.<br>Kirk.white@dep.state.fl.us<br>Florida Department of Environmental<br>Protection<br>3900 Commonwealth Blvd., MS 35<br>Tallahassee, FL  32399<br>Telephone:  (850) 245-2258<br>Facsimile:  (850) 245-2301<br><br>*Counsel for State of Florida Department of<br>Environmental Protection* | James M. Porter, Esq.<br>Jim@JamesMPorterPA.com<br>James M. Porter, P.A.<br>9350 South Dixie Highway, 10th Floor<br>Miami, FL  33156<br>Telephone:  (786) 425-2299<br>Facsimile:   (786) 536-6495<br><br>*Counsel for Biscayne Bay Waterkeeper*<br>**- AND –**    *Judi Koslen* |
| Holly Ellen Van Horsten, Esq.<br>hvanhorsten@phillipsrichard.com<br>jll@phillipsrichard.com<br>jrey@phillipsrichard.com<br>mmcdougald@phillipsrichard.com<br>Phillips Richard & Rind, P.A.<br>9360 Southwest 72nd Street, Suite 283<br>Miami, FL  33173<br>Telephone:  (305) 412-8322<br>Facsimile:   (305) 412-8299<br><br>*Counsel for Miami-Dade Sewer and Water<br>Employees, Local 121 of the American<br>Federation of State, County and Municipal<br>Employees, AFL-CIO   **- and –**<br>Intervenor Plaintiff Emilio Azoy* | Henry N. Gillman<br>hgill@miamidade.gov<br>lpaxt01@miamidade.gov<br>Assistant County Attorney<br>Stephen P. Clark Center<br>111 N.W. First Street, Suite 2810<br>Miami, FL  33128-1993<br>Telephone:  (305) 375-5151<br><br>*Counsel for Miami-Dade County* |
| Julie Dick, Esq.<br>jdick@abrahamlawgroup.com<br>Abraham Law Group<br>151 Crandon Blvd., #100<br>Key Biscayne, FL 33149<br>Telephone: (786) 224-4555<br>Facsimile:   (888) 335-2579<br><br><br>*Counsel for Biscayne Bay Waterkeeper*<br>**- AND –**    *Judi Koslen* | Thomas H. Robertson<br>Robert@miamidade.gov<br>Lpaxt01@miamidade.gov<br>Assistant County Attorney<br>Stephen P. Clark Center<br>111 N.W. First Street, Suite 2810<br>Miami, FL  33128-1993<br>Telephone:  (305) 375-5151<br>Facsimile:   (305) 375-5611<br><br>*Counsel for Miami-Dade County* |

| Sarah E. Davis | Lauren Morse |
|---|---|
| SEDavis@miamidade.gov | LaurenM@miamidade.gov |
| Lpaxt01@miamidade.gov | Lpaxt01@miamidade.gov |
| Assistant County Attorney | Assistant County Attorney |
| Stephen P. Clark Center | Stephen P. Clark Center |
| 111 N.W. First Street, Suite 2810 | 111 N.W. First Street, Suite 2810 |
| Miami, FL  33128-1993 | Miami, FL  33128-1993 |
| Telephone:  (305) 375-5151 | Telephone:  (305) 375-5151 |
| Facsimile:  (305) 375-5634 | Facsimile:  (305) 375-5611 |
| | |
| *Counsel for Miami-Dade County* | *Counsel for Miami-Dade County* |