IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA,                       )
the STATE OF FLORIDA DEPARTMENT )
OF ENVIRONMENTAL PROTECTION,         )
and the STATE OF FLORIDA,                         )
                              Plaintiffs,                     )            Case: No. 1:12-cv-24400-FAM
                                                                       )
                    v.                                               )            CONSENT DECREE
                                                                       )
MIAMI-DADE COUNTY,                                )
FLORIDA,                                                      )
                              Defendant.                    )
_____)

-i-

## TABLE OF CONTENTS

I.  JURISDICTION AND VENUE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

II.  APPLICABILITY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

III.  OBJECTIVES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

IV.  DEFINITIONS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

V.  REVIEW, APPROVAL AND IMPLEMENTATION OF DELIVERABLES . . . 18

VI.  COMPLIANCE REQUIRMENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

    17.  Obligation to Perform Work . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
    18.  Continuation of Capacity, Management, Operations and Maintenance ("CMOM") Programs of the First Partial Consent Decree and Second and  Final Partial Consent Decree . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    23
       (a).  Adequate Pumping, Transmission and Treatment Capacity Program . . . . 23
       (b).  Pump Station Remote Monitoring Program . . . . . . . . . . . . . . . . . . . . . . . 24
       (c).  WCTS Model . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
       (d).  Spare Parts Program . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
       (e).  Volume Sewer Customer Ordinance Program . . . . . . . . . . . . . . . . . . . . . 28
    19.  New CMOM Programs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
       (a).  Fats, Oils and Grease ("FOG") Control Program . . . . . . . . . . . . . . . . . . 31
       (b).  Sewer Overflow Response Plan ("SORP") . . . . . . . . . . . . . . . . . . . . . . . 34
       (c).  Information Management System ("IMS") Program . . . . . . . . . . . . . . . . 38
       (d).  Sewer System Asset Management Program . . . . . . . . . . . . . . . . . . . . . . . 40
       (e).  Gravity Sewer System Operations and Maintenance Program . . . . . . . . . 41
       (f).  Pump Station Operations and Preventative Maintenance Program . . . . . . 44
       (g).  Force Main Operations, Preventative Maintenance and Assessment/Rehabilitation Program . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47
       (h).  WWTP Operations and Maintenance Program . . . . . . . . . . . . . . . . . . . . 53
       (i).  Specific Capital Improvement Projects . . . . . . . . . . . . . . . . . . . . . . . . . . 57
       (j).  Financial Analysis Program . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

VII.  CIVIL PENALTY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

VIII.  SUPPLEMENTAL ENVIRONMENTAL PROJECT. . . . . . . . . . . . . . . . . . . 62

IX.  REPORTING REQUIREMENTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

-ii-

X.      STIPULATED PENALTIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

XI.     FORCE MAJEURE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

XII.    DISPUTE RESOLUTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

XIII.   RIGHT OF ENTRY AND INFORMATION COLLECTION
        AND RETENTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

XIV.    NOT A PERMIT/COMPLIANCE WITH OTHER STATUTES/
        REGULATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82

XV.     EFFECT OF SETTLEMENT/RESERVATION OF RIGHTS. . . . . . . . . . . . . . . 83

XVI.    COSTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85

XVII.   NOTICES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85

XVIII.  DATE OF ENTRY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 88

XIX.    RETENTION OF JURISDICTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 88

XX.     MODIFICATION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 88

XXI.    TERMINATION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

XXII.   PUBLIC PARTICIPATION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90

XXIII.  SIGNATORIES/SERVICE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90

XXIV.   INTEGRATION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91

XXV.    FINAL JUDGMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91

XXVI.   APPENDICES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91

-iii-

WHEREAS, Plaintiff, the United States of America ("United States"), by the authority of the Attorney General of the United States and through its undersigned counsel, acting at the request and on behalf of the United States Environmental Protection Agency ("EPA"), filed a Complaint on December 13, 2012 alleging that the Defendant, Miami-Dade County, Florida ("Miami-Dade"), has violated and continues to violate Sections 301 of the Clean Water Act, 33 U.S.C. § 1311 ("CWA"), and the terms and conditions of its National Pollutant Discharge Elimination System ("NPDES") permits issued under Section 402 of the CWA, 33 U.S.C. § 1342;

WHEREAS, Plaintiff, the State of Florida Department of Environmental Protection ("FDEP"), joined in the Complaint and seeks injunctive relief and civil penalties for Miami-Dade's alleged violations of the Florida Air and Water Pollution Control Act, Chapter 403 of the Florida Statutes ("Fla. Stat.") and applicable rules of the Florida Administrative Code ("Fla. Admin. Code") promulgated thereto;

WHEREAS, FDEP has been authorized by EPA to administer the NPDES program in the State of Florida pursuant to Section 402(b) of the CWA, 33 U.S.C. § 1342(b);

WHEREAS, the State of Florida is a Plaintiff in this action, satisfying the requirements of Section 309(e) of the CWA, 33 U.S.C. § 1319(e), which requires the state in which a municipality is located to be joined as a party whenever a municipality is a party to a civil action brought by the United States under Section 309 of the CWA;

WHEREAS, Miami-Dade is a political subdivision of the State of Florida and a "municipality" pursuant to Section 502 of the CWA, 33 U.S.C. § 1362;

-1-

WHEREAS, Miami-Dade owns and operates a publically owned treatment works ("POTW") consisting of a municipal wastewater collection and transmission system ("WCTS"), which is designed to collect and convey municipal sewage (domestic, commercial and industrial), and three (3) municipal wastewater treatment plants: the North District Wastewater Treatment Plant ("North District WWTP"), the Central District Wastewater Treatment Plant ("Central District WWTP") and the South District Wastewater Treatment Plant ("South District WWTP");

WHEREAS, Miami-Dade's WCTS is a separate system from Miami-Dade's storm water conveyance system;

WHEREAS, Miami-Dade's POTW is one of the largest public utilities in the United States, providing both water and wastewater service to a population of over 2 million with 336,000 retail sewer accounts as well as fifteen (15) Volume Sewer Customers and numerous private collection systems; the POTW consists of three (3) regional WWTPs, 1,035 Pump Stations, roughly 910 miles of Force Main and approximately 3,071 miles of Gravity Sewer interceptors, Gravity Sewers and siphons; additionally, Miami-Dade is responsible for an estimated 2,241 miles of public laterals, for a total collection and transmission system of nearly 6,000 miles;

WHEREAS, the Volume Sewer Customers are responsible for collection and transmission systems totaling nearly 1,200 miles;

WHEREAS, Miami-Dade estimates that at least 10% of its Force Mains and Gravity Sewer interceptors are greater than fifty (50) years old, at least 42% are twenty-five (25) to fifty

-2-

(50) years old, at least 26% are less than twenty-five (25) years old, and 22% are of unknown age;

WHEREAS, the North District WWTP is regulated pursuant to NPDES Permit Number FL0032182, issued to Miami-Dade by FDEP pursuant to Section 402 of the CWA, 33 U.S.C. § 1342, Chapter 403 Fla. Stat. and applicable rules of the Fla. Admin. Code;

WHEREAS, the North District WWTP is also regulated pursuant to Florida Permit Number 0057792-009-UO, issued by FDEP to Miami-Dade pursuant to the Underground Injection Control requirements and regulations of the Safe Drinking Water Act, 42 U.S.C. § 300h, and Chapter 403 Fla. Stat. and applicable rules of the Fla. Admin. Code, as its treated wastewater is emplaced subsurface through well injection;

WHEREAS, the Central District WWTP is regulated pursuant to NPDES Permit Number FL0024805, issued to Miami-Dade by EPA pursuant to Section 402 of the CWA, 33 U.S.C. § 1342, as the ocean outfall for the Central District WWTP extends into federal waters;

WHEREAS, the Central District WWTP is also regulated pursuant to Florida Permit Number FLA024805, issued by FDEP to Miami-Dade pursuant to Chapter 403 Fla. Stat. and applicable rules of the Fla. Admin. Code;

WHEREAS, the South District WWTP is regulated pursuant to Permit Number FLA042137, issued by FDEP to Miami-Dade pursuant to Chapter 403 Fla. Stat. and applicable rules of the Fla. Admin. Code;

WHEREAS, the South District WWTP is also regulated pursuant to Florida Permit Numbers 61787-022-UO and 61787-023-UC, issued by FDEP to Miami-Dade pursuant to the Underground Injection Control requirements and regulations of the Safe Drinking Water Act, 42

-3-

U.S.C. § 300h, and Chapter 403 Fla. Stat. and applicable rules of the Fla. Admin. Code, as its treated wastewater is emplaced subsurface through well injection;

WHEREAS, on January 13, 1994, the United States District Court, Southern District of Florida, entered the First Partial Consent Decree resolving certain claims brought by the United States against Miami-Dade in a complaint pursuant to Section 504 of the CWA, 33 U.S.C. § 1364, concerning the alleged threat presented by Miami-Dade's continued use of the seventy-two (72) inch Force Main that conveyed untreated wastewater from the City of Miami under Biscayne Bay to the Central District WWTP;

WHEREAS, the First Partial Consent Decree required Miami-Dade to implement certain injunctive relief measures, including measures to address the alleged threat presented by Miami-Dade's continued use of the above-referenced seventy-two (72) inch Force Main;

WHEREAS, the State was identified in the First Partial Consent Decree as a statutory defendant pursuant to Section 309(e) of the CWA, 33 U.S.C. § 1319(e);

WHEREAS, on September 12, 1995, the United States District Court, Southern District of Florida, entered the Second and Final Partial Consent Decree resolving the outstanding claims brought by the United States against Miami-Dade in the complaint pursuant to Sections 301, 309(b) and (d), and 402 of the CWA, 33 U.S.C. §§ 1311, 1319(b) and (d), and 1342, alleging that the discharge of untreated wastewater from Miami-Dade's WCTS without a permit (also known as "Sanitary Sewer Overflows" or "SSOs") constitutes a violation of the CWA, the regulations promulgated thereunder, and the various terms and conditions of the NPDES Permits;

-4-

WHEREAS, the Second and Final Partial Consent Decree required Miami-Dade to implement certain injunctive relief measures to address the SSOs from Miami-Dade's WCTS;

WHEREAS, the State was identified in the Second and Final Partial Consent Decree as a statutory defendant pursuant to Section 309(e) of the CWA, 33 U.S.C. § 1319(e);

WHEREAS, since entry of the First Partial Consent Decree and the Second and Final Partial Consent Decree, Miami-Dade completed over 1,000 milestones and has successfully complied with and/or completed a substantial portion of the injunctive relief measures required by both the First Partial and Second and Final Partial Consent Decrees;

WHEREAS, Miami-Dade contends that from fiscal year 1995 to fiscal year 2011 it has spent approximately $1.8 billion upgrading its wastewater infrastructure and achieving significant progress in implementing and improving Capacity, Management, Operations and Maintenance ("CMOM") programs in compliance with the requirements of various consent decrees and settlement agreements including, without limitation, the First Partial Consent Decree, the Second and Final Partial Consent Decree, and FDEP's Settlement Agreement System Wide and Settlement Agreement Cross Bay Line; and as a result, the number and volume of SSOs have been significantly reduced and with no capacity-related SSOs in the WCTS for the period from 2002 through October 2011 despite the increase in service area population and Hurricanes Wilma and Katrina;

WHEREAS, Miami-Dade contends that, as a result of the First Partial Consent Decree and the Second and Final Partial Consent Decree, it has implemented and continues to implement a $300 million Pump Station Improvement Program ("PSIP") to upgrade the WCTS including Pump Stations and Force Mains pursuant to which each Pump Station had to be

-5-

certified as capable of meeting a nominal average pump operating time ("NAPOT") of less than or equal to 10 hours per day; and Pump Stations exceeding the NAPOT criteria had to have a Remedial Action Plan and no building permits could be issued for connections to WCTS upstream of that station; and as a result, a total of 666 Remedial Action Plans were prepared and submitted to EPA through June 30, 2012, and a total of 664 Pump Stations and 222 Force Main projects have been completed;

WHEREAS, Miami-Dade contends that, as a result of the First Partial Consent Decree and the Second and Final Partial Consent Decree, it has implemented an Infiltration/Exfiltration/Inflow ("I/E/I") Program to minimize the amount of groundwater infiltration, to redirect rainwater inflow from the sanitary sewers and to minimize potential leakage of raw sewage from defective sewers resulting in more than 32,000 mandated repairs being completed and, as of December 31, 2011 an estimated 127 million gallons per day ("mgd") of I/I being removed from the WCTS;

WHEREAS, the First Partial Consent Decree and the Second and Final Partial Consent Decree mandated improvements in fats, oils and grease ("FOG") control and volume customer control resulting in Miami-Dade adopting the following ordinances:  (1) Grease Trap Ordinance, Sections 24-15 and 24-18 of the Code of Miami-Dade County, June 21, 1994; and (2) Volume Sewer Customer Ordinance, Section 24-42.2 of the Code of Miami-Dade County, November 12, 1997;

WHEREAS, the Parties recognize that since entry of the First Partial Consent Decree and the Second and Final Partial Consent Decree, conditions within and circumstances surrounding

-6-

Miami-Dade's WCTS and WWTPs have changed over the last eighteen (18) years, including, in particular, the causes and locations of SSOs;

WHEREAS, in April 2011, Miami-Dade conducted a CMOM Program self assessment to review its current programs to determine how these programs should be modified in order to more effectively address SSOs and improve system performance; and on May 1, 2011, Miami-Dade submitted to EPA a CMOM Report;

WHEREAS, as a result of such changed circumstances and conditions and the issues identified in Miami-Dade's self-assessment, the Parties recognize that appropriate modifications and updates to the required injunctive relief terms of both the First Partial Consent Decree and the Second and Final Partial Consent Decree are warranted;

WHEREAS, it is recognized that there are Volume Sewer Customers that own and operate their own wastewater collection and transmission systems that discharge into Miami-Dade's WCTS;

WHEREAS, the Parties intend for the terms and conditions of this Consent Decree to replace and supersede in their entirety the terms and provisions of both the First Partial Consent Decree and the Second and Final Partial Consent Decree, and the Parties request that the Court terminate both the First Partial Consent Decree and the Second and Final Partial Consent Decree upon entry of this Consent Decree;

WHEREAS, Miami-Dade has reported to EPA and FDEP within the last five (5) years numerous SSOs from its WCTS, including a number of large volume SSOs from ruptured Force Mains;

-7-

WHEREAS, Miami-Dade has also reported to EPA and FDEP within the last five (5) years a number of exceedances of the effluent limitations in the NPDES Permits;

WHEREAS, EPA and FDEP have inspected Miami-Dade's WCTS and WWTPs and have discovered a number of improper management, operations, and maintenance practices;

WHEREAS, the United States and FDEP contend that these SSOs; effluent limit exceedances; and improper management, operation, and maintenance practices are violations of the CWA, Fla. Stat., Fla. Admin. Code, and NPDES Permits;

WHEREAS, Miami-Dade has paid to FDEP civil penalties to settle notices of SSOs as follows:  $9,500.00 for a 2006 SSO as memorialized in Short Form Consent Order ("SFCO") No. 06-2308; $8,500.00 for a 2006 SSO as memorialized in SFCO 06-2309; $10,000.00 for a 2007 SSO as memorialized in SFCO 07-1185; $7,500.00 for a 2007 SSO as memorialized in SFCO 07-1186; and $10,000.00 for a 2010 SSO as memorialized in SFCO 08-0050;

WHEREAS, this Consent Decree requires Miami-Dade to develop, submit, finalize, and implement plans for the continued improvement of its WCTS and WWTPs to eliminate, reduce, prevent or otherwise control SSOs; to correct effluent limit violations; and to properly manage, operate and maintain its WCTS and WWTPs;

WHEREAS, the Parties acknowledge that, in 2008, the State of Florida enacted Chapter 2008-232, Laws of Florida which prohibits, in pertinent part, construction of new ocean outfalls and requires that all six (6) ocean outfalls in Florida cease using the outfalls as the primary means of wastewater disposal by December 31, 2025; and that wastewater facilities that discharged wastewater through an ocean outfall on July 1, 2008, are required to install a functioning reuse system (providing beneficial reuse of a significant percentage of the outfall

-8-

flow amounts) no later than December 31, 2025, and submit a detail implementation plan by July 1, 2013;

WHEREAS, the Parties acknowledge that the implementation of this legislation may impact the scope and scheduling of the capital improvements projects identified in Appendix D of this Consent Decree;

WHEREAS, the Parties to this Consent Decree have negotiated in good faith and have reached a settlement of the issues raised in the Complaint;

WHEREAS, Miami-Dade's agreement to this Consent Decree is not an admission of liability to the allegations arising out of transactions or occurrences alleged in the Complaint, and except for Miami-Dade's consent to jurisdiction and venue as provided in Section I of this Consent Decree (Jurisdiction and Venue), nor is it an adjudication or admission of any fact or law;

WHEREAS, the Parties recognize, and the Court by entering this Consent Decree finds, that this Consent Decree has been negotiated by the Parties in good faith and will avoid litigation between the Parties and that this Consent Decree is fair, reasonable, and in the public interest.

NOW THEREFORE, with the consent of the Parties, it is hereby ORDERED, ADJUDGED and DECREED as follows:

## I. JURISDICTION AND VENUE

1.     This Court has jurisdiction over the subject matter of this action, pursuant to 28 U.S.C. §§ 1331, 1345, and 1355, and Sections 309(b) and 504 of the CWA, 33 U.S.C. §§ 1319(b) and 1364, and over the Parties.  This Court has supplemental jurisdiction over the state law claims asserted by FDEP pursuant to 28 U.S.C. § 1367.  Venue is proper in the Southern

-9-

District of Florida pursuant to Section 309(b) of the CWA, 33 U.S.C. § 1319(b), and 28 U.S.C. §§ 1391(b) and 1395(a), because the violations alleged in the Complaint are alleged to have occurred in this judicial district. For purposes of this Consent Decree, or any action to enforce this Consent Decree, Miami-Dade consents to the Court's jurisdiction over this Consent Decree and any such action and over Miami-Dade and consents to venue in this judicial district.

2.      For purposes of this Consent Decree, Miami-Dade agrees that the Complaint states claims upon which relief may be granted pursuant to Sections 309(b) and 504 of the CWA, 33 U.S.C. §§ 1319(b) and 1364; Fla. Stat. §§ 403.161, 403.141, 403.131 and 403.121.

## II. APPLICABILITY

3.      The obligations of this Consent Decree apply to and are binding upon the United States, EPA, the State, FDEP, and upon Miami-Dade and any successors, assigns, or other entities or persons otherwise bound by law.

4.      No transfer of ownership or operation of any portion of the WCTS or of any WWTP, whether in compliance with the procedures of this Paragraph or otherwise, shall relieve Miami-Dade of its obligation to ensure that the terms of this Consent Decree are implemented. At least thirty (30) Days prior to such transfer, Miami-Dade shall provide a copy of this Consent Decree to the proposed transferee and shall simultaneously provide written notice of the prospective transfer, together with a copy of the proposed written agreement, to the United States and FDEP in accordance with Section XVII of this Consent Decree (Notices). Miami-Dade shall require, as a condition of any sale or transfer, that the purchaser or transferee agrees in writing to be bound by this Consent Decree and submit to the jurisdiction of the Court for its enforcement.

Any attempt to transfer ownership or operation of any portion of the WCTS or of any WWTP without complying with this Paragraph constitutes a violation of this Consent Decree.

5. Miami-Dade shall provide or otherwise make available a copy of this Consent Decree to all officers, employees, and agents whose duties might reasonably include compliance with any provision of this Consent Decree, as well as to any contractor retained to perform work required under this Consent Decree. Miami-Dade shall condition any such contract upon performance of the work in conformity with the terms of this Consent Decree.

6. In any action to enforce this Consent Decree, Miami-Dade shall not raise as a defense the failure by any of its officers, directors, employees, agents, or contractors to take any actions necessary to comply with the provisions of this Consent Decree.

## III. **OBJECTIVES**

7. The express purpose of the Parties entering into this Consent Decree is for Miami-Dade to take all necessary measures, consistent with the objectives of the CWA, to achieve full compliance with the CWA, the regulations promulgated thereunder, Fla. Stat. Chapter 403, and the applicable Fla. Admin. Code Rules promulgated thereto, as well as the NPDES Permits, with the goal of eliminating all SSOs and Prohibited Bypasses. All plans, reports, construction, remedial maintenance, and other obligations in this Consent Decree, and under any amendment to this Consent Decree, shall have the objective of ensuring that Miami-Dade complies with the CWA, Fla. Stat. Chapter 403, all applicable federal and state regulations, and the terms and conditions of the NPDES Permits.

## IV. **DEFINITIONS**

8.     Terms used in this Consent Decree that are defined in the CWA or in regulations promulgated pursuant to the CWA shall have the meanings assigned to them in the CWA, 33 U.S.C. §§ 1251 *et seq*., and regulations promulgated under the CWA, unless otherwise provided in this Consent Decree.  Whenever the terms set forth below are used in this Consent Decree, the following definitions shall apply:

(a).     "Building Backup" shall mean a wastewater release or backup into a building that is caused by blockages, flow conditions, or other malfunctions in Miami-Dade's WCTS.  A wastewater backup or release that is caused by blockages, flow conditions, or other malfunctions of a Private Lateral is not a Building Backup.

(b).     "Calendar Quarter" shall mean the three (3) Month periods ending on March 31, June 30, September 30, and December 31.

(c).     "Calendar Year" shall mean the twelve (12) Month period starting on January 1 and ending on December 31.

(d).     "Certification" or "Certify" when used in this Consent Decree shall require Miami-Dade to comply with Paragraph 16 of this Consent Decree.

(e).     "CMOM" or "Capacity, Management, Operations, and Maintenance" shall mean a program of accepted industry practices to properly manage, operate and maintain sanitary wastewater collection, transmission and treatment systems, investigate capacity-constrained areas of these systems, and respond to SSO events.

(f).     "Complaint" shall mean the complaint filed by the United States, the State, and FDEP in this action.

-12-

(g).  "Consent Decree" shall mean this Consent Decree and all appendices attached hereto (listed in Section XXVI. (Appendices)).  In the event of a conflict between this document and any appendix, this document shall control.

(h).  "CWA" shall mean the Clean Water Act, as amended, 33 U.S.C. §§ 1251, *et seq.*

(i)  "Date of Entry" shall have the definition provided in Section XVIII (Date of Entry).

(j).  "Date of Lodging" shall mean the date this Consent Decree is filed for lodging with the Clerk of the Court for the United States District Court for the Southern District of Florida.

(k).  "Day" shall mean a calendar day unless expressly stated to be a business day.  In computing any period of time under this Consent Decree, where the last day would fall on a Saturday, Sunday, or federal holiday, the period shall run until the close of business of the next business day.

(l).  "Defendant" shall mean Miami-Dade County, Florida and any successor thereto.

(m).  "Deliverable" shall mean any written document required to be prepared and/or submitted by or on behalf of Miami-Dade pursuant to this Consent Decree.

(n).  "DOJ" shall mean the United States Department of Justice.

(o).  "EPA" shall mean the United States Environmental Protection Agency and any of its successor departments or agencies.

-13-

(p).    "Effective Date" shall mean the Date of Entry or six (6) Months after the Date of Lodging, whichever occurs first.

(q).    "FDEP" shall mean the State of Florida Department of Environmental Protection and any successor departments or agencies of the State.

(r).    "Force Main" shall mean any pipe that receives and conveys, under pressure, wastewater from the discharge side of a pump.  A Force Main is intended to convey wastewater under pressure.

(s).    "Gravity Sewer Line" or "Gravity Sewer" shall mean a pipe that receives, contains and conveys wastewater not normally under pressure, but is intended to flow unassisted under the influence of gravity.

(t).    "Infiltration" as defined by 40 C.F.R. § 35.2005(b)(20) shall mean water other than wastewater that enters the WCTS (including sewer service connections and foundation drains) from the ground through such means as defective pipes, pipe joints, connections, or manholes.

(u).    "Inflow" as defined by 40 C.F.R. § 35.2005(b)(21) shall mean water other than wastewater that enters the WCTS (including sewer service connections) from sources such as, but not limited to, roof leaders, cellar drains, yard drains, area drains, drains from springs and swampy areas, manhole covers, cross connections between storm sewers and sanitary sewers, catch basins, cooling towers, storm water, surface runoff, street wash waters, or drainage.

(v).    "I/I" shall mean the total quantity of water from Inflow, Infiltration, and rainfall-induced Inflow and Infiltration without distinguishing the source.

-14-

(w).    "Miami-Dade" shall mean Miami-Dade County, Florida, including all of its departments, agencies, instrumentalities such as the Water and Sewer Department and the Department of Regulatory and Economic Resources, and any successor thereto.

(x).    "Month" shall mean one (1) calendar month running from the numbered day to the same numbered day of the following calendar month, regardless of whether the particular month has 28, 29, 30 or 31 days.  In the event a triggered event would occur on a day of the month which does not exist (for example, on February 30), then the event shall be due on the first day of the following month (for example, March 1).

(y).    "NPDES" shall mean the National Pollutant Discharge Elimination System authorized under Section 402 of the CWA, 33 U.S.C. § 1342.

(z).    "NPDES Permits" shall mean the most recently issued NPDES permits issued to Miami-Dade for its WWTPs.

(aa).    "Ocean Outfall Legislation" shall mean the part of Chapter 2008-232, Laws of Florida, that has been codified in Fla. Stat. Section 403.086(9)(a)-(j).

(bb).    "Paragraph" shall mean a portion of this Consent Decree identified by an Arabic numeral.

(cc).    "Parties" shall mean the United States of America on behalf of EPA, the State of Florida, FDEP, and Miami-Dade.

(dd).    "Plaintiffs" shall mean the United States of America on behalf of EPA, the State of Florida, and FDEP.

(ee).    "Private Lateral" shall mean that portion of a sanitary sewer conveyance pipe that extends from a single-family, multi-family, apartment, or other dwelling unit or

-15-

commercial or industrial structure to which wastewater service is or has been provided up to the property line of such structure.

(ff).   "Prohibited Bypass" shall mean the intentional diversion of waste streams from any portion of a treatment facility which is prohibited pursuant to the terms set forth at 40 C.F.R. § 122.41(m).

(gg).   "Public Document Repository" or "PDR" shall mean the Miami-Dade Water and Sewer Department located at 3071 SW 38th Avenue and the Miami-Dade Water and Sewer Department's website, miamidade.gov/water.

(hh).   "Pump Station" shall mean facilities comprised of pumps which pump wastewater to a higher hydraulic elevation, including all related electrical, mechanical, and structural systems necessary to the operation of that Pump Station.

(ii).   "Sanitary Sewer Overflow" or "SSO" shall mean any discharge of wastewater to waters of the United States or the State from Miami-Dade's WCTS through a point source not permitted in any NPDES permit, as well as any overflow, spill, or release of wastewater to public or private property from the WCTS that may not have reached waters of the United States or the State, including all Building Backups.

(jj).   "Section" shall mean a portion of this Consent Decree identified by a Roman numeral.

(kk).   "Sewer System" shall mean the WCTS and the WWTPs.

(ll).   "State" shall mean the State of Florida, including all of its departments, agencies, and instrumentalities.

-16-

(mm).  "Subparagraph" shall mean a portion of a paragraph identified by a lowercase letter, a lowercase Roman numeral, or a capital letter.

(nn).  "Timely" when applied to the submittal of a Deliverable shall mean submitted no later than the deadline established in this Consent Decree (or in a document approved pursuant to this Consent Decree) and containing all of the elements pertaining to the submittal as set forth in this Consent Decree (or in a document approved pursuant to this Consent Decree).  "Timely," when applied to the implementation of any Work shall mean implemented no later than the deadline established in this Consent Decree (or in a document approved pursuant to this Consent Decree) and in accordance with the elements pertaining to such Work as set forth in this Consent Decree (or in a document approved pursuant to this Consent Decree).

(oo).  "United States" shall mean the United States of America, acting on behalf of EPA, including its departments, agencies, and instrumentalities.

(pp).  "Volume Sewer Customer" or "VSC" shall mean any entity or municipality serviced on a bulk basis (at a wholesale rate) by Miami-Dade within the territorial limits of Miami-Dade County, and currently includes the municipalities of Bal Harbour, Bay Harbor Islands, Coral Gables, Florida City, Homestead, Hialeah, Hialeah Gardens, Medley, Miami Beach, North Miami, Opa Locka, North Bay Village, North Miami Beach, Surfside and West Miami.

(qq).  "Wastewater Collection and Transmission System" or "WCTS" shall mean the wastewater collection and transmission systems, including all pipes, Force Mains, Gravity Sewer Lines, Pump Stations, manholes and appurtenances thereto, owned or operated by

-17-

Miami-Dade designed to collect and convey municipal sewage (domestic, commercial and industrial) to Miami-Dade's WWTPs.

(rr).    "Wastewater Treatment Plant" or "WWTP" shall mean devices or systems used in the storage, treatment, recycling, and reclamation of municipal wastewater.  For purposes of this Consent Decree, this definition shall include all facilities owned, managed, operated, and maintained by Miami-Dade, including but not limited to the North District WWTP, the Central District WWTP, the South District WWTP, and all components of those plants.

(ss).    "Work" shall mean all activities Miami-Dade is required to perform under this Consent Decree.

## V.      REVIEW, APPROVAL AND IMPLEMENTATION OF DELIVERABLES

9.      Public Document Repository.  No later than one business day from the submission of a Deliverable to EPA and FDEP pursuant to Sections VI (Compliance Requirements), VIII (Supplemental Environmental Project) and IX (Reporting Requirements) of this Consent Decree, Miami-Dade shall make available a copy of each Deliverable in the Public Document Repository ("PDR").  The Miami-Dade Water and Sewer Department office located at 3071 SW 38th Avenue and the Miami-Dade Water and Sewer Department's website, http://www.miamidade.gov/water, shall constitute the PDR.  Miami-Dade shall bear the sole responsibility for depositing all Deliverables in the PDR.  Additionally, Miami-Dade shall create a form on the Miami-Dade Water and Sewer Department's website that will allow any person or entity to register online to receive an electronic notice that a Deliverable is available in the PDR. Miami-Dade shall not be responsible for changes in electronic addresses.  A registered person or entity shall not be a third-party beneficiary of this Agreement.  Within seven (7) Days after

EPA's approval, approval upon conditions, or modification by EPA pursuant to this Section, if revised, Miami-Dade shall place a copy of such revised version of the Deliverable in the PDR. Every registered person or entity shall also receive an electronic notice that such revised version of the Deliverable is available in the PDR.  Such copy shall replace all previous copies of that Deliverable in the PDR, and shall remain in the PDR until termination of this Consent Decree. In addition, Miami-Dade shall maintain in the PDR a listing of all Deliverables.

    10.    <u>EPA Action on Deliverables</u>.  After review of any Deliverable that is required to be submitted pursuant to this Consent Decree, EPA, after consultation with FDEP, shall in writing:  (a) approve the submission; (b) approve part of the submission and disapprove the remainder; or (c) disapprove the submission.  If EPA approves only in part or disapproves entirely a submission pursuant to Subparagraphs 10(b) and (c) above, EPA shall provide a written explanation of how the submission is inconsistent with the applicable criteria set forth in the relevant Sections of this Consent Decree.  EPA agrees to use best efforts to expeditiously review and comment on Deliverables.  If EPA issues written comments and decisions on any Deliverable more than sixty (60) Days after receipt of such Deliverable, any subsequent deadline or milestone that is dependent upon such comments or decisions shall be extended.  The length of the extension shall be determined by calculating the number of Days between EPA's receipt of the Deliverable and the date of Miami-Dade's receipt of EPA's written response, less sixty (60) Days.  Within thirty (30) Days of the date that Miami-Dade knows or should know of a deadline or milestone that Miami-Dade believes is extended under this Paragraph, Miami-Dade shall inform EPA, in writing, of its belief and the amount of time Miami-Dade believes the deadlines or milestones are extended.  If EPA disagrees with Miami-Dade's determination that a

-19-

deadline is dependent upon such comments or decisions, EPA shall inform Miami-Dade in writing.  Miami-Dade may invoke Dispute Resolution pursuant to Section XII (Dispute Resolution) regarding EPA's conclusion regarding whether a deadline is dependent upon such comments or decisions.

      11.    <u>Approved Deliverables</u>.  If a Deliverable is approved by EPA in its entirety pursuant to Subparagraph 10(a), Miami-Dade shall take all actions required by the Deliverable in accordance with the schedules and requirements of the Deliverable as approved.  If the Deliverable is approved only in part pursuant to Subparagraph 10(b), Miami-Dade shall, upon written direction from EPA, after consultation by EPA with FDEP, take all actions required by the approved plan, report, or other item that EPA, after consultation by EPA with FDEP, determines are technically severable from any disapproved portions and not directly dependent upon an unapproved portion of the Deliverable, subject to Miami-Dade's right to dispute only the specified conditions or the disapproved portions, under Section XII of this Consent Decree (Dispute Resolution).  Following EPA approval of any Deliverable or portion thereof, such Deliverable or portion thereof so approved shall be incorporated into and become enforceable under this Consent Decree, subject to Miami-Dade's right to dispute under Section XII of this Consent Decree (Dispute Resolution).

      12.    <u>Disapproved Deliverables</u>.  If the Deliverable is disapproved in whole or in part pursuant to Subparagraph 10(b) or (c), Miami-Dade shall, within sixty (60) Days or such other time as EPA and Miami-Dade agree to in writing, correct all identified deficiencies and resubmit to EPA the Deliverable, or disapproved portion thereof, for approval, in accordance with Paragraphs 10 and 11, subject to Miami-Dade's right to dispute under Section XII of this

Consent Decree (Dispute Resolution).  If the resubmission is approved in whole or in part by EPA, Miami-Dade shall proceed in accordance with Paragraph 11.

13.     Stipulated Penalties Accruing.  Any stipulated penalties applicable to the original Deliverable, as provided in Section X of this Consent Decree (Stipulated Penalties), shall accrue during the sixty (60)-Day period or other specified period, but shall not be payable unless the resubmitted Deliverable is not Timely or is disapproved in whole or in part; provided that, if the original submission was so deficient as to constitute a material breach of Miami-Dade's obligations under this Consent Decree, the stipulated penalties applicable to the original submission shall be due and payable notwithstanding any subsequent resubmissions.

14.     Resubmitted Deliverable.  If a resubmitted Deliverable, or portion thereof, is disapproved in whole or in part, EPA, after consultation with FDEP, may again require Miami-Dade to correct any deficiencies, in accordance with Paragraph 12, or may itself correct any deficiencies, subject to Miami-Dade's right to invoke Dispute Resolution under Section XII of this Consent Decree (Dispute Resolution) and the right of EPA to seek stipulated penalties as provided in preceding Paragraph 13.  Upon correction of any deficiencies, such resubmitted Deliverable or portion thereof will be incorporated into and become enforceable under this Consent Decree and shall be implemented by Miami-Dade according to the approved schedule subject to Miami-Dade's right to invoke Dispute Resolution.

15.     Revisions to Deliverables.  The Parties recognize that Miami-Dade may need or want to revise certain Deliverables during the term of this Consent Decree.  Any such revision shall be considered a non-material change to this Consent Decree for purposes of Section XX (Modification).  Miami-Dade must obtain EPA's prior written approval, after EPA consults with

-21-

FDEP, of any revision to the substance of a Deliverable and shall place copies of any such revised Deliverable in the PDR and provide an electronic notice of such revised Deliverable to registered persons and entities in accordance with the provisions of Paragraph 9. Miami-Dade may revise the form of any Deliverable without consulting EPA or FDEP and shall place a copy of any such revised Deliverable in the PDR within seven (7) Days after making such revision.

16.     <u>Certification</u>.  In all Deliverables, notices, documents or reports submitted to the United States and FDEP pursuant to this Consent Decree, Miami-Dade shall, by a Miami-Dade senior management official, sign and certify such notices, documents and reports as follows:

> *I certify under penalty of law that this document and all attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted.  Based on my inquiry of the person or persons who manage the system, or those persons directly responsible for gathering such information, the information submitted is, to the best of my knowledge and belief, true, accurate and complete.  I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations.*

## VI. <u>COMPLIANCE REQUIREMENTS</u>

17.     <u>Obligation to Perform Work</u>.  Upon the Effective Date of this Consent Decree, Miami-Dade shall implement the Work pursuant to this Consent Decree.  Miami-Dade is responsible for ensuring that any contractors hired to perform Work pursuant to this Consent Decree comply with all applicable laws and with this Consent Decree.  All Work shall be performed using sound engineering practices, which may include appropriate provisions of the

-22-

most recent edition of the following publications: EPA's Handbook: *Sewer System Infrastructure Analysis and Rehabilitation*, EPA/625/6-91/030, 1991; EPA's Handbook: *Condition Assessment of Wastewater Collection Systems (State of Technology Review Report)*, EPA/600/R-09/049, May 2009; EPA's Handbook: *State of Technology Report for Force Main Rehabilitation*, EPA/600/R-10/044, March 2010; *Existing Sewer Evaluation and Rehabilitation*, WEF Manual of Practice No. FD-6, 1994; *Design of Wastewater and Stormwater Pumping Stations*, WEF Manual of Practice No. FD-4; and Fla. Admin. Code. Rule 62-604; *Gravity Sanitary Sewer Design and Construction*, WEF Manual of Practice No. FD-5, 2007; *Wastewater Collection Systems Management*, WEF Manual of Practice No. FD-7, 2009; and *Recommended Standards for Wastewater Facilities*, Health Education Services (a Division of Health Research, Inc.), 2004.

      18.   <u>Continuation of CMOM Programs of the First Partial Consent Decree and Second and  Final Partial Consent Decree.</u>

      (a).   <u>Adequate Pumping, Transmission and Treatment Capacity Program</u>. Pursuant to Paragraph 16(C) of the First Partial Consent Decree (as amended by Paragraph 23 of the Second and Final Partial Consent Decree), Miami-Dade developed and implemented a program to ensure adequate transmission capacity for its Pump Stations and adequate treatment capacity for its WWTPs. Miami-Dade shall ensure adequate transmission and treatment capacity under the conditions provided for in <u>Appendix A</u> of this Consent Decree, attached hereto and incorporated herein. Within one hundred-eighty (180) Days of the Effective Date of this Consent Decree, Miami-Dade shall amend Section 24-42.3 of the Code of Miami-Dade County to incorporate the criteria in <u>Appendix A</u>.

-23-

(b).   <u>Pump Station Remote Monitoring Program</u>.  Pursuant to Paragraph 14 of the Second and Final Partial Consent Decree, Miami-Dade developed and implemented a Supervisory Control and Data Acquisition ("SCADA") program for the installation and operation of remote monitoring equipment in all Pump Stations within the WCTS.  Miami-Dade shall continue to implement this program as an enforceable obligation under this Consent Decree as set forth below:

(i).  Miami-Dade's Pump Station monitoring system shall continuously monitor, report and transmit information as follows:

(A).  For each Pump Station that does not have dry pits and that has no more than two (2) pumps of less than or equal to 25 horsepower per pump:

(1)  highwater level alarm in wet well;

(2)  Pump Station power failure;

(3)  D.C. low battery; and

(4)  remote signal failure alarm.

(B).  For each Pump Station, other than the Pump Stations described in (A) above:

(1)  operating hours after midnight for each sewage pump, total Pump Station operating hours after midnight, and number of pump starts;

(2)  wet well level with high and low level alarm set points;

(3)  kilowatts calculated from Pump Station amperage;

(4)  flow (instantaneous and average) determined from a flow meter or flow calculated based on pump(s) amperage and discharge pressure;

-24-

(5)  discharge pressure with high and low level alarm set points; and

(6)  minimum digital inputs, including high water level alarm in wet well, drywell flooding, intrusion alarm, A.C. Pump Station power failure, D.C. low battery and remote signal failure alarm.

(ii).  With respect to all Pump Stations, system monitoring data of wet well levels, Force Main pressures, and energy requirements (kilowatts) shall be stored in a historical database.  In addition, the Pump Station operating hours for each pump shall be recorded Monthly with elapsed time meters and entered into a historical database.  Miami-Dade shall use radio transceivers for the primary transmission of data.  Where radio paths are unreliable in areas with heavy foliage or building structures, other remote terminal units or telephone dialers or alarm systems shall be used.  Miami-Dade shall retain for each Month the 24-hour maximum and the Monthly average flow data until termination of this Consent Decree.

(iii).  In addition, as a continuing obligation under this Consent Decree, Miami-Dade shall require the installation of SCADA remote monitoring equipment as a condition of new construction for all new Pump Stations that it builds or receives from developers as a donation. SCADA remote monitoring equipment shall be installed within six (6) Months after Miami-Dade becomes operationally responsible for said Pump Station.

(c).    WCTS Model.  Pursuant to Paragraph 16 of the Second and Final Partial Consent Decree, Miami-Dade developed and implemented a computerized collection and transmission system model to assist in the development and implementation of CMOM programs to optimize transmission capacity and to evaluate the impact of I/I rehabilitation projects;

-25-

proposed modifications, upgrades and expansions to the WCTS; and performance of the WCTS. Miami-Dade shall continue to use and maintain this program as an enforceable obligation under this Consent Decree.

(i). The WCTS Model required by this Paragraph shall, at a minimum, be capable of, and be used for, predicting:

(A). Volume of wastewater flow in the Force Mains and the Major Gravity Sewer Lines, as defined in Subparagraph 18(c)(iii)(A) below, throughout Miami-Dade's WCTS;

(B). Hydraulic pressure (psig) of wastewater at any point in Force Mains throughout Miami Dade's WCTS;

(C). Flow capacity of each of the Pump Stations in Miami Dade's WCTS;

(D). Flow capacity of Pump Stations with the back-up pump out of service;

(E). Peak pumping rates for each Pump Station; and

(F). The likelihood and location of SSOs and Surcharged Conditions, as defined in Subparagraph 18(c)(iii)(D) below, within a Pump Station's service area under conditions where the Pump Station's back-up pump is out-of-service and considering available wet well capacity, off-line storage capacity, and Normal In-Line Storage Capacity, as defined in Subparagraph 18(c)(iii)(B) below.

(ii). The WCTS model shall also be capable of simulating all manifolded Force Mains and all private Pump Stations which manifold into Miami Dade's Force Main

-26-

system.

(iii). Definitions:  For the purposes of this Paragraph only, the following phrases shall have the following meanings:

(A).  The phrase "Major Gravity Sewer Lines" shall mean all Gravity Sewer Lines that are twenty-four (24) inches in diameter or larger, all Gravity Sewer Lines that convey wastewater from one Pump Station service area to another Pump Station service area, and all Gravity Sewer Lines that have caused or contributed, or that Miami-Dade knows will likely cause or contribute to, a capacity-related SSO.

(B).  The phrase "Normal In-Line Storage Capacity" shall mean the available storage capacity within Miami-Dade's Gravity Sewer Lines, manholes and appurtenances which discharge to a Pump Station with wet well level no higher than the lower of one (1) foot below the annual low ground water table or, where suitable ground water instrumentation is available, one (1) foot below the current groundwater elevation.

(C).  The phrase "Peak Flow" shall mean the greatest flow in a sewer averaged over a sixty (60) minute period at a specific location in the WCTS expected to occur as a result of a representative two (2)-year twenty-four (24)-hour rain event as determined by the South Florida Water Management District.

(D).  The phrase "Surcharged Condition" shall mean the condition that exists when the wastewater flow resulting from a Peak Flow causes the wastewater level to exceed the elevation of the crown of the Pump Station influent sewer at the wet well.

(iv).  Notwithstanding the foregoing, Miami-Dade shall calibrate the WCTS model at least once every five (5) years following the Effective Date of this Consent

-27-

Decree.  Calibration work shall be summarized in a report which describes the calibration methodology including target allowable tolerances between model results and equivalent field values from SCADA, actual comparisons of the WCTS model results with equivalent field values from SCADA, general descriptions of adjustments made to the WCTS model, and areas for additional investigation for continued improvement of the model.  The calibration report shall be made available to EPA and FDEP upon their request.  Newly-constructed facilities including Pump Stations, Gravity Sewer Lines and Force Mains and associated initial and projected flows added to the WCTS shall be incorporated into the WCTS model within ninety (90) days of their incorporation into Geographic Information Systems ("GIS").  The system layout included in the WCTS model is based on importing the GIS layers for the WCTS.  Procedures shall be developed so that updating of the GIS layers and the WCTS model are coordinated to the extent that the updates of the GIS WCTS layers are conveniently exportable to the WCTS model. All new facilities added to GIS will be imported into the model within ninety (90) days of their input into GIS.

      (d).   <u>Spare Parts Program</u>.  Pursuant to Paragraph 20 of the Second and Final Partial Consent Decree, Miami-Dade developed and implemented an inventory management program for spare parts for the WCTS.  Miami-Dade shall continue to implement this program pursuant to Subparagraphs 19(e), (f), (g), and (h) of this Consent Decree.

      (e).   <u>Volume Sewer Customer Ordinance Program</u>.  Pursuant to Paragraph 22 of the Second and Final Partial Consent Decree, Miami-Dade developed and implemented a Volume Sewer Customer Program ("VSC Program") as codified in Section 24-42.2 of the

-28-

Miami-Dade County Code ("VSC Ordinance") to eliminate or otherwise control SSOs from the WCTS and the collection and transmission systems of present and future VSCs.

(i).   Miami-Dade shall continue to implement the VSC Program as an enforceable obligation under this Consent Decree except as otherwise modified as set forth in Subparagraphs 18(e)(ii) and (iii) below.  The existing VSC Program includes the following CMOM related programs:

(A).   An I/I evaluation and rehabilitation program to reduce I/I into VSC collection and transmission systems;

(B).   Identification and elimination of each illegal stormwater connection to the VSC collection and transmission systems;

(C).   Inspection and rehabilitation of each Pump Station within the VSC collection and transmission systems;

(D).   Installation and operation of remote monitoring equipment at each Pump Station within the VSC collection and transmission systems;

(E).   Creation and maintenance of a WCTS computer model for the VSC collection and transmission systems;

(F).   Implementation of maintenance and spare parts programs; and

(G).   A program for the reporting of unpermitted discharges and overflows from the VSC collection and transmission systems.

(ii). Within four (4) Months of the Effective Date of this Consent Decree, Miami-Dade shall make changes to the VSC Program and the VSC Ordinance as follows:

-29-

(A).   Chapter 24-42.2(4) shall be modified to require that the system model be updated at intervals of no more than five (5) years;

(B).   The spare parts program required under Chapter 24-42.2(6) shall be changed to comply with Paragraph 18(e)(i)(F) and require that the listing of required spare parts shall be reviewed and updated annually; and

(C).   Chapter 24-42.2(1)(f)(iii) shall be modified to require that the system map provided to the Director annually shall be provided in an electronic format compatible with the Miami-Dade GIS system.

(iii)  Within four (4) Months of the Effective Date of this Consent Decree, Miami-Dade shall submit to EPA and FDEP for review and comment a proposed amendment to the VSC Ordinance which will require each existing and future VSC to implement the following items in accordance with an approved Plan of Compliance as defined in Appendix B and the scheduling requirements provided in Appendix B of this Consent Decree, attached hereto and incorporated herein:

(A).   A sewer overflow response plan consistent with the requirements of Paragraph 19(b) of this Consent Decree;

(B).   An information management system program consistent with the requirements of Paragraph 19(c) of this Consent Decree;

(C).   A sewer system asset management plan consistent with the requirements of Paragraph 19(d) of this Consent Decree;

(D).   A Gravity Sewer system operation and maintenance program consistent with the requirements of Paragraph 19(e) of this Consent Decree;

-30-

(E).  A Pump Station operations and preventative maintenance program consistent with the requirements of Paragraph 19(f) of this Consent Decree; and

(F).  A Force Main operations, preventative maintenance and assessment/rehabilitation program consistent with the requirements of Paragraph 19(g) of this Consent Decree.

Within one hundred eighty (180) Days of receipt of EPA's approval of the proposed amendment to the VSC Ordinance, Miami-Dade shall enact the amendment.  Subject to enactment of the amendment, Miami-Dade shall immediately undertake the implementation of such amended VSC Ordinance, which shall be incorporated into, and become enforceable under this Consent Decree.

19.    New CMOM Programs.  Miami-Dade shall develop and implement the CMOM programs as provided below.  All CMOM programs shall be developed in accordance with EPA Region IV guidance, as set forth in Appendix C, attached hereto and incorporated herein. Miami-Dade shall ensure that each CMOM program has a written, defined purpose; a written, defined goal; is documented in writing with specific detail; is implemented by trained personnel; has established performance measures; and has written procedures for periodic review.

(a).    Fats, Oils and Grease ("FOG") Control Program.  Miami-Dade approved a Grease Trap Ordinance pursuant to the First Partial Consent Decree.  Pursuant to the Grease Trap Ordinance, Miami-Dade implemented a FOG Control Program which allowed Miami-Dade to regulate industrial and commercial sources of oil and grease.  Notwithstanding any improvements already achieved through the existing FOG Control Program, Miami-Dade shall review, evaluate and revise its Grease Trap Ordinance and FOG Control Program and submit to

-31-

EPA and FDEP for review and comment a new FOG Control Program within eighteen (18) Months after the Effective Date of this Consent Decree. Miami-Dade shall continue to implement the existing FOG Control Program as an enforceable obligation under this Consent Decree until it implements a new FOG Control Program approved by EPA and FDEP as set forth below. At a minimum, the new FOG Control Program shall apply county-wide and include the following:

(i). A FOG characterization study that shall identify the sources of FOG causing problems in the WCTS and the wastewater collection and transmission systems of the VSCs and the most appropriate method or mechanism for addressing those sources.

(ii). The legal authority to control the discharge of FOG into the WCTS and the wastewater collection and transmission systems of the VSCs, including the ability to implement a permit and enforcement program for commercial and industrial sources.

(iii). Specification of accepted devices to control the discharge of FOG into the WCTS and the wastewater collection and transmission systems of the VSCs.

(iv). Establishment of standards for the design and construction of FOG control devices including standards for capacity and accessibility, site map, design documents and as-built drawings.

(v). Establishment of FOG control device management, operations and maintenance standards, or best management practices, that address onsite record keeping requirements, cleaning frequency, cleaning standards, use of additives, and ultimate disposal.

(vi). Establishment of construction inspection protocols, including scheduling, inspection report forms, and inspection record keeping requirements, to assure that

-32-

FOG control devices are constructed in accordance with established design and construction standards.

(vii).  Establishment of compliance inspection protocols, including scheduling, inspection report forms, and inspection record keeping requirements to assure that FOG control devices are being managed, operated and maintained in accordance with the established management, operation and maintenance standards or best management practices.

(viii).  Establishment of a FOG disposal manifest system, with the included requirements that FOG and septage not be comingled and that the point of origin be specified on the manifest.

(ix).  Establishment of an enforcement program, including specific enforcement mechanisms, to ensure compliance with the FOG Control Program.

(x).  Establishment of a compliance assistance program to facilitate training of FOG generators and their employees.

(xi).  Establishment of a comprehensive public education program directed at reducing the amount of FOG entering the WCTS from residences.

(xii).  Establishment of staffing (technical and legal) and equipment requirements to ensure effective implementation of the FOG Control Program.

(xiii).  A regularly maintained list of current commercial establishment FOG generators including a description of their FOG generating processes and estimated average quantity of FOG generated daily.

(xiv).  Establishment of performance indicators to be used by Miami-Dade to measure the effectiveness of the FOG Control Program.

(xv).  A schedule to review, evaluate and revise the FOG Control Program on at least an annual basis.  Any revisions to the FOG Control Program shall be submitted to EPA and FDEP in accordance with Paragraph 15 of this Consent Decree.

Within one hundred-eighty (180) Days of receipt of EPA's approval of the new FOG Control Program, Miami-Dade shall enact the ordinance.  Subject to enactment, Miami-Dade shall immediately undertake the implementation of the new FOG Control Program, which shall be incorporated into, and become enforceable under, this Consent Decree.

(b).    Sewer Overflow Response Plan ("SORP").  Pursuant to Paragraph 15 of the First Partial Consent Decree and Paragraph 24 of the Second and Final Consent Decree, Miami-Dade developed and implemented a program for identifying and reporting SSOs. Miami-Dade shall continue to implement this program as an enforceable obligation under this Consent Decree until it implements a SORP approved by EPA and FDEP as set forth below.  Within nineteen (19) Months after the Effective Date of this Consent Decree, Miami-Dade shall submit to EPA and FDEP for review and comment a SORP that will establish timely and effective methods and means of responding to, cleaning up, and/or minimizing the impact of SSOs; timely reporting of the location, volume, cause, impact, and other pertinent SSO information to the appropriate regulatory agencies; and timely and effective notification of SSOs to potentially impacted public.  At minimum, the SORP shall include and provide for the following:

(i).  Within twenty-four (24) hours of the time Miami-Dade first becomes aware of a SSO to waters of the United States or the State, of a SSO greater than or equal to one thousand (1,000) gallons, or of a SSO that will endanger public health or the environment, Miami-Dade shall provide in an oral report to FDEP the location of the SSO by street address or

-34-

any other appropriate method *(i.e.,* latitude-longitude).  The oral report shall be given to FDEP through the State Warning Point Hotline.

(ii).  Within five (5) days of the time Miami-Dade first becomes aware of a SSO to waters of the United States or the State, of a SSO greater than or equal to one thousand (1,000) gallons, or of a SSO that will endanger public health or the environment,  Miami-Dade shall also provide a written report to FDEP for the SSO.  Miami-Dade shall maintain a copy of any written reports prepared pursuant to this Paragraph for a period of not less than five (5) years from the date of the SSO.  The written report shall contain the following:

(A).  The location of the SSO by street address, or any other appropriate method *(i.e.,* latitude-longitude);

(B).  The estimated date and time when the SSO began and stopped, or if it is still an active SSO, the anticipated time to stop the SSO;

(C).  The steps taken to respond to the SSO;

(D).  The name of the receiving water, if applicable;

(E).  An estimate of the volume (in gallons) of sewage spilled;

(F).  A description of the WCTS component from which the SSO was released (such as manhole, crack in pipe, Pump Station wet well or constructed overflow pipe);

(G).  Subject to available information, an estimate of the SSO's impact on public health and to water quality in the receiving water body;

(H).  The cause or suspected cause of the SSO;

(I).  The date of the last SSO at the same point;

-35-

(J).   The steps taken or to be taken to reduce, prevent, or eliminate,
reoccurrence of the SSO;

(K).   A list of all notifications to the public and other agencies or
departments; and

(L).   The steps taken or to be taken to clean up any surfaces that
have been in contact and/or contaminated by the SSO.

(iii).   Miami-Dade shall maintain for all SSOs for a period of not less than
five (5) years from the date of the SSO all records documenting the steps that have been and will
be taken to prevent the SSO from recurring, including work order records associated with
investigation and repair activities related to the SSO.  Miami-Dade shall also maintain for a
period of not less than five (5) years from the date of the SSO a list and description of complaints
from customers or others regarding the SSO.

(iv).   The SORP shall provide procedures for responding to all SSOs to
minimize the environmental impact and potential human health risk of SSOs.  At a minimum,
such response procedures shall include:

(A).   A detailed description of the actions Miami-Dade will
undertake to immediately provide notice to the public (through the local news media or other
means including signs or barricades to restrict access) of a SSO;

(B).   A detailed description of the actions Miami-Dade will
undertake to provide notice to appropriate federal, state or local agencies/authorities;

(C).   A detailed plan (including the development of response
standard operating procedures) to minimize the volume of untreated wastewater transmitted to

-36-

the portion of the WCTS impacted by the events precipitating the SSO to minimize overflow volumes;

(D).   A particular description of Miami-Dade's response to Building Backups, including the timeframe for responses and the measures to be taken to clean up Building Backups found to be caused by conditions in Miami-Dade's Sewer System, including procedures necessary to disinfect and/or remove items potentially contaminated by Building Backups such as wet vacuuming or other removal of spillage, wiping floors and walls with cleaning solution and disinfectant, flushing out and disinfecting plumbing fixtures, carpet cleaning and/or replacement and other appropriate measures to disinfect and/or remove items potentially contaminated by Building Backups; and a description of Miami-Dade's follow-up process to insure adequacy of cleanup.

(v).   A detailed plan of the resources to be used to correct or repair the condition causing or contributing to the SSO.

(vi).   A detailed plan to ensure the preparedness, including response training of Miami-Dade employees and personnel of other affected agencies, necessary for the effective implementation of the SORP in the event of a SSO and establishing procedures and providing adequate training to response personnel for estimating SSO volumes.

(vii).   A list of those SSO locations within the area of the WCTS served by each Pump Station that have been recorded as overflowing more than once within the previous twelve (12) month period and/or those locations at which a SSO is likely to occur first in the event of a Pump Station failure.

-37-

(viii).  Pump Station emergency bypass/pump-around strategies, and procedures.

(c).    <u>Information Management System ("IMS") Program</u>.  Within twenty-four (24) Months after the Effective Date of this Consent Decree, Miami-Dade shall submit to EPA and FDEP for review and comment an IMS Program, as more particularly described below.  At a minimum, the IMS Program shall include the following:

(i).  A management IMS component to provide Miami-Dade managers with guidance and instruction to adequately evaluate operations, maintenance, customer service, and Sewer System rehabilitation activities so that overall Sewer System performance can be determined and utility planning can be conducted.  This IMS component shall utilize management reports and standard management forms.

(ii).  An operations IMS component to provide Miami-Dade managers and field supervisors with guidance to adequately track scheduled operational activities and to enhance operational performance.  This IMS component shall utilize operating reports and standard operation forms used by field personnel and shall provide for field supervisor review.

(iii).  A maintenance IMS component to provide Miami-Dade managers and field supervisors with guidance to adequately track scheduled maintenance activities and to enhance maintenance performance.  This IMS component shall utilize maintenance reports and standard maintenance forms used by field personnel.  The system shall provide for field supervisor review.

(iv).  A description of what information will be fed into the system, how it will be entered and by what means it will be recorded.

-38-

(v).  A description of the management reports that will be generated from the input data (*i.e.*, work reports), including examples and periodicity for review of such reports.

(vi).  A description of the work reports that will be prepared and submitted, including examples and periodicity for review of such reports.

(vii).  Standard forms that will be used by both field personnel and management for the Program, where applicable.

(viii).  A detailed description of how the records will be maintained.

(ix).  If computer software will be utilized, a description of the software to be used with cited references for software training and procedures for utilizing the software.

(x).  Implementation of a Geographic Information Systems ("GIS") map of its entire WCTS on or before forty-two (42) Months after the Effective Date of this Consent Decree.  Specifically, Miami-Dade shall implement improvements to its current GIS as follows:

(A).  An updated GIS database to include all as-builts and Active As-built Supplemental Information System ("AAS IS") forms, including new and corrected asset attribute data;

(B).  Streamlining of the GIS data entry process for new assets, including electronic as-built data and necessary standards so that all new assets are added to the GIS system within ninety (90) calendar days of their activation in the field.  Included shall be the development of a system to interface with the Miami-Dade WCTS hydraulic computer model so that the information can be efficiently exported to the WCTS hydraulic computer model;

(C).  Simplification of the AAS IS process to facilitate wider usage;

-39-

(D).  Development of a "flagging process" for damage investigators to note GIS inaccuracies;

(E).  Provision for additional GIS training and refresher training;

(F).  Use of Dade On-Line Facilities Information Network version II ("DOLFIN II") to facilitate more widespread access to GIS resources to remote staff; and

(G).  Determination via suitable as-built drawings, or GPS or traditional surveying field measurements, elevations of all manhole rim elevations and sewer inverts at connections to manholes and Pump Stations and their inclusion into GIS.

(xi).  Development and implementation of performance indicators to provide Miami-Dade managers with guidance to adequately evaluate data collected in the IMS for use in determining the condition of the Sewer System and an evaluation of Miami-Dade's CMOM programs.  Performance indicators shall include, without limitation, the linear footage of Gravity Sewer Line and Force Main inspections, the linear footage of Gravity Sewers cleaned, the number of manholes inspected, the number of manholes cleaned/maintained, the number of inverted siphons inspected, the number of inverted siphons cleaned/maintained, the number of SSOs per mile of Gravity Sewer, the number of SSOs per mile of Force Main, the number of SSOs per Pump Station, per capita wastewater flow, NPDES Permit effluent compliance and such other performance indicators as Miami-Dade may suggest and EPA approve; and

(xii).  Maintenance activity tracked by type (corrective, preventative, and emergency).

(d).  <u>Sewer System Asset Management Program</u>.  For purposes of this Consent Decree, the term "Asset Management Program" shall mean a management program that

-40-

maintains a desired level of service for Miami-Dade's Sewer System considering life cycle cost to ensure compliance with regulatory requirements and this Consent Decree.  Within twenty-two (22) Months after the Effective Date of the Consent Decree, Miami-Dade shall submit to EPA and FDEP for review and comment an Asset Management Program, including a schedule for full implementation of the program.  The Asset Management Program shall include the following components:

(i).  A current condition assessment of all Sewer System components, including, but not limited to, Pump Station components, Gravity Sewer Lines, manholes, siphons, aerial crossings, Force Mains, etc.  Miami-Dade may use data gathered from its latest round of Infiltration/Exfiltration/Inflow sewer assessments as a baseline conditional assessment to meet this component.

(ii).  A statement of the level of service Miami-Dade intends to provide the customers it serves considering life cycle cost to ensure compliance with regulatory requirements and this Consent Decree.

(iii).  The identification of critical assets within the Sewer System that are absolutely necessary to have in service to maintain the developed level of service.

(iv).  The identification of minimum life cycle costs for each critical asset.

(v).  A long-term funding plan to fully implement and be able to pay for all identified life cycle costs for each critical asset.  The long-term funding plan shall include all potential sources of revenue and the likelihood of securing funding from each source.

(e).    Gravity Sewer System Operations and Maintenance Program.  Within fourteen (14) Months after the Effective Date of this Consent Decree, Miami-Dade shall submit

-41-

to EPA and FDEP for review and comment, a Gravity Sewer System Operations and Maintenance Program to address SSOs, particularly those caused by FOG, roots and/or debris obstructions.  At a minimum, the Gravity Sewer System Operations and Maintenance Program shall include the following:

(i).  Written preventative operations and maintenance schedules and procedures which shall be scheduled appropriately and shall include, but not be limited to, written procedures for the following:

(A).  Inspection and maintenance of all Gravity Sewers, manholes and inverted siphons;

(B).  Identifying and documenting Gravity Sewer, manhole and inverted siphon conditions, including grease, roots, and/or debris accumulation;

(C).  Identifying maintenance needs; and

(D).  Scheduling preventative maintenance work/cleaning which Miami-Dade may schedule in connection with the Force Main Assessment Program and/or Force Main Rehabilitation/Replacement Program as described in Subparagraphs 19(g)(iii) and (iv) below.

(ii).  An engineering evaluation of potential sulfide and corrosion control options and a summary report of findings, including a recommendation of the preferred sulfide and corrosion control method(s); provided, however, that such corrosion control options and methods shall not apply to components made of plastic or other similar materials.

-42-

(iii).  Prioritization for evaluating the Gravity Sewers based upon the size of the pipe (*e.g.,* starting with the larger pipes and work back to smaller pipes), location of SSOs, community input or other criteria it finds appropriate.

(iv).  Inspection of Gravity Sewers, manholes, and inverted siphon easements, including inspection of creek crossings, canal crossings, stream bank encroachment toward Gravity Sewers, manholes and inverted siphons, and easement accessibility (including the need to control vegetative growth or encroachment of man-made structures or activities that could threaten the integrity of the affected Gravity Sewer, manhole, or inverted siphon). Inspections shall include written reports, and where appropriate, representative photographs or videos of appurtenances being inspected (Gravity Sewers, manholes, inverted siphons, creek crossings, canal crossings, etc.).  Inspectors shall promptly report any observed SSOs to their area supervisors and shall record any evidence of SSOs which may have occurred since the last inspection.  Any observed SSO shall be promptly reported in accordance with the SORP.

(v).  A schedule for the maintenance of easements.

(vi).  A staffing and funding plan sufficient in structure, skills, numbers and funding to allow completions of the operation and maintenance activities required by this Subparagraph 19(e).

(vii).  Data attributes for Miami-Dade's mapping program allowing program data to be compared in Miami-Dade's IMS against other pertinent data such as the occurrence of  SSOs, including repeat SSO locations and permit violations.

(viii).  An inventory management system that includes:

(A).  A list of critical equipment and critical spare parts;

(B).  A list of where critical spare parts and critical equipment may be secured to allow repairs in a reasonable amount of time for those spare parts and critical equipment that are not stored by Miami-Dade, including spare pipe having a diameter of 48 inches or greater; the list shall also set forth an inventory of spare parts and critical equipment stored by Miami-Dade, as applicable; and

(C).  Written procedures for updating the critical spare parts and equipment inventories in the IMS.

(ix).  Reports which list equipment problems and the status of work orders generated during the prior Month.

(f).    Pump Station Operations and Preventative Maintenance Program.  Within sixteen (16) Months after the Effective Date of this Consent Decree, Miami-Dade shall submit to EPA and FDEP for review and comment a Pump Station Operations and Preventative Maintenance Program to facilitate proper operation and maintenance activities associated with the Pump Stations within the WCTS.  At a minimum, the Pump Station Operations and Preventative Maintenance Program shall include the following:

(i).  Identification of the means and modes of communication between Pump Stations, field crews, and supervising staff.

(ii).  Technical specifications of each Pump Station within the WCTS.

(iii).  A description of each Pump Station monitoring system which shall continuously monitor, report, and transmit information for each Pump Station.

-44-

(iv).  Written preventative operations and maintenance schedules and procedures which shall be scheduled appropriately and shall include, but not be limited to, written procedures for the following:

(A).  Periodic service and calibration of instrumentation such as flow meters, liquid level sensors, alarm systems, elapsed time meters, and remote monitoring equipment;

(B).  Predictive (including non-physical inspections) and/or physical inspection and service for all Pump Stations including, but not limited to:

(1)  reading, recording and maintaining records of information from the elapsed time meters and pump start counters;

(2)  observing and documenting wet well conditions, including grease and/or debris accumulation;

(3)  checking and re-setting, as necessary to improve system performance, wet well pumping points (*e.g.*, floats);

(4)  checking, recording and maintaining records of system pressure(s);

(5)  checking SCADA and/or alarm components;

(6)  checking stand-by power sources;

(7)  checking motor electrical system, including, but not limited to, line voltage on each leg quarterly, current draw on each leg quarterly, and resistance of windings on each leg quarterly; and

(8)  identifying maintenance needs.

-45-

(v).  Written standard emergency/reactive operations and maintenance procedures.  Miami-Dade, subject to its discretion, may use portable pumps, portable generators or alternative power sources as it deems appropriate.  At a minimum, the standard emergency/reactive Pump Station operating procedures shall include:

(A).  Criteria used to determine the need for emergency operations and maintenance;

(B).  Initiation/use of stand-by power (*e.g.*, portable generators), where applicable;

(C). Initiation/use of portable pump (*e.g.*, bypass/pump-around operations), where applicable.

(D).  Evaluation of the need for additional equipment for emergency/reactive operations, including, but not limited to, additional portable generators and/or additional portable pumps (for pump-around operations);

(E).  Evaluation of the need for on-site standby power (*e.g.*, on-site generator and/or second electrical feed from the power grid) for each Pump Station should Miami-Dade choose, subject to its discretion, not to have a portable pump available for the Pump Station; and

(F).  Establishing standard forms, reporting procedures and performance measures for emergency/reactive operations and maintenance.

(vi).  An inventory management system that includes:

(A).  A list of critical equipment and critical spare parts;

-46-

(B).  A list of where critical spare parts and critical equipment may be secured to allow repairs in a reasonable amount of time for those spare parts and critical equipment that are not stored by Miami-Dade; the list shall also set forth an inventory of spare parts and critical equipment stored by Miami-Dade, as applicable; and

(C).  Written procedures for updating the critical spare parts and equipment inventories in the IMS.

(vii).  Reports which list equipment problems and the status of work orders generated during the prior Month.

(viii). A staffing and funding plan sufficient in structure, skills, numbers and funding to allow completion of the operations and maintenance activities required by this Subparagraph 19(f).

(g).    Force Main Operations, Preventative Maintenance and Assessment/Rehabilitation Program.

(i).  Within twenty (20) Months after the Effective Date of this Consent Decree, Miami-Dade shall submit to EPA and FDEP for review and comment a Force Main Operations, Preventative Maintenance and Assessment/Rehabilitation Program to facilitate proper operations and maintenance activities associated with Force Mains within the WCTS.  At a minimum, the Force Main Operations, Preventative Maintenance and Assessment/Rehabilitation Program shall include the following:

(A).  The assessment of Force Mains, including an evaluation of potential sulfide and corrosion control options, and a summary report of findings, including a recommendation of the preferred sulfide and corrosion control method(s); provided, however,

-47-

that such corrosion control options and methods shall not apply to components made of plastic or other similar materials;

(B).   The Inspection of Force Main easements, including inspection of canal crossings, stream bank encroachment toward Force Mains, and easement accessibility to identify whether further action would be necessary for Miami-Dade to be able to have access should a problem arise.  Inspections shall include written reports, and where appropriate, representative photographs or videos of appurtenances being inspected (Force Mains, creek crossings, canal crossings, etc.).  Inspectors shall promptly report any observed SSOs to their area supervisors and shall record any evidence of SSOs which may have occurred since the last inspection.  Any observed SSO shall be promptly reported in accordance with the SORP.

(C).   A schedule for the maintenance of easements.

(D).   A staffing and funding plan sufficient in structure, skills, numbers and funding to allow completion of the activities required by this Subparagraph 19(g).

(E).   An inventory management system that includes:

(1).   A list of critical equipment and critical spare parts;

(2).   A list of where critical spare parts and critical equipment may be secured to allow repairs in a reasonable amount of time for those spare parts and critical equipment that are not stored by Miami-Dade (*e.g.,* spare pipe having a diameter of 48 inches or greater); the list shall also set forth an inventory of spare parts and critical equipment stored by Miami-Dade, as applicable; and

-48-

(3).  Written procedures for updating the critical spare parts and equipment inventories in the IMS.

(F).  Reports which list equipment problems and the status of work orders generated during the prior Month.

(ii).  <u>Force Main Criticality Assessment and Prioritization Report.</u>  Within nine (9) Months after EPA's approval of the Force Main Operations, Preventative Maintenance and Assessment/Rehabilitation Program, Miami-Dade shall submit to EPA and FDEP for review and comment a Force Main Criticality Assessment and Prioritization Report that shall set forth the results of Miami-Dade's criticality assessment of the structural integrity of its Force Mains and the risk of Force Main critical failure.  Miami-Dade shall base its criticality assessment of a Force Main on any previous assessments or investigations regarding the structural integrity of the Force Main, the size of the Force Main (*e.g.*, gallons per day capacity and/or diameter), the age of the Force Main, the pipe material of the Force Main, the length of the Force Main, the availability (including distance) of the nearest WCTS component which could handle flows from that Force Main in the event of failure, the operating pressure of the Force Main during peak flow events, the availability of new pipe in case of failure (*i.e.* for large diameter Force Mains). Miami-Dade shall use this criticality assessment to prioritize its Force Mains for further assessment and/or rehabilitation/replacement pursuant to the Force Main Assessment Program and the Force Main Rehabilitation/Replacement Program set forth below.  The Force Main Criticality Assessment and Prioritization Report shall include the results of Miami-Dade's Force Main prioritization for further assessment and/or rehabilitation/replacement of its Force Mains, including a prioritized schedule for implementation of the Force Main Assessment Program

-49-

provided, however, that all Force Mains shall be assessed pursuant to the Force Main Assessment Program on or before sixty (60) Months after approval by the EPA of the Force Main Criticality Assessment and Prioritization Report.

                (iii).   <u>Force Main Assessment Program.</u> Miami-Dade shall implement the Force Main Assessment Program in accordance with the schedule set forth in the Force Main Criticality Assessment and Prioritization Report.  At a minimum, the Force Main Assessment Program shall include the following:

                (A).   Standard procedures and schedules for continual above-ground assessment of the route(s) of each Force Main in the WCTS.  This component shall include standard forms for the visual assessment of Force Main routes and ground level conditions that may show structural issues with the Force Main below ground.

                (B).   Standard procedures and schedules for continual assessment of the route(s) of each Force Main in the WCTS where it crosses a surface water body and/or drainage way.  This component shall include standard forms for the visual assessment of Force Main routes and above ground conditions that may show structural or leakage issues with the Force Main where it crosses a surface water body and/or drainage way.

                (C).   Standard procedures and schedules for inspecting and identifying Force Mains that are either corroded or at risk of corrosion.  This component shall include a system for prioritizing repair of corrosion defects, corrosion identification forms, and

                (D).   Standard procedures and schedules for monitoring all existing cathodic protection measures on existing Force Mains, as well as detailed cathodic protection requirements for any newly installed Force Mains.

-50-

(E).  Standard procedures and schedules for implementing acoustic monitoring of the Force Mains.  The acoustic monitoring component shall include leak detection, acoustic monitoring (*i.e.*, monitoring for wire breaks in pre-stressed concrete cylinder Pipe), and Sonar or Ultrasonic monitoring for pipe defect analysis (*e.g.*, pipe wall deflections, corrosion, pits, voids, cracks, and debris).  Any resulting internal wall thickness measurements shall be used to establish a list of potential corrosion problems and rehabilitation of the Force Main to prevent line breaks and/or ability to operate under pressures experienced during peak flow events.

(F).  Criteria for use of ground-penetrating radar to determine leaks, Force Main bedding conditions and/or Force Main bedding voids.

(G).  Assessment of the feasibility of installation of parallel Force Mains in the case of emergency repairs of those Force Mains determined by Miami-Dade to be highly critical.

(iv).  <u>Force Main Rehabilitation/Replacement Program.</u>  Within twenty-four (24) Months after the Effective Date of this Consent Decree, Miami-Dade shall submit to EPA and FDEP for review and approval a Force Main Rehabilitation/Replacement Program.  At a minimum, the Force Main Rehabilitation/Replacement Program shall include the following:

(A).  Standard procedures for repairing each Force Main in the WCTS that is deemed to be in need of repair pursuant to the Force Main Criticality Assessment and Prioritization Report and/or Force Main Assessment Program.  Repair technologies shall include, but not be limited to, open cut replacement of section(s) of pipe, spot repairs using

cured-in-place pipe ("CIPP"), mechanical sleeves or repair clamps, or joint repairs using internal sleeves or external devices.

(B).  Standard procedures for rehabilitating each Force Main in the WCTS that is deemed to be in need of rehabilitation pursuant to the Force Main Criticality Assessment and Prioritization Report and/or Force Main Assessment Program.  Rehabilitation technologies shall include, but not be limited to, spray-on linings, close fit linings, CIPP, and woven hose linings (including adhesive-backed linings, non-adhesive backed linings and glass-reinforced thermoplastic linings).

(C).  Standard procedures for replacing each Force Main in the WCTS that is deemed to be in need of replacement pursuant to the Force Main Criticality Assessment and Prioritization Report and/or Force Main Assessment Program.  Replacement technologies shall include, but not be limited to, open cut replacement of pipe, sliplining, pipe bursting, directional drilling, and microtunneling/pipe jacking.

Miami-Dade shall implement the Force Main Rehabilitation/Replacement Program in accordance with the prioritization of the Force Main Criticality Assessment and Prioritization Report and based on the results and finding of its implementation of the Force Main Assessment Program; provided, however, that all Force Mains shall be repaired, rehabilitated or replaced pursuant to the Force Main Assessment Program on or before sixty (60) Months after completion of the condition assessment.  Within three (3) Months after completion of all work pursuant to the Force Main Rehabilitation/Replacement Program, Miami-Dade shall submit to EPA and FDEP for review and comment a Force Main Rehabilitation/Replacement Program Final Report summarizing the implementation of the Program.

(h).   <u>WWTP Operations and Maintenance Program</u>.  Within seventeen (17) Months of the Effective Date of this Consent Decree, Miami-Dade shall submit to EPA and FDEP for review and approval a WWTP Operations and Maintenance Program to facilitate proper operation, maintenance and equipment replacement activities associated with the WWTPs.  At a minimum, the WWTP Operations and Maintenance Program shall include the following:

(i).  A prioritization of WWTP equipment as critical, semi-critical or non-critical based upon an evaluation of the impacts of the loss of use or failure of each piece of WWTP equipment.  Such prioritization shall include the following WWTP equipment, as it applies specifically to each Miami-Dade operated WWTP:

(A).  In-plant raw sewage conveyance, including, but not limited to, raw sewage transmission pipes, flow meters and valves;

(B).  Pretreatment screening, including, but not limited to, bar screen equipment, perforated plate screen equipment, concrete channels and structures, and screening collection, compaction and conveyance equipment;

(C).  Influent grit chamber equipment, including but not limited to, aeration equipment and physical grit removal equipment (*e.g.*, chains and pins, gear boxes, motors, conveyors, etc.);

(D).  Primary clarifiers, including, but not limited to, concrete tank and structures, scum skimmer equipment, sludge collection mechanism and equipment, covers, ventilation systems, and primary sludge pumping systems;

(E).  Aeration/oxygenation tank equipment, including but not limited to, motors, aeration blades, effluent trough screens, effluent trough air diffusion equipment and oxygen generation equipment;

(F).  Final settling tank equipment, including, but not limited to, scum skimmer equipment, sludge collection mechanism and equipment, covers, ventilation systems, effluent weirs, and concrete tank and structures.

(G).  Return activated sludge ("RAS") equipment, including but not limited to, pump control equipment, RAS pumps and physical equipment (*e.g.*, air conditioning);

(H).  Sludge thickener and digester equipment, including but not limited to, sludge digester tanks/covers, gas and sludge mixers, heat exchangers and internal pumps;

(I).  Sludge dewatering, including, but not limited to, centrifuge equipment, polymer systems, centrate handling and on-site sludge hauling and transferring vehicles.

(J).  Effluent disinfection, including, but not limited to, chlorine gas equipment, bulk hypochlorite solution storage, on-site hypochlorite generation equipment, and chlorine solution dosage and distribution equipment;

(K).  Chlorine contact chamber, including, but not limited to, concrete tank, diffuser  and structures;

-54-

(L).  Effluent disposal, including, but not limited to, effluent pumping equipment, effluent wet well, effluent surge tank, effluent outfalls and diffusers, effluent deep injection wells, industrial and public reuse treatment and distribution equipment;

(M).  Yard piping, including, but not limited to, pipes, flow metering and valves;

(N).  Odor control systems, including, but not limited to, air scrubbing towers, blower equipment and duct work, and chemical storage and metering equipment;

(O).  Tertiary treatment, including, but not limited to, screw pump equipment, flocculation tanks, polymer system, and deep bed sand filter equipment;

(P).  Biosolids handling, including, but not limited to, sludge drying beds, composting equipment, and biosolids handling heavy equipment;

(Q).  Septage, fats, oils, and grease receiving facility, including, but not limited to, septic truck receiving station equipment, septage screening equipment, and solids/ liquid/scum separation equipment;

(R).  Laboratory, training and administration facilities;

(S).  Ferric salts dosing facilities; and

(T).  WWTP electrical equipment, including, but not limited to, motor control centers, remote telemetry units,  metering, SCADA equipment, electrical conduit, electrical breakers, on-site emergency generators, biogas conveyance, biogas condition systems, methane storage spheres, and combined heat and power co-generation equipment.

-55-

(ii).  A schedule for preventative maintenance activities that is as expeditious as possible.  Miami-Dade shall develop a schedule for preventative maintenance activities such as grit chamber equipment maintenance, aeration tank equipment maintenance, final settling tank equipment maintenance, sludge thickener and digester equipment maintenance, electrical equipment maintenance (*e.g.*, on-site generators and electrical co-generation equipment), pump maintenance (*e.g.*, preventative lubrication and packing maintenance), mechanical maintenance, physical maintenance (*e.g.* building repairs, equipment painting, and grounds upkeep) and other maintenance activities as needed at Miami-Dade's WWTPs that is as expeditious as possible.  Such schedule shall include, but not be limited to, manufacturers' maintenance recommendations.

(iii).  A maintenance information management system that shall have the capability of scheduling and tracking both preventative and reactive maintenance activities.

(iv).  An inventory of spare parts.  Miami-Dade shall identify which critical spare parts are maintained in inventory and provide a schedule to purchase critical spare parts that are not in inventory.

(v).  A spare parts inventory control system.  Miami-Dade shall also develop, either as part of the maintenance information management system, or as a separate data management system, an inventory control system that shall have the capability of tracking spare parts use and inventory, as well as generating inventory replenishment needs reports.

(vi).  A staffing and funding plan sufficient in structure, skills, numbers and funding to allow completion of the activities required by this Subparagraph 19(h).

-56-

(vii).  An active control program for hauled wasteloads to the WWTP that includes, but is not limited to: hauled wasteload receiving station(s) that allow the control of flow and loadings from a wasteload into the WWTP; communication, data collection, documentation, and other standard operating procedures to effectively determine, prior to acceptance of a wasteload into the WWTP, the sources of an individual domestic or non-domestic wasteload, the pollutant characteristics of an individual wasteload, and the compliance of an individual wasteload with applicable federal and local standards and requirements.  Miami-Dade shall submit an implementation schedule for the program, and shall develop the program using the considerations and recommendations in the EPA's Handbook: *Guidance Manual for Control of Hauled Wastes*, EPA-833-B-98-003 (September 1999) to the extent applicable and appropriate.

(i).    Specific Capital Improvement Projects.  Based on previous investigations, Miami-Dade has identified certain rehabilitation projects that are intended to address conditions currently causing SSOs or contributing to NPDES permit violations.  These specific capital improvement projects are identified and described in the Work Plan set forth in Appendix D, attached hereto and incorporated herein.  Miami-Dade shall complete each of these capital improvement projects in accordance with the schedules set forth in Appendix D.  The Parties acknowledge that Miami-Dade's implementation of the Ocean Outfall Legislation may impact the scope and scheduling of certain capital improvement projects identified in Appendix D of this Consent Decree.  Notwithstanding any other right Miami-Dade may have to seek a modification to this Consent Decree, the Parties therefore acknowledge that Miami-Dade may request of EPA and FDEP modifications to the scope and scheduling of such capital

-57-

improvement projects as set forth in Appendix D. Any such request shall include a demonstration by Miami-Dade of how implementation of the Ocean Outfall Legislation impacts the scope or scheduling of a capital improvement project; why the scope or scheduling of an affected capital improvement project should be modified because of implementation of the Ocean Outfall Legislation; whether any such requested modification is necessary in order for Miami-Dade to comply with the Ocean Outfall Legislation; and how the proposed modification would affect Miami-Dade's compliance with the CWA, the regulations promulgated thereunder, Fla. Stat. Chapter 403, and the applicable Fla. Admin. Code Rules promulgated thereto, as well as the NPDES Permits. Except as provided below, any modifications agreed upon in writing by the United States, FDEP, and Miami-Dade to this list of projects or schedules set forth in Appendix D shall constitute a non-material change to this Consent Decree as set forth in Section XX (Modification) below. Notwithstanding the foregoing, any deletion of an entire project set forth in **bold** and delineated by an ID number with one decimal point (*e.g.* 1.1) in Appendix D agreed upon in writing by the United States, FDEP and Miami-Dade shall constitute a material change to this Consent Decree as set forth in Section XX (Modification) below. Additionally, Miami-Dade shall complete all the capital improvement projects set forth in Appendix D on or before fifteen (15) years from the Date of Lodging, and any modification agreed upon in writing by the United States, FDEP, and Miami-Dade to this final compliance date shall be considered a material change to this Consent Decree as set forth in Section XX (Modification) below.

(j).    Financial Analysis Program. Within twelve (12) Months after the Effective Date of this Consent Decree, Miami-Dade shall submit to EPA and FDEP for review and approval a Financial Analysis Program to ensure that it can effectively establish and track

the sufficiency of funds for operations and maintenance, capital projects financing, and debt service coverage associated with the Sewer System, including, without limitation, the continued implementation of the Work pursuant to this Consent Decree. The Financial Analysis Program shall be consistent with the following criteria:

(i). A program that regularly analyzes and projects future utility management, operations, and maintenance costs needed to effectively manage, operate, and maintain the Sewer System, including, without limitation, the continued implementation of the CMOM Programs required pursuant to Paragraphs 18 and 19 of this Consent Decree. The cost analyses should include, at a minimum: capital infrastructure improvements; labor needs (including a staffing plan); and equipment and materials needs.

(ii). A program that analyzes, projects, plans, and finances capital improvement needs established through engineering studies; Sewer System condition assessments; historical Sewer System management, operations, and maintenance cost data; and sound sewer infrastructure asset management programs, including, without limitation, capital improvement needs established and required pursuant to Paragraphs 18 and 19 of this Consent Decree. Capital improvement financing should be planned using a five (5) year planning horizon with annual updates.

(iii). A program that establishes the annual utility budget and customer rates periodically. The program should assure that the budget and funding provided by customer rates will meet the cost and financing needs for the management, operation, and maintenance of the Sewer System and the capital improvement needs as identified pursuant to the procedures set forth in Subparagraphs 19(j)(i) and (ii) above.

(iv).  A program that directly tracks and reports operation and maintenance costs by the type of activity (corrective, preventative, and emergency) and capital improvement costs.

(v).  A program that tracks and reports any transfer or use of funds obtained by Miami-Dade from the collection of sewer rates for any purpose not related to the management, operation, or maintenance of the Sewer System or to any capital improvement needs of the Sewer System.  Such transfers or uses of funds to be tracked and reported in this program do not apply to funds internally used within the Miami-Dade Water and Sewer Department and funds transferred or used to administratively reimburse other departments or agencies within Miami-Dade for services rendered to the Miami-Dade Water and Sewer Department for purposes related to the management, operation, or maintenance of the Sewer System or to any capital improvement needs of the Sewer System.  The amount, recipient and date of any such use or transfer of funds to be tracked and reported in this program also shall be included in the semi-annual report as provided in Paragraph 33 of this Consent Decree.  Miami-Dade shall also provide thirty (30) days advance written notice to the United States and FDEP of Miami-Dade's intent to transfer or use funds required to be tracked and reported in this program.

## VII.  CIVIL PENALTY

20.     Within thirty (30) Days after the Date of Entry of this Consent Decree, Miami-Dade shall pay the sum of $978,100 as a civil penalty in accordance with the provisions of Paragraphs 21 and 22.

21.     Miami-Dade shall pay to the United States $511,800 of the civil penalty due by FedWire Electronic Funds Transfer ("EFT") to the U.S. Department of Justice in accordance

with written instructions to be provided to Miami-Dade, following the Date of Entry of this

Consent Decree, by the Financial Litigation Unit of the U.S. Attorney's Office for the Southern

District of Florida, 99 N.E. 4th Street, Miami, Fl. 33132, (305) 961-9001.  At the time of

payment, Miami-Dade shall send a copy of the EFT authorization form and the EFT transaction

record, together with a transmittal letter, which shall state that the payment is for the civil

penalty owed pursuant to the Consent Decree in United States et al. v. Miami-Dade County, and

shall reference the civil action number and DOJ case number 90-5-1-1-4022/1, to the United

States in accordance with Section XVII of this Consent Decree (Notices); by email to

acctsreceivable.CINWD@epa.gov; and by mail to:

> EPA Cincinnati Finance Office
> 26 Martin Luther King Drive
> Cincinnati, Ohio  45268

In the event that full cash payment to the United States is not made within thirty (30) Days of the

Date of Entry of this Consent Decree, Miami-Dade shall pay to the United States interest on the

balance due from the original due date to the date of payment, at the rate calculated pursuant to

28 U.S.C. § 1961.

22.    Miami-Dade shall pay to FDEP $466,300 of the civil penalty due by check

payable to the "Florida Department of Environmental Protection."  The check shall reference the

case name and include a notation to the "Ecosystem Restoration Trust Fund" and shall be sent to:

> Florida Department of Environmental Protection
> Southeast District
> Attn: Compliance/Enforcement Section
> 400 N. Congress Ave.
> West Palm Beach, FL 33401

-61-

In the event that full cash payment to FDEP is not made within thirty (30) Days of the Date of Entry of this Consent Decree, Miami-Dade shall pay to FDEP interest on the balance due from the original due date to the date of payment, at the rate calculated pursuant to 28 U.S.C. § 1961.

## VIII.  SUPPLEMENTAL ENVIRONMENTAL PROJECT

23.     Miami-Dade shall satisfactorily implement and complete a Supplemental Environmental Project ("SEP") in accordance with this Section VIII (Supplemental Environmental Project) and Appendix E of this Consent Decree.  The SEP shall be completed in accordance with the schedule set forth in Appendix E.

24.     The SEP shall include the installation of approximately seven thousand six hundred and sixty (7,660) linear feet of Gravity Sewers within a corridor designated by the Miami-Dade Board of County Commissioners as the "Miami-Dade Green Technology Corridor," which will facilitate the connection to the Sewer System of approximately seventy four (74) business entities currently using septic tanks.  Miami-Dade may use contractors or consultants in planning and implementing the SEP.

25.     With regard to the SEP, Miami-Dade certifies the truth and accuracy of each of the following:

(a).     That all cost information provided to EPA in connection with EPA's approval of the SEP is complete and accurate and that Miami-Dade in good faith estimates that the cost to implement the SEP is $2,047,200.

(b).     That, as of the date of executing this Consent Decree, Miami-Dade is not required to perform or develop the SEP by any federal, state, or local law or regulation and is not

-62-

required to perform or develop the SEP by agreement, grant, or as injunctive relief awarded in any other action in any forum.

(c).     That Miami-Dade is not a party to any Open Federal Financial Assistance Transaction that is funding or could be used to fund the same activity as the SEP, and that there is no such open federal financial transaction that is funding or could be used to fund the same activity as the SEP, nor has the same activity been described in an unsuccessful federal financial assistant transaction proposal submitted to EPA within two (2) years of the date of Miami-Dade's execution of this Consent Decree (unless the project was barred from funding as statutorily ineligible).  For purposes of this certification, the term "Open Federal Financial Assistance Transaction" refers to a grant, cooperative agreement, loan, federally-guaranteed loan guarantee or other mechanism for providing federal financial assistance whose performance period has not yet expired.

(d).     That the SEP is not a project that Miami-Dade was planning or intending to construct, perform, or implement other than in settlement of the claims resolved in this Consent Decree.

(e).     That Miami-Dade has not received and will not receive credit for the SEP in any other enforcement action.

(f).     That Miami-Dade will not receive any reimbursement for any portion of the SEP from any other person.

26.     <u>SEP Completion Report</u>.  Within thirty (30) Days after the date set for completion of the SEP, Miami-Dade shall submit a SEP Completion Report to the EPA and FDEP for

-63-

review and comment.  The SEP Completion Report shall contain all of the following

information:

      (a).     A detailed description of the SEP as implemented.

      (b).     A description of any problems encountered in completing the SEP and the

solutions thereto.

      (c).     An itemized list of all eligible SEP costs expended.

      (d).     Certification that the SEP has been fully implemented pursuant to the

provisions of this Consent Decree.

      (e).     A description of the environmental and public health benefits resulting

from implementation of the SEP (with a quantification of the benefits and pollutant reductions, if

feasible).

      27.     EPA may, in its sole discretion, require information in addition to that described

in the preceding Paragraph, in order to evaluate Miami-Dade's SEP Completion Report.

      28.     After receiving the SEP Completion Report, EPA shall notify Miami-Dade

whether or not Miami-Dade has satisfactorily completed the SEP.  If Miami-Dade has not

completed the SEP in accordance with this Consent Decree, stipulated penalties may be assessed

under Section X of this Consent Decree (Stipulated Penalties).

      29.     Disputes concerning the satisfactory performance of the SEP and the amount of

eligible SEP costs may be resolved under Section XII of this Consent Decree (Dispute

Resolution).

      30.     Each submission required under this Section shall be signed by an official with

knowledge of the SEP and shall bear the certification language set forth in Paragraph 16.

-64-

31.     Any public statement, oral or written, in print, film, or other media, made by Miami-Dade making reference to the SEP under this Consent Decree shall include the following language: "This project was undertaken in connection with the settlement of an enforcement action, United States et al. v. Miami-Dade County, taken on behalf of the U.S. Environmental Protection Agency and the Florida Department of Environmental Protection under the Clean Water Act."

## IX.  REPORTING REQUIREMENTS

32.     Quarterly Reports.  Beginning one (1) Month after the first Calendar Quarter following the Effective Date of this Consent Decree, and one (1) Month after each Calendar Quarter thereafter until termination of the Consent Decree, Miami-Dade shall submit to EPA and FDEP for review and comment a Quarterly Report.  Such Quarterly Reports shall include the date, time, location, source, estimated duration, estimated volume, receiving water (if any), and cause of all SSOs occurring in the previous Calendar Quarter.  In reporting such data, Miami-Dade shall provide the information in a tabulated electronic format (e.g., Excel spreadsheet) as it deems appropriate.

33.     Semi-Annual Reports.  Beginning one (1) Month after the first two (2) Calendar Quarters following the Effective Date of this Consent Decree, and one (1) Month after each subsequent two (2) Calendar Quarters until termination of the Consent Decree, Miami-Dade shall submit to EPA and FDEP for review and comment a Semi-Annual Report.  Six (6) years from the Effective Date of this Consent Decree and each subsequent year until termination, the United States, FDEP, and Miami-Dade agree to consider whether to discontinue the Semi-Annual Reports.  If the United States, FDEP, and Miami-Dade agree to discontinue the Semi-

-65-

Annual Reports, such modification shall be considered a non-material change to this Consent Decree pursuant to Section XX (Modification); and the information required in Subparagraphs 33(a) through (d) below shall then be included in each Annual Report submitted pursuant to Paragraph 34 and shall cover the applicable Calendar Year rather than two (2) Calendar Quarters. Each Semi-Annual Report shall include, at a minimum:

(a). A description of projects and activities completed and milestones achieved during the previous two (2) Calendar Quarters pursuant to the requirements of this Consent Decree, in Gantt chart or similar format, including a description of the status of compliance or non-compliance with the requirements of this Consent Decree and, if applicable, the reasons for non-compliance. If any non-compliance cannot be fully explained at the time the report is due, Miami-Dade shall include a statement to that effect in the report. Miami-Dade shall investigate to determine the cause of the non-compliance and then shall submit an amendment to the report, including a full explanation of the cause of the non-compliance, within thirty (30) Days after submission of the report.

(b). A summary of significant projects and activities anticipated to be performed, and milestones anticipated to be achieved, in the successive two (2) Calendar Quarters to comply with the requirements of this Consent Decree, in Gantt chart or similar format.

(c). The amount, recipient and date of any transfer or use during the previous two (2) Calendar Quarters of funds obtained by Miami-Dade from the collection of sewer rates for any purpose not related to the management, operation or maintenance of the Sewer System or to any capital improvement needs of the Sewer System that is required to be tracked and reported

-66-

pursuant to the Financial Analysis Program set forth in Subparagraph 19(j)(v) of this Consent Decree.

      (d).     Any additional information Miami-Dade determines is appropriate to demonstrate that Miami-Dade is implementing the remedial actions required under this Consent Decree in an adequate and timely manner.

      34.    <u>Annual Reports</u>.  Beginning two (2) Months after the first full Calendar Year following the Effective Date of this Consent Decree, and two (2) Months after each subsequent Calendar Year until termination of this Consent Decree, Miami-Dade shall submit to EPA and FDEP for review and comment an Annual Report.  Each Annual Report shall cover the most recent applicable Calendar Year and shall include, at a minimum:

      (a).     A narrative summary of progress made, including key accomplishments and significant activities, under the CMOM Programs implemented or modified pursuant to this Consent Decree for the most recent Calendar Year.

      (b).     A trends analysis of the number, volume, average duration, and cause of Miami-Dade's SSOs for the previous two (2) Calendar Years.

      35.    Except as otherwise provided in the SORP, whenever any violation of this Consent Decree or any other event affecting Miami-Dade's performance under this Consent Decree or its NPDES Permits may pose an immediate threat to the public health or welfare or the environment, Miami-Dade shall notify EPA and FDEP orally or by electronic or facsimile transmission as soon as possible, but no later than twenty-four (24) hours after Miami-Dade first knew of the violation or event.

36.     All reports shall be submitted to the persons designated in Section XVII of this Consent Decree (Notices) for EPA and FDEP and shall be certified pursuant to Paragraph 16 of this Consent Decree.  The certification requirement in Paragraph 16 does not apply to emergency or similar notifications where compliance would be impractical.  In addition, a copy of all reports submitted pursuant to this Section IX (Reporting Requirements) shall also be made available to the public in the PDR.

37.     Compliance with this Section does not relieve Miami-Dade of any other reporting obligations required by the CWA, Florida law, implementing regulations, or by any other Federal, state, or local law, regulation, permit, or other requirement, including the NPDES Permits.

38.     Notification to EPA or FDEP pursuant to this Section of an anticipated delay shall not by itself excuse the delay or otherwise satisfy the notification requirements set forth in Section XI (Force Majeure).

39.     Any information provided pursuant to this Consent Decree may be used by the United States, FDEP, and/or the State in any proceeding to enforce the provisions of this Consent Decree and as otherwise permitted by law.

## X.  STIPULATED PENALTIES

40.     After the Date of Entry, Miami-Dade shall be liable for stipulated penalties to the United States and FDEP for violations of this Consent Decree as specified below, unless excused under Section XI (Force Majeure).  A violation includes failing to perform any obligation required by the terms of this Consent Decree, including any work plan or schedule approved

-68-

under this Consent Decree, according to all applicable requirements of this Consent Decree and within the specified time schedules established by or approved under this Consent Decree.

41.    If Miami-Dade fails to pay the civil penalty required to be paid under Section VII of this Consent Decree (Civil Penalty) when due, Miami-Dade shall pay a stipulated penalty of $1,000 per day for each day that the payment is late.

42.    The following stipulated penalties shall accrue for each violation identified below:

(a).    SSOs.

(i).  For each SSO reaching waters of the United States due to a release of wastewater from the WCTS less than or equal to 10,000 gallons, a stipulated penalty of $500 may be assessed.

(ii).  For each SSO reaching waters of the United States due to a release of wastewater from the WCTS greater than 10,000 gallons but less than or equal to 250,000 gallons, a stipulated penalty may be assessed as follows:

| If SSO Occurs | Penalty Per SSO |
| --- | --- |
| Within 2 years of Date of Entry | $500 |
| Between 2 years and 5 years from Date of Entry | $1,000 |
| More than 5 years from Date of Entry | $2,000 |

(iii).  For each SSO reaching waters of the United States due to a release of wastewater from the WCTS greater than 250,000 gallons but less than or equal to 1,000,000 gallons, a stipulated penalty may be assessed as follows:

-69-

| If SSO Occurs | Penalty Per SSO |
|---|---|
| Within 2 years of Date of Entry | $1,000 |
| Between 2 years and 5 years from Date of Entry | $2,500 |
| More than 5 years from Date of Entry | $5,000 |

(iv).  For each SSO reaching waters of the United States due to a release of wastewater from the WCTS greater than 1,000,000 gallons, a stipulated penalty may be assessed as follows:

| If SSO Occurs | Penalty Per SSO |
|---|---|
| Within 2 years of Date of Entry | $2,000 |
| Between 2 years and 5 years from Date of Entry | $5,000 |
| More than 5 years from Date of Entry | $10,000 |

(v).  For each SSO due to a release of wastewater from the WCTS of 1,000 gallons or more that does not reach waters of the United States, a stipulated penalty may be assessed by FDEP based on the tiered volume and time thresholds provided in Subparagraphs 42(a)(i) through (iv), provided, however, that the amounts that may be assessed shall be half of the amounts listed therein.

(vi)  Miami-Dade shall not be liable for stipulated penalties under this Paragraph 42 if Miami-Dade demonstrates that the SSO was caused by an Act of God, vandalism, a non-County Contractor, or any act of a third party not working directly or indirectly on behalf of Miami-Dade, and Miami-Dade demonstrates that it has used all reasonable measures to prevent such SSO.

-70-

(b).    <u>Failure to Timely Submit Deliverable</u>.  For each day Miami-Dade fails to Timely submit any Deliverable, a stipulated penalty for each such Deliverable may be assessed as follows:

| Period of Noncompliance: | Penalty Per Deliverable Per Day: |
|---|---|
| One (1) to thirty (30) days | $1,000 |
| More than thirty (30) days | $2,000 |

(c).    <u>Failure to Meet Deadlines in Appendix D</u>.  For each day Miami-Dade fails to complete the rehabilitation projects pursuant to and in accordance with the final deadlines set forth in **bold** in <u>Appendix D</u>, daily stipulated penalties may be assessed for each missed deadline as follows:

| Period of Noncompliance: | Penalty Per Violation Per Day: |
|---|---|
| One (1) to fourteen (14) days | $500 |
| Fifteen (15) to thirty (30) days | $1,000 |
| Thirty-one (31) to sixty (60) days | $1,500 |
| Sixty-one (61) to one hundred-eighty (180) days | $2,000 |
| More than one hundred-eighty (180) days | $2,500 |

(d).    <u>Failure to Timely Implement SEP Milestones</u>.  For each day Miami-Dade fails to Timely implement a SEP milestone set forth in Section VIII (Supplemental Environmental Project) or <u>Appendix E</u>, daily stipulated penalties may be assessed as follows:

| Period of Noncompliance: | Penalty Per Violation Per Day: |
|---|---|
| 1 - 30 days | $1,000 |
| More than 30 days | $2,000 |

(e).   <u>Failure to Satisfactorily Complete SEP</u>.  After receiving the SEP Completion Report, in the event EPA notifies Miami-Dade that Miami-Dade has failed to satisfactorily complete the SEP in accordance with the terms of this Consent Decree as described in Section VIII (Supplemental Environmental Project) and <u>Appendix E</u> (including the allowable expenditures for the SEP), a stipulated penalty of $850,000 may be assessed if Miami-Dade does not cure the deficiencies identified in EPA's notice within ninety (90) Days after receiving such notice.  Notwithstanding the foregoing, if EPA determines that Miami-Dade has made good faith efforts to satisfactorily complete the SEP and has certified, with supporting documentation, that at least ninety (90) percent of the required amount of money has been spent on the SEP, Miami-Dade shall not be liable for any stipulated penalty.

43.     Stipulated penalties under this Section shall begin to accrue on the day after performance is due or on the day a violation occurs, whichever is applicable, and shall continue to accrue until performance is satisfactorily completed or until the violation ceases.  Stipulated penalties shall accrue simultaneously for separate violations of this Consent Decree.

44.     Miami-Dade shall pay stipulated penalties within thirty (30) Days of a written demand.  EPA and/or FDEP may seek stipulated penalties under this Section by both sovereigns sending a joint written demand to Miami-Dade, or by either sovereign sending a written demand to Miami-Dade, with a copy simultaneously sent to the other sovereign.  The other sovereign has twenty (20) Days from receiving the demand to elect to join in on the demand, except that EPA shall not demand or join in on a demand by FDEP for stipulated penalties that accrue pursuant to Subparagraph 42(a)(v).  Either sovereign may waive stipulated penalties or reduce the amount of stipulated penalties it demands, in the unreviewable exercise of its discretion and in accordance

-72-

with this Paragraph 44.  Where both sovereigns demand stipulated penalties for the same violation of this Consent Decree, Miami-Dade shall pay fifty percent (50%) of the total stipulated penalty amount due to the United States and fifty percent (50%) to FDEP.  Where only one sovereign demands stipulated penalties for a violation, and the other sovereign does not join in the demand within twenty (20) Days of receiving the demand, Miami-Dade shall pay the full stipulated penalties due for the violation to the sovereign making the demand.  Where both sovereigns demand stipulated penalties for a violation, but only one sovereign subsequently elects to waive or reduce stipulated penalties for that violation, Miami-Dade shall pay the full stipulated penalties due for that sovereign making the full demand less any amount paid to the other sovereign.

   45.  Stipulated penalties shall continue to accrue as provided in Paragraph 43, during any Dispute Resolution, but need not be paid until the following:

     (a).  If the dispute is resolved by agreement or by a decision of EPA and/or FDEP that is not appealed to the Court, Miami-Dade shall pay accrued penalties determined to be owing, together with interest, to the United States and/or FDEP within thirty (30) Days of the effective date of the agreement or the receipt of the decision or order.

     (b).  If the dispute is appealed to the District Court and the United States prevails in whole or in part, Miami-Dade shall pay all accrued penalties determined by the District Court to be owed, together with interest, within sixty (60) Days of receiving the Court's decision or order, except as provided in Subparagraph 45(c), below.

     (c).  If the District Court's decision is appealed, and the United States and/or FDEP prevails in whole or in part upon appeal, Miami-Dade shall pay all accrued penalties

-73-

determined to be owed, together with interest, within fifteen (15) Days of receiving the final

Appellate Court decision.

46.    Miami-Dade shall pay stipulated penalties owing to the United States in the

manner set forth and with the confirmation notices required by Paragraph 21, except that the

transmittal letter shall state that the payment is for stipulated penalties and shall state for which

violation(s) the penalties are being paid.  Miami-Dade shall pay stipulated penalties owing to

FDEP in the manner set forth in Paragraph 22.

47.    If Miami-Dade fails to pay stipulated penalties according to the terms of this

Consent Decree, Miami-Dade shall be liable for interest on such penalties, as provided for in

28 U.S.C. § 1961, accruing as of the date payment became due.  Nothing in this Paragraph shall

be construed to limit the United States or FDEP from seeking any remedy otherwise provided by

law for Miami-Dade's failure to pay any stipulated penalties.

48.    Subject to the provisions of Section XV of this Consent Decree (Effect of

Settlement/Reservation of Rights), the stipulated penalties provided for in this Consent Decree

shall be in addition to any other rights, remedies, or sanctions available to the United States and

FDEP for Miami-Dade's violation of this Consent Decree or applicable law.

49.    The United States and/or FDEP shall credit Miami-Dade for any stipulated

penalty paid to the sovereign with respect to any SSO pursuant to this Consent Decree in any

future enforcement action in which that sovereign seeks penalties for that SSO.  The United

States and/or FDEP shall also credit Miami-Dade against any stipulated penalty assessed for an

SSO pursuant to this Consent Decree by the amount of any penalty paid to that sovereign by

Miami-Dade for the SSO in any enforcement action.

50.    In exercising its discretion of whether to assess a stipulated penalty for an SSO, EPA and/or FDEP will consider the amount of any sewage recovered.

## XI.  FORCE MAJEURE

51.    "Force Majeure," for purposes of this Consent Decree, is defined as any event arising from causes beyond the control of Miami-Dade, of any entity controlled by Miami-Dade, or of Miami-Dade's consultants and contractors that delays or prevents the performance of any obligation under this Consent Decree despite Miami-Dade's best efforts to fulfill the obligation. The requirement that Miami-Dade exercise "best efforts to fulfill the obligation" includes using best efforts to anticipate any potential force majeure event and best efforts to address the effects of any such event (a) as it is occurring and (b) after it has occurred to prevent or minimize any resulting delay to the greatest extent possible.  "Force Majeure" does not include Miami-Dade's financial inability to perform any obligation under this Consent Decree.  Where any compliance obligation under this Consent Decree requires Miami-Dade to obtain a Federal, State, or local permit or approval, Miami-Dade should submit timely and complete applications and take all other actions required by law to obtain all such permits or approvals. Miami-Dade may seek relief under the provisions of this Section XI of this Consent Decree (Force Majeure) for any delay in the performance of any such obligation resulting from a failure to obtain, or a delay in obtaining, any permit or approval required to fulfill such obligation to the extent that Miami-Dade has submitted timely and complete applications and has taken all other actions required by law to obtain all such permits or approvals.

52.    If any event occurs or has occurred that may delay the performance of any obligation under this Consent Decree, whether or not caused by a Force Majeure event, Miami-

Dade shall provide notice orally or by electronic or facsimile transmission to EPA and FDEP as set forth in Section XVII (Notices), within seventy-two (72) hours of when Miami-Dade first knew that the event might cause a delay.  Within fourteen (14) Days thereafter, Miami-Dade shall provide in writing to EPA and FDEP an explanation and description of the reasons for the delay; the anticipated duration of the delay; all actions taken or to be taken to prevent or minimize the delay; a schedule for implementation of any measures to be taken to prevent or mitigate the delay or the effect of the delay; Miami-Dade's rationale for attributing such delay to a force majeure event if it intends to assert such a claim; and a statement as to whether, in the opinion of Miami-Dade, such event may cause or contribute to an endangerment to public health, welfare or the environment.  Miami-Dade shall include with any notice all available documentation supporting the claim that the delay was attributable to a force majeure event.  Failure to comply with the above requirements shall preclude Miami-Dade from asserting any claim of Force Majeure for that event for the period of time of such failure to comply, and for any additional delay caused by such failure.  Miami-Dade shall be deemed to know of any circumstance of which Miami-Dade, any entity controlled by Miami-Dade, or Miami-Dade's contractors knew or should have known.

53.     If EPA, after a reasonable opportunity for review and comment by FDEP, agrees that the delay or anticipated delay is attributable to a Force Majeure event, the time for performance of the obligations under this Consent Decree that are affected by the Force Majeure event will be extended by EPA, after a reasonable opportunity for review and comment by FDEP, for such time as is necessary to complete those obligations.  An extension of the time for performance of the obligations affected by the force majeure event shall not, of itself, extend the

-76-

time for performance of any other obligation.  EPA will notify Miami-Dade in writing of the

length of the extension, if any, for performance of the obligations affected by the Force Majeure

event.

54.    If EPA, after a reasonable opportunity for review and comment by FDEP, does

not agree that the delay or anticipated delay has been or will be caused by a Force Majeure

event, EPA will notify Miami-Dade in writing of its decision.

55.    If Miami-Dade elects to invoke the dispute resolution procedures set forth in

Section XII (Dispute Resolution), it shall do so no later than fifteen (15) Days after receipt of

EPA's notice.  In any such proceeding, Miami-Dade shall have the burden of demonstrating by a

preponderance of the evidence that the delay or anticipated delay has been or will be caused by a

Force Majeure event, that the duration of the delay or the extension sought was or will be

warranted under the circumstances, that best efforts were exercised to avoid and mitigate the

effects of the delay, and that Miami-Dade complied with the requirements of Paragraphs 51 and

52 above.  If Miami-Dade carries this burden, the delay at issue shall be deemed not to be a

violation by Miami-Dade of the affected obligation of this Consent Decree identified to EPA and

the Court.

## XII.  DISPUTE RESOLUTION

56.    Unless otherwise expressly provided for in this Consent Decree, the dispute

resolution procedures of this Section shall be the exclusive mechanism to resolve disputes

arising under or with respect to this Consent Decree.  Miami-Dade's failure to seek resolution of

a dispute under this Section shall preclude Miami-Dade from raising any such issue as a defense

to an action by the United States or FDEP to enforce any obligation of Miami-Dade arising under this Consent Decree.

57.    <u>Informal Dispute Resolution</u>.  Any dispute subject to Dispute Resolution under this Consent Decree shall first be the subject of informal negotiations.  The dispute shall be considered to have arisen when Miami-Dade sends the United States a written Notice of Dispute.  Such Notice of Dispute shall state clearly the matter in dispute.  The period of informal negotiations shall not exceed twenty (20) Days from the date the dispute arises, unless that period is modified by written agreement between the United States and Miami-Dade.  The United States shall consult with FDEP during the period of informal negotiations.  If the United States and Miami-Dade cannot resolve a dispute by informal negotiations, then the position advanced by the United States shall be considered binding unless, within forty-five (45) Days after the conclusion of the informal negotiation period, Miami-Dade invokes formal dispute resolution procedures as set forth below.

58.    <u>Formal Dispute Resolution</u>.  Miami-Dade shall invoke formal dispute resolution procedures, within the time period provided in the preceding Paragraph, by serving on the United States and FDEP a written Statement of Position regarding the matter in dispute.  The Statement of Position shall include, but need not be limited to, any factual data, analysis, or opinion supporting Miami-Dade's position and any supporting documentation relied upon by Miami-Dade.  The United States shall serve its Statement of Position within one hundred (100) Days of receipt of Miami-Dade's Statement of Position.  The United States' Statement of Position shall include, but need not be limited to, any factual data, analysis, or opinion supporting that position and any supporting documentation relied upon by the United States.  The United States shall

-78-

consult with FDEP during preparation of its Statement of Position. The United States' Statement of Position shall be binding on Miami-Dade, unless Miami-Dade files a motion for judicial review of the dispute in accordance with the following Paragraph.

59. <u>Judicial Dispute Resolution</u>. Miami-Dade may seek judicial review of the dispute by filing with the Court and serving on the United States and FDEP, in accordance with Section XVII of this Consent Decree (Notices), a motion requesting judicial resolution of the dispute. The motion must be filed within thirty (30) Days of receipt of the United States' Statement of Position pursuant to the preceding Paragraph. The motion shall contain a written statement of Miami-Dade's position on the matter in dispute, including any supporting factual data, analysis, opinion, or documentation, and shall set forth the relief requested and any schedule within which the dispute must be resolved for orderly implementation of the Consent Decree. The United States shall respond to Miami-Dade's motion within the time period allowed by the Local Rules of this Court. The United States shall consult with FDEP during preparation of its response. Miami-Dade may file a reply memorandum, to the extent permitted by the Local Rules.

60. <u>Standard of Review</u>.

(a). <u>Disputes Concerning Matters Accorded Record Review</u>. Except as otherwise provided in this Consent Decree, in any dispute brought under Paragraphs 58 and 59 pertaining to the adequacy or appropriateness of plans, procedures to implement plans, schedules or any other items requiring approval by EPA under this Consent Decree; the adequacy of the performance of work undertaken pursuant to this Consent Decree; and all other disputes that are accorded review on the administrative record under applicable principles of administrative law,

-79-

Miami-Dade shall have the burden of demonstrating, based on the administrative record, that the position of the United States is arbitrary and capricious or otherwise not in accordance with law.

(b).    Other Disputes.  Except as otherwise provided in this Consent Decree, in any other dispute brought under Paragraphs 58 and 59, Miami-Dade shall bear the burden of demonstrating that its position complies with this Consent Decree and furthers the objectives of the Consent Decree.

61.    The invocation of dispute resolution procedures under this Section shall not, by itself, extend, postpone, or affect in any way any obligation of Miami-Dade under this Consent Decree, unless and until final resolution of the dispute so provides.  Stipulated penalties with respect to the disputed matter shall continue to accrue from the first day of noncompliance, but payment shall be stayed pending resolution of the dispute as provided in Paragraph 45.  If Miami-Dade does not prevail on the disputed issue, stipulated penalties shall be assessed and paid as provided in Section X (Stipulated Penalties).

## XIII.  RIGHT OF ENTRY AND INFORMATION COLLECTION AND RETENTION

62.    The United States, FDEP, and their representatives, including attorneys, contractors, and consultants, shall have the right of entry into any facility covered by this Consent Decree, at all reasonable times, upon presentation of credentials, to:

(a).    Monitor the progress of activities required under this Consent Decree.

(b).    Verify any data or information submitted to the United States or FDEP in accordance with the terms of this Consent Decree.

(c).    Obtain samples and, upon request, splits of any samples taken by Miami-Dade or its representatives, contractors, or consultants.

-80-

(d).   Obtain documentary evidence, including photographs and similar data.

(e).   Assess Miami-Dade's compliance with this Consent Decree.

63.   Upon request, Miami-Dade shall provide EPA and FDEP or their authorized representatives splits of any samples taken by Miami-Dade.  Upon request, EPA and FDEP shall provide Miami-Dade splits of any samples taken by EPA or FDEP.

64.   Until five (5) years after the termination of this Consent Decree, Miami-Dade shall retain, and shall instruct its contractors and agents to preserve, all non-identical copies of all documents, records, or other information (including documents, records, or other information in electronic form) in its or its contractors' or agents' possession or control, or that come into its or its contractors' or agents' possession or control, and that relate in any manner to Miami-Dade's performance of its obligations under this Consent Decree.  This information-retention requirement shall apply regardless of any contrary corporate or institutional policies or procedures.  At any time during this information-retention period, upon request by the United States or FDEP, Miami-Dade shall provide copies of any documents, records, or other information required to be maintained under this Paragraph.

65.   At the conclusion of the information-retention period provided in the preceding Paragraph, Miami-Dade shall notify the United States and FDEP at least ninety (90) Days prior to the destruction of any documents, records, or other information subject to the requirements of the preceding Paragraph and, upon request by the United States or FDEP, Miami-Dade shall deliver any such documents, records, or other information to the United States or FDEP.  Miami-Dade may assert that certain documents, records, or other information are privileged under the

-81-

attorney-client privilege or any other privilege recognized by federal law.  If Miami-Dade asserts

such a privilege, it shall provide the following:

      (a).     The title of the document, record, or information.

      (b).     The date of the document, record, or information.

      (c).     The name and title of each author of the document, record, or information.

      (d).     The name and title of each addressee and recipient.

      (e).     A description of the subject of the document, record, or information.

      (f).     The privilege asserted by Miami-Dade.

However, no documents, records, or other information created or generated pursuant to the

requirements of this Consent Decree shall be withheld on grounds of privilege.

66.     Miami-Dade may also assert that information required to be provided under this

Section is protected as Confidential Business Information ("CBI") under 40 C.F.R. Part 2.  As to

any information that Miami-Dade seeks to protect as CBI, Miami-Dade shall follow the

procedures set forth in 40 C.F.R. Part 2.

67.     This Consent Decree in no way limits or affects any right of entry and inspection,

or any right to obtain information, held by the United States or FDEP pursuant to applicable

federal or state laws, regulations, or permits, nor does it limit or affect any duty or obligation of

Miami-Dade to maintain documents, records, or other information imposed by applicable federal

or state laws, regulations, or permits.

## XIV. <u>NOT A PERMIT/COMPLIANCE WITH OTHER STATUTES/REGULATIONS</u>

68.     This Consent Decree is not a permit, or a modification of any permit, under any

federal, State, or local laws or regulations. Nor shall this Consent Decree in any way relieve

Miami-Dade of its obligation to obtain NPDES and/or Florida permits for its North, Central and South District WWTPs or any other part of its WCTS or facilities. Miami-Dade is responsible for achieving and maintaining complete compliance with all applicable federal, State, and local laws, regulations, and permits including, without limitation, the NPDES and/or Florida Permits for its North, Central and South District WWTPs or any other part of its WCTS facilities; and Miami-Dade's compliance with this Consent Decree shall be no defense to any action commenced pursuant to any such laws, regulations, or permits, except as set forth herein. The United States and FDEP do not, by their consent to the entry of this Consent Decree, warrant or aver in any manner that Miami-Dade's compliance with any aspect of this Consent Decree will result in compliance with provisions of the CWA, Florida law, or with any other provisions of federal, State, or local laws, regulations, or permits.

## XV.   EFFECT OF SETTLEMENT/RESERVATION OF RIGHTS

69.     This Consent Decree resolves the civil claims of the United States, the State and FDEP for the violations alleged in the Complaint filed in this action through the Date of Lodging of this Consent Decree.

70.     The United States, the State and FDEP reserve all legal and equitable remedies available to enforce the provisions of this Consent Decree, except as expressly stated in Paragraph 69. This Consent Decree shall not be construed to limit the rights of the United States, the State or FDEP to obtain penalties or injunctive relief under the CWA, Florida law, implementing regulations, or under other federal or state laws, regulations, or permit conditions, except as expressly specified in Paragraph 69. The United States and FDEP further reserve all legal and equitable remedies to address any imminent and substantial endangerment to the public

-83-

health or welfare or the environment arising at, or posed by, Miami-Dade's Sewer System, whether related to the violations addressed in this Consent Decree or otherwise.

71.     In any subsequent administrative or judicial proceeding initiated by the United States or FDEP for injunctive relief, civil penalties, other appropriate relief relating to the Sewer System or Miami-Dade's violations of the CWA, Florida law, or with any other provisions of federal, State, or local laws, regulations or permits, Miami-Dade shall not assert, and may not maintain, any defense or claim based upon the principles of waiver, res judicata, collateral estoppel, issue preclusion, claim preclusion, claim-splitting, or other defenses, where the defense or claim is based upon any contention that the claims raised by the United States or FDEP in the subsequent proceeding were or should have been brought in the instant case, except with respect to claims that have been specifically resolved pursuant to Paragraph 69 of this Section.

72.     This Consent Decree does not limit or affect the rights of Miami-Dade or of the United States, the State, or FDEP against any third parties, not party to this Consent Decree, nor does it limit the rights of third parties, not party to this Consent Decree, against Miami-Dade, except as otherwise provided by law.

73.     This Consent Decree shall not be construed to create rights in, or grant any cause of action to, any third party not party to this Consent Decree.

74.     Nothing in this Consent Decree limits the rights or defenses available under Section 309(e) of the Clean Water Act, 33 U.S.C. § 1319(e), in the event that the laws of the State, as currently or hereafter enacted, may prevent Miami-Dade from raising revenues needed to comply with this Consent Decree.

-84-

## XVI.  COSTS

75.     Except as otherwise provided in Paragraph 76 below, the Parties shall bear their own costs of this action, including attorneys' fees, except that the United States and FDEP shall be entitled to collect the costs (including attorneys' fees) incurred in any action necessary to collect any portion of the civil penalty or any stipulated penalties due but not paid by Miami-Dade.

76.     Miami-Dade is currently providing funding to FDEP at the rate of $55,000 per year to monitor Miami-Dade's compliance with the terms of FDEP Consent Order OGC No.03-1376(A) (hereinafter "FDEP CO").  When Miami-Dade's obligation to fund the FDEP CO ceases, Miami-Dade shall provide funding to FDEP to monitor Miami-Dade's compliance with the terms of this Consent Decree at the rate of $55,000 per year until this Consent Decree is terminated.  However, in no event shall Miami-Dade be obligated to pay more than $55,000 for any one (1) year period under the terms of either this Consent Decree or the FDEP CO.  Within thirty (30) Days of termination of this Consent Decree, FDEP shall return to Miami-Dade any unused funds.

## XVII.  NOTICES

77.     Unless otherwise specified herein, whenever notifications, submissions, or communications are required by this Consent Decree, they shall be made in writing (electronically delivery-receipt requested or by mail return-receipt requested) and addressed as follows:

<u>To the United States</u>:

Chief, Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Ben Franklin Station
Washington, D.C.  20044-7611
Re: DOJ No. 90-5-1-1-4022

Rachael Amy Kamons
Environmental Enforcement Section
U.S. Department of Justice
P.O. Box 7611
Ben Franklin Station
Washington, D.C. 20044-7611

and

Chief, Clean Water Enforcement Branch
Water Protection Division
ATTN:  Brad Ammons
U.S Environmental Protection Agency, Region 4
61 Forsyth Street, S.W.
Atlanta, GA  30303
(404) 562-9769
ammons.brad@epa.gov

<u>To EPA</u>:

Chief, Clean Water Enforcement Branch
Water Protection Division
ATTN:  Brad Ammons
U.S Environmental Protection Agency, Region 4
61 Forsyth Street, S.W.
Atlanta, GA  30303
(404) 562-9769
ammons.brad@epa.gov

-86-

To the State:

Jonathan A. Glogau
Special Counsel
Chief, Complex Litigation
Office of the Attorney General
PL-01, The Capitol
Tallahassee, FL  32399-1050
850-414-3817
jon.glogau@myfloridalegal.com

Florida Department of Environmental Protection
Southeast District – Suite 200
400 N. Congress Ave.
West Palm Beach, FL 33401
Attn: Compliance/Enforcement Section

To FDEP:

Florida Department of Environmental Protection
Southeast District – Suite 200
400 N. Congress Ave.
West Palm Beach, FL 33401
Attn: Compliance/Enforcement Section

To Miami-Dade:

County Mayor
111 NW First Street 29th Floor
Miami, Florida 33128

Director
Miami-Dade Water and Sewer Department
3071 SW 38th Avenue
Miami, Florida 33146

County Attorney
111 NW First Street Suite 2810
Miami, Florida 33128

      78.    Any Party may, by written notice to the other Parties, change its designated notice

recipient or notice address provided above.

-87-

79.     Notices submitted pursuant to this Section shall be deemed submitted upon mailing, or if submitted electronically upon delivery-receipt, unless otherwise provided in this Consent Decree or by mutual agreement of the Parties in writing.

## XVIII.  DATE OF ENTRY

80.     The Date of Entry of this Consent Decree shall be the date upon which this Consent Decree is entered by the Court or a motion to enter the Consent Decree is granted, whichever occurs first, as recorded on the Court's docket.  Upon the Date of Entry of this Consent Decree, the First Partial Consent Decree and the Second and Final Partial Consent Decree shall be terminated.

## XIX.  RETENTION OF JURISDICTION

81.     The Court shall retain jurisdiction over this case until termination of this Consent Decree, for the purpose of resolving disputes arising under this Consent Decree or entering orders modifying this Consent Decree, pursuant to Sections XII (Dispute Resolution) and XX (Modification), or effectuating or enforcing compliance with the terms of this Consent Decree.

## XX.  MODIFICATION

82.     The terms of this Consent Decree, including any attached appendices, may be modified only by a subsequent written agreement signed by the United States, FDEP, and Miami-Dade.  Where the modification constitutes a material change to this Consent Decree, it shall be effective only upon approval by the Court.  Non-material changes to this Consent Decree (including appendices) may be made by written agreement of the United States, FDEP, and Miami-Dade without Court approval, and such parties may by mutual agreement determine whether a modification is non-material.

-88-

83.     Any disputes between the United States, FDEP, and Miami-Dade concerning modification of this Consent Decree shall be resolved pursuant to Section XII of this Consent Decree (Dispute Resolution), provided, however, that, instead of the burden of proof provided by Paragraph 60, the party seeking the modification bears the burden of demonstrating that it is entitled to the requested modification in accordance with Federal Rule of Civil Procedure 60(b).

## XXI. <u>TERMINATION</u>

84.     This Consent Decree may be terminated when the United States determines that Miami-Dade has satisfactorily completed performance of its compliance (Section VI) and SEP (Section VIII) obligations required by this Consent Decree, provided that Miami-Dade has fulfilled all other obligations of this Consent Decree, including payment of the civil penalty under Section VII of this Consent Decree and any accrued stipulated penalties as required by Section X of this Consent Decree not waived or reduced by the United States.  Miami-Dade may serve upon the United States a Request for Termination, certifying that Miami-Dade has satisfied those requirements, together with all necessary supporting documentation.

85.     Following receipt by the United States of Miami-Dade's Request for Termination, the United States and Miami-Dade shall confer informally concerning the Request and any disagreement that they may have as to whether Miami-Dade has satisfactorily complied with the requirements for termination of this Consent Decree.  If the United States, after consultation with FDEP, agrees that this Consent Decree may be terminated, the United States and Miami-Dade shall submit, for the Court's approval, a joint stipulation terminating the Consent Decree.

86.     If the United States, after consultation with FDEP, does not agree that this Consent Decree may be terminated, Miami-Dade may invoke Dispute Resolution under Section

XII of this Consent Decree.  However, Miami-Dade shall not seek Dispute Resolution of any dispute regarding termination, under Paragraph 58 of Section XII (Dispute Resolution), until one hundred-twenty (120) Days after service of its Request for Termination.

## XXII.  **PUBLIC PARTICIPATION**

87.      This Consent Decree shall be lodged with the Court for a period of not less than thirty (30) Days for public notice and comment in accordance with 28 C.F.R. § 50.7.  The United States, the State and FDEP each reserve the right to withdraw or withhold its consent if the comments regarding the Consent Decree disclose facts or considerations indicating that the Consent Decree is inappropriate, improper, or inadequate.  Miami-Dade consents to entry of this Consent Decree without further notice and agrees not to withdraw from or oppose entry of this Consent Decree by the Court or to challenge any provision of the Consent Decree, unless the United States, the State or FDEP has notified the Parties in writing that it no longer supports entry of the Consent Decree.

## XXIII.  **SIGNATORIES/SERVICE**

88.      Each undersigned representative of Miami-Dade, the United States, the State, and FDEP certifies that he or she is fully authorized to enter into the terms and conditions of this Consent Decree and to execute and legally bind the Party he or she represents to this document.

89.      This Consent Decree may be signed in counterparts, and its validity shall not be challenged on that basis.  Miami-Dade agrees to accept service of process by mail and/or e-mail with respect to all matters arising under or relating to this Consent Decree and to waive the formal service requirements set forth in Rules 4 and 5 of the Federal Rules of Civil Procedure and any applicable Local Rules of this Court including, but not limited to, service of a summons.

## XXIV.  <u>INTEGRATION</u>

90.    This Consent Decree constitutes the final, complete, and exclusive agreement and understanding among the Parties with respect to the settlement embodied in this Consent Decree and supersedes all prior agreements and understandings, whether oral or written, concerning the settlement embodied herein.  Prior drafts of this Consent Decree shall not be used in any action involving the interpretation or enforcement of this Consent Decree.  Other than Deliverables that are subsequently submitted and approved pursuant to this Consent Decree, no other document, nor any representation, inducement, agreement, understanding, or promise, constitutes any part of this Consent Decree or the settlement it represents, nor shall it be used in construing the terms of this Consent Decree.

## XXV.  <u>FINAL JUDGMENT</u>

91.    Upon approval and entry of this Consent Decree by the Court, this Consent Decree shall constitute a final judgment of the Court as to the United States, the State, FDEP, and Miami-Dade.  The Court finds that there is no just reason for delay and therefore enters this judgment as a final judgment under Fed. R. Civ. P. 54 and 58.

## XXVI.  <u>APPENDICES</u>

92.    The following appendices are attached to and part of this Consent Decree:

"Appendix A" is the Adequate Treatment and Transmission Capacity Criteria;

"Appendix B" is the Volume Sewer Customer Ordinance Program Implementation;

"Appendix C" is the US EPA Region IV CMOM guidance;

"Appendix D" is the Work Plan for Specific Capital Improvement Projects; and

-91-

"Appendix E" is the description of the Supplemental Environmental Project.

Dated and entered this 16th day of April, 2014

_____
UNITED STATES DISTRICT JUDGE
Southern District of Florida

-92-

WE HEREBY CONSENT to the entry of this Consent Decree, subject to the public notice and comment provisions of 28 C.F.R. § 50.7:

**FOR PLAINTIFF UNITED STATES OF AMERICA**:


IGNACIA S. MORENO
Assistant Attorney General
U.S. Department of Justice
Environment and Natural Resources Division


RACHAEL AMY KAMONS
Trial Attorney
U.S. Department of Justice
Environment and Natural Resources Division
Environmental Enforcement Section
P.O. Box 7611
Ben Franklin Station
Washington, D.C. 20044-7611
Telephone: 202-514-5260
Facsimile: 202-616-2427
rachael.kamons@usdoj.gov


WIFREDO A. FERRER
United States Attorney
Southern District of Florida


-93-

WE HEREBY CONSENT to the entry of this Consent Decree, subject to the public notice and comment provisions of 28 C.F.R. § 50.7:

**FOR PLAINTIFF UNITED STATES OF AMERICA (Continued):**


V. ANNE HEARD
Acting Regional Counsel
United States Environmental Protection Agency
Region 4


WILLIAM B. BUSH, JR.
Associate Regional Counsel
United States Environmental Protection Agency
Region 4
61 Forsyth Street
Atlanta, GA 30303
Telephone: 404-562-9538
Facsimile: 404-562-9486
bush.william@epa.gov

-94-

WE HEREBY CONSENT to the entry of this Consent Decree, subject to the public notice and comment provisions of 28 C.F.R. § 50.7:

**FOR PLAINTIFF UNITED STATES OF AMERICA (Continued):**

6/5/13

CYNTHIA GILES
Assistant Administrator
Office of Enforcement and Compliance Assurance
United States Environmental Protection Agency

SUSAN SHINKMAN
Office Director
Office of Civil Enforcement
Office of Enforcement and Compliance Assurance
United States Environmental Protection Agency

May 22, 2013

MARK POLLINS
Division Director
Water Enforcement Division
Office of Civil Enforcement
Office of Enforcement and Compliance Assurance
United States Environmental Protection Agency

6/5/13.

ALAN MORRISSEY
Senior Attorney
Water Enforcement Division
Office of Civil Enforcement
Office of Enforcement and Compliance Assurance
United States Environmental Protection Agency
1200 Pennsylvania Ave., NW (2243A)
Washington, DC 20460
Telephone: 202-564-4026
Facsimile: 202-564-0024
morrissey.alan@epa.gov

-95-

**FOR PLAINTIFF STATE OF FLORIDA DEPARTMENT OF ENVIRONMENTAL PROTECTION:**


JEFF LITTLEJOHN, P.E.
Deputy Secretary for Regulatory Programs
Florida Department of Environmental Protection
Douglas Building
3900 Commonwealth Blvd
Tallahassee, Florida 32399-3000
Telephone: 850-245-2037
Facsimile: 850-245-2147

-96-

**FOR PLAINTIFF STATE OF FLORIDA**:

PAMELA JO BONDI
Attorney General

JONATHAN A. GLOGAU
Florida Bar Number 371823
Special Counsel
Chief, Complex Litigation
Office of the Attorney General
PL-01, The Capitol
Tallahassee, FL 32399-1050
Telephone:  850-414-3300, ext. 4817
Facsimile:  850-414-9650
jon.glogau@myfloridalegal.com

-97-

**FOR DEFENDANT MIAMI-DADE COUNTY, a political subdivision of the State of Florida:**


THE HONORABLE CARLOS A. GIMENEZ
Mayor
Miami-Dade County


R.A. CUEVAS, JR.
Miami-Dade County Attorney


HENRY N. GILLMAN
Florida Bar Number 793647
Assistant County Attorney
111 NW 1st Street Suite 2810
Miami, Florida 33128
Telephone: 305-375-2149
Facsimile: 305-375-5611
hgill@miamidade.gov

-98-